

FILED by _____ D.C.
DKT8

SEP 17 2007

CLARENCE MA _ OX
CLERK U.S. DIS . CT.
S.D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT PIERCE DIVISION

WILLIAM KORNFELD, Individually And
On Behalf of All Others Similarly Situated,

        Plaintiff,

vs.

OPTEUM INC., ROBERT E. CAULEY,
PETER R. NORDEN, JEFFREY J. ZIMMER,
MARTIN J. LEVINE, KEVIN L. BESPOLKA,
MAUREEN A. HENDRICKS, W.
CHRISTOPHER MORTENSON, BUFORD H.
ORTALE, FLAGSTONE SECURITIES, LLC,
and BB&T CAPITAL MARKETS,

        Defendants.

# 07-14278

CIVIL ACTION NO. _____

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS**

## CIV-GRAHAM

**JURY TRIAL DEMANDED**

MAGISTRATE JUDGE
LYNCH

## INTRODUCTION

1.      This is a federal class action on behalf of purchasers of the common stock of Opteum Inc. ("Opteum" or the "Company") in connection with, or traceable to, the Company's September 2004 Initial Public Offering (the "IPO") and/or the December 2004 Secondary Offering (the "Secondary Offering" or together with the IPO, the "Offerings"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"), and including those who purchased shares of the Company in the open market between November 3, 2005 and May 10, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, in connection with the IPO Defendants published a materially false and misleading Registration Statement and Proxy-Prospectus in connection with each of the Offerings and, thereafter during the Class Period, Defendants published a series of materially false and misleading statements that the individual Defendants

knew and/or recklessly disregarded were materially false and misleading when published, and that omitted to reveal material information necessary to make Defendants' statements, in light of such material omissions, not materially false and misleading.

### JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§11, 12(a)(2) and 15 of the Securities Act, §§77k and 77o, and rules promulgated thereunder by the Securities and Exchange Commission (the "SEC") [15 U.S.C. §§78j(b)].

3.      Certain of the claims asserted herein also arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa] and by §22 of the Securities Act.

5.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), and also by §22 of the Securities Act. Opteum maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

6.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

7.      Plaintiff William Kornfeld, as set forth in the accompanying certification, incorporated herein by reference, purchased the common stock of Opteum at artificially inflated prices during the Class Period and has been damaged thereby.

**Corporate Defendant**

8.      Defendant **OPTEUM INC.** is a Maryland corporation with its principal place of business located at 3305 Flamingo Drive, Vero Beach, Florida 32963. The Company was founded in 2003, as Bimini Mortgage Management, Inc. and changed its name to Opteum, Inc. on or about February 10, 2006, following the completion of the November 3, 2005 acquisition of Opteum Financial Services, LLC ("OFS"). The Company operates as a real estate investment trust ("REIT"), and has traditionally invested in residential mortgage-related securities ("MBS") issued by the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, and the Government National Mortgage Association.[1] Following the acquisition of OFS, the Company also became significantly engaged in the origination and purchase of residential mortgage loans, including "Alternate-A" loans and other non-government backed *subprime* mortgage loans.

**Individual Defendants**

9.      Defendant **ROBERT E. CAULEY** ("Cauley") is, and during the Class Period was, Vice-Chairman of the Board of Directors, Senior Executive Vice President, and Chief Investment Officer of the Company. Defendant Cauley founded the Company and, following the

---

[1]  Opteum qualifies as a REIT for federal income tax purposes and is generally exempt from federal corporate income taxes if it distributes at least 90% of its taxable income to stockholders.

3

acquisition of OFS, served and continues to serve as Senior Executive Vice President and Co-Head of OFS Capital Markets. Defendant Cauley signed and certified the Company's SEC filings, including but not limited to Opteum's 2005 and 2006 Forms 10-K and its Forms 10-Q for interim periods, as well as the Registration Statement and Proxy-Prospectus filed in connection with the IPO and Secondary Offerings. Following the acquisition of OFS, Defendant Cauley obtained a 45% salary increase (2006 vs. 2005), and he also received bonuses of $450,000 and $400,000, in 2005 and 2006, and stock awards of 672,000 shares and 1.06 million shares, respectively.

10.    Defendant **PETER R. NORDEN** ("Norden") was, during the Class Period, a member of the Board of Directors and Senior Executive Vice President of the Company. Defendant Norden was also President and CEO of OFS since 1999 and, following the acquisition of OFS by the Company, has served as Co-Head of Capital Markets. In conjunction with the sale of the Retail Mortgage Origination Business on July 2, 2007, Defendant Norden resigned his positions with the Company effective June 29, 2007. During the Class Period, Defendant Norden signed Opteum's SEC filings, including but not limited to its 2005 and 2006 Form 10-K. Following the acquisition of OFS, Defendant Narden obtained a massive 500% + salary increase ($118,000 in 2005 vs. $750,000 in 2006), and also received bonuses of $750,000 in 2006.

11.    Defendant **JEFFREY J. ZIMMER** ("Zimmer") is, and during the Class Period was, Chairman of the Board of Directors and Chief Executive Officer of the Company. Prior to joining the Company, Defendant Zimmer was employed at Drexel Burnham Lambert in the institutional mortgage-backed sales area from 1984 until 1990. Defendant Zimmer signed and certified the Company's SEC filings, including but not limited to Opteum's 2005 and 2006 Forms 10-K and its Forms 10-Q for interim periods as well as the Registration Statement and

4

Proxy-Prospectus filed in connection with the IPO and Secondary Offerings. Following the acquisition of OFS, Defendant Zimmer also obtained a 25% salary increase (2006 vs. 2005), and he bonuses of $685, 000 and $500,000, in 2005 and 2006, as well as stock awards of 1 million and 1.6 million shares, respectively.

12. Defendant **MARTIN J. LEVINE** ("Levine") was, during the Class Period, Executive Vice President and Chief Operations Officer of OFS. Defendant Levine Co-Founded OFS in 1999, and served as a senior executive officer of OFS from its inception until his unscheduled retirement from the Company on or about March 31, 2007. Levine aided in the preparation and review of the Company's SEC filings, including but not limited to Opteum's 2005 and 2006 Forms 10-K, as well as the Registration Statement and Proxy-Prospectus filed in connection with the IPO and Secondary Offerings.

13. Defendant **KEVIN L. BESPOLKA** ("Bespolka") was, during the Class Period, a member of the Board of Directors of the Company as well as a member of the Audit, Governance, and Compensation Committee(s) of the Board. Defendant Bespolka signed the Company's SEC filings, including but not limited to Opteum's 2005 and 2006 Forms 10-K, as well as the Registration Statement and Proxy-Prospectus filed in connection with the IPO and Secondary Offerings.

14. Defendant **MAUREEN A. HENDRICKS** ("Hendricks") was, during the Class Period, a member of the Board of Directors of the Company as well as a member of the Audit and Compensation Committee(s) of the Board. Defendant Hendricks signed the Company's SEC filings, including but not limited to Opteum's 2005 and 2006 Forms 10-K, as well as the Registration Statement and Proxy-Prospectus filed in connection with the IPO and Secondary Offerings.

15.     Defendant **W. CHRISTOPHER MORTENSON** ("Mortenson") was, during the Class Period, a member of the Board of Directors of the Company.  Defendant Mortenson signed the Company's SEC filings, including but not limited to Opteum's 2005 and 2006 Forms 10-K, as well as the Registration Statement and Proxy-Prospectus filed in connection with the IPO and Secondary Offerings.

16.     Defendant **BUFORD H. ORTALE** ("Ortale") was, during the Class Period, a member of the Board of Directors of the Company as well as a member of the Audit and Governance Committee(s) of the Board.  Defendant Ortale signed the Company's SEC filings, including but not limited to Opteum's 2005 and 2006 Forms 10-K, as well as the Registration Statement and Proxy-Prospectus filed in connection with the IPO and Secondary Offerings.

**IPO Underwriter Defendants**

17.     In connection with the Initial Public Offering and the Secondary Offering Defendant **FLAGSTONE SECURITIES, LLC** ("Flagstone") and Defendant **BB&T CAPITAL MARKETS** ("BB&T Capital") acted as "Lead Underwriters" of *both* Offerings, organizing the distribution of at least 10.35 million shares of Company stock to investors and initiating the first public market for Company shares. In connection with the IPO and the Secondary Offering the Underwriter Defendants distributed those shares, not including the exercise of over-subscription options, as follows:

| IPO Underwriters | # Shares |
|---|---|
| Flagstone Securities, LLC | 3,590,000 |
| BB&T Capital Markets, A division of Scott & Stringfellow, Inc. | 1,000,000 |
| FIG Partners, LLC | 210,000 |
| Capital West Securities, Inc. | 200,000 |
| **Total** | 5,000,000 |

[* Oversubscription Option of 750,000 shares ]

| Secondary Offering Underwriters | # Shares |
|---|---|
| Flagstone Securities, LLC | 2,888,000 |
| BB&T Capital Markets, A division of Scott & Stringfellow, Inc. | 722,000 |
| FIG Partners, LLC | 200,000 |
| Capital West Securities, Inc. | 190,000 |
| **Total** | 4,000,000 |
| [* Oversubscription Option of 600,000 shares ] | |

18.    In connection with the Initial Public Offering and the Secondary Offering the Underwriter Defendants were paid over $10.114 million in fees, paid indirectly by purchasers of the Company's shares. The Underwriter Defendants were paid as much as $1.0150 per share in connection with the sale of these common shares, including shares sold pursuant to the exercise of the Underwriter's over-subscription option, as follows:

| IPO UNDERWRITING FEES | No Exercise | Full Exercise |
|---|---|---|
| Per share | $        1.0150 | $        1.0150 |
| **Total** | $     5,075,000 | $     **5,836,250** |

| SECONDARY OFFERING UNDERWRITING FEES | No Exercise | Full Exercise |
|---|---|---|
| Per share | $        0.93 | $        0.93 |
| **Total** | $     3,720,000 | $     **4,278,000** |

## GROSS FEES PAID ALL UNDERWRITERS = $10,114,250.00

19.    Shareholders paid over $10.114 million in combined fees – the substantial majority of which was paid to Underwriter Defendants – to compensate the Underwriters for conducting purported significant due diligence investigations into the Company in connection with each of the stock Offerings. The Underwriter Defendants' due diligence investigation was a critical component of the IPO and Secondary Offerings, and it was supposed to provide investors with important safeguards and protections.

7

20.     The due diligence investigations that were required by the Underwriter Defendants included a detailed investigation into the Company, its operations, risk-management controls and procedures, and other assumptions that extended well beyond a mere casual review of the Company and its operational and financial controls. The failure of the Underwriter Defendants to conduct an adequate due diligence investigation prior to each of the Offerings was a substantial contributing factor leading to the harm complained of herein.

21.     In addition to the foregoing, because of the Underwriter Defendants' and Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about the Company's business, operations, products, operational trends, financial statements, markets, and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets, and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith.

22.     In addition to the Underwriting Defendants, it is also appropriate to treat the Individuals named as Defendants herein as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its

8

business, operations, products, growth, financial statements, and financial condition, as alleged herein. Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

23. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions made in connection with the issuance of IPO and Secondary Offering shares violated these specific requirements and obligations.

24. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

25.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Opteum in connection with, or traceable to, the Company's Initial Public Offering and/or Secondary Offering, and including those who purchased shares of the Company in the open market between **November 3, 2005 and May 10, 2007,** inclusive (the "Class") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

26.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Opteum common shares were actively traded on the NYSE. As of December 18, 2006, the Company had over 24.513 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Opteum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Opteum; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background to the Class Period

31.     The Company was formed in September 2003, with the purpose and intent of investing primarily in residential mortgage-related securities issued by the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Government National Mortgage Association ("Ginnie Mae"). The Company earned returns on the "spread" (or the difference) between the yield on assets and costs, primarily the interest expense on borrowed funds. From its inception, the Company intended to expand

11

revenues by borrowing between 8 and 12 times the amount of equity capitals and to invest this all in government backed, high-rated securities.[2]

32.     In December 2003 the Company commenced operations and following an initial private placement of approximately 10 million shares of Class A Common Stock, Defendants raised net proceeds (after commissions and expenses) of approximately $141.7 million. This stock sale provided the Company with the money to invest, and to leverage, in government backed securities. In fact, the Company grew from mortgage-backed securities with a fair market value of $225 million in 4Q:03 to MBS with a fair market value of over $1.51 billion by 1Q:04.

33.     At the same time the Company was launching this business, however, interest expenses relative to interest income earned off these mortgage investments began to grow. Thus, in 4Q:03, where interest expenses were approximately 28% of interest income, this number grew to 39% by 2Q:04. The rise in interest expenses as a percentage of interest income was of critical importance because, unless the Company was able to effectively manage its costs and expenses while at the same time managing the enormous risk that grew as leverage was added, the Company's business plan was incapable of success and was destined to fail.

## Materially False & Misleading Statements in the IPO Prospectus

34.     For investors, the ability of Defendants to manage and control costs and expenses while at the same time managing the enormous risk that attached to Defendants use of massive leverage rising interest expenses was especially important because, in mid-September 2004, Defendants initiated an Initial Public Offering of 5 million shares of common stock to investors

---

[2] The Company is also self-managed and self-advised, and it has elected to be taxed as a real estate investment trust, or REIT, for federal income tax purposes commencing with taxable year ended December 31, 2003. As a REIT, the Company is generally not subject to federal income tax on the REIT taxable income distributed to stockholders.

in the open market at $14.50 per share, to raise gross proceeds of over $83.375 million, including over-subscription allotments[3]

35.    The IPO Prospectus, filed with the SEC on September 17, 2004, conditioned investors to believe that Defendants would be able to grow revenues and expand profitability, despite the increasing percentage of interest expenses compared to interest income, by employing a variety of cost controls and procedures and an array of proprietary risk-management tools. Thus, in addition to investing only in high-grade securities collateralized by government backed prime mortgages as a means of controlling risk of loss, the Company also purported to employ significant self-management and analysis, and risk-management controls and procedures that allowed it to control costs and expand profitability.

36.    As evidence of the foregoing, the IPO Prospectus described the Company's purported "Risk Management Approach," its "Asset Acquisition Strategy," its "Interest Rate Risk Management," and the "Asset Tests" employed, in part, as follows:

**Risk Management Approach**

*We seek to differentiate ourselves from other mortgage portfolio managers through our approach to risk management. We invest in a limited universe of mortgage related securities, primarily those issued by Fannie Mae, Freddie Mac and Ginnie Mae. Payment of principal and interest underlying securities issued by Ginnie Mae is guaranteed by the U.S. Government. Fannie Mae and Freddie Mac mortgage related securities are guaranteed as to payment of principal and interest by the respective agency issuing the security.* We seek to manage the risk of prepayments of the underlying mortgages by creating a diversified portfolio with a variety of prepayment characteristics. Finally*, we seek to address interest rate risks by managing the interest rate indices and borrowing periods of our debt,* as well as through hedging against interest rate changes.

---

[3] According to a report by the Daily Deal, shares of the Company debuted trading on Friday, September 17, 2004, and this IPO was concluded within 30 days, on or about October 18, 2004, at the time Defendants sold an additional 750,000 shares of common stock pursuant to an Underwriters over-subscription allotment.

*We have implemented a risk-based capital methodology patterned on the general principles underlying the proposed risk-based capital standards for* internationally active banks of the Basel Committee on Banking Supervision, commonly referred to as the Basel II Accord. The Basel II Accord encourages banks to develop methods for measuring the risks of their banking activities to determine the amount of capital required to support those risks. *Similarly, we use our methodology to calculate an internally generated risk measure for each asset in our portfolio. This measure is then used to establish the amount of leverage we use. We expect our risk management program to reduce our need to use hedging techniques.* [Emphasis added.]

37.     In addition to the foregoing, the Company also purported to manage risk through its Asset Acquisition Strategy, as follows:

**Asset Acquisition Strategy**

The primary assets in our current portfolio of mortgage related securities are fixed–rate mortgage-backed securities, floating rate collateralized mortgage obligations, adjustable-rate mortgage-backed securities, hybrid adjustable-rate mortgage-backed securities and balloon maturity mortgage-backed securities. *The mortgage related securities we acquire are obligations issued by federal agencies or federally chartered entities, primarily Fannie Mae, Freddie Mac and Ginnie Mae.*

We seek to manage the effects on our income of prepayments of the mortgage loans underlying our securities at a rate materially different than anticipated. *Our diversified portfolio includes securities with prepayment characteristics that we expect to result in slower prepayments, such as pools of mortgage-backed securities collateralized by mortgages with low loan balances, mortgages originated under Fannie Mae's Expanded Approval Program or agency pools collateralized by loans against investment properties.*

*      *      *

We have created and will maintain a diversified portfolio to avoid undue geographic, loan originator, and other types of concentrations. *By maintaining essentially all of our assets in government or government-sponsored or chartered enterprises and government or federal agencies, which may include an implied guarantee of the federal government as to payment of principal and interest, we believe we can significantly reduce our exposure to losses from credit risk….* [Emphasis added.]

14

38.    The Company also purported to use Interest Rate risk management as a component of its overall risk-management strategy, through various management techniques including, in part, the following:

**Interest Rate Risk Management**

We believe the primary risk inherent in our investments is the effect of movements in interest rates. This arises because the changes in interest rates on our borrowings will not be perfectly coordinated with the effects of interest rate changes on the income from, or value of, our investments. *We therefore follow an interest rate risk management program designed to offset the potential adverse effects resulting from the rate adjustment limitations on our mortgage related securities. We seek to minimize differences between interest rate indices and interest rate adjustment periods of our adjustable-rate mortgage-backed securities and related borrowings by matching the terms of assets and related liabilities both as to maturity and to the underlying interest rate index used to calculate interest rate charges.*

*Our interest rate risk management program encompasses a number of procedures, including the following:*

- *monitoring and adjusting, if necessary, the interest rate sensitivity of our mortgage related securities* compared with the interest rate sensitivities of our borrowings.

- *attempting to structure our repurchase agreements* that fund our purchases of adjustable-rate mortgage-backed securities to have a range of different maturities and interest rate adjustment periods...

- *actively managing, on an aggregate basis, the interest rate indices and interest rate adjustment periods of our mortgage related securities* compared to the interest rate indices and adjustment periods of our borrowings…..

As a result, *we expect to be able to adjust the average maturities and reset periods of our borrowings on an ongoing basis by changing the mix of maturities and interest rate adjustment periods as borrowings mature or are renewed*. Through the use of these procedures, we attempt to reduce the risk of differences between interest rate adjustment periods of our adjustable-rate mortgage-backed securities and our related borrowings. [Emphasis added.]

15

39.     At all relevant times, the Company also stated that it maintained "Asset Test"

procedures, that imposed regular asset monitoring, review, and adjustment. The Company's

Asset Test procedures included, in part, the following:

> *At the close of each quarter of our taxable year, we must satisfy four tests relating to the nature and diversification of our assets:*
>
> - at least 75% of the value of our total assets must be represented by qualified real estate assets, cash, cash items and government securities;
>
> - not more than 25% of our total assets may be represented by securities, other than those securities included in the 75% asset test;
>
> - of the investments included in the 25% asset class, the value of any one issuer's securities may not exceed 5% of the value of our total assets...;and
>
> - the value of the securities we own in any taxable REIT subsidiaries, in the aggregate, may not exceed 20% of the value of our total assets.
>
> \*   \*   \*
>
> *We will monitor the status of our assets for purposes of the various asset tests and will seek to manage our portfolio to comply at all times with such tests.*
> [Emphasis added.]

40.     The statements made by Defendants and contained in the Company's IPO

Registration Statement and Proxy-Prospectus were each materially false and misleading at the

time of this Offering, for the following reasons, among others:

(a)     At the time of the IPO, it was not true that the Company was operating

according to plan, because interest costs were already rising and because interest expenses were

already growing as a percentage of interest income, such that it was already foreseeable to

Defendants that their ability to generate profits simply by raising more money and obtaining

more leverage was already in jeopardy;

(b)     At the time of the IPO, because interest costs were already rising and

because interest expenses were already growing as a percentage of interest income beyond plan,

it was not true that the Company's "Risk Management Approach," "Asset Acquisition Strategy," Interest Rate Risk Management," "Asset Testing" or "Hedging Strategy" provided investors reasonable protection against loss as Defendants reported;

(c)     At the time of the IPO, it was also not true that the Company contained adequate systems of internal operational or financial controls, such that the statements in the Registration Statement and Proxy-Prospectus were true, accurate or reliable; and

(d)     As a result of the aforementioned adverse conditions which Defendants failed to disclose, at the time of the IPO Defendants lacked any reasonable basis to claim that the Company was operating according to plan, or that it could achieve guidance sponsored and/or endorsed by Defendants and provided to the media or to investors in interviews, one-on-one presentations, and road-show demonstrations preceding this Offering.

41.     The IPO occurred during 3Q:04; by 4Q:04 interest expenses had grown to over 52% of interest income, almost twice the size when compared to the year earlier period. Thus, despite the fact that by 4Q:04 after Defendants had raised over $80 million that was invested into almost $1.5 billion *more* of mortgage backed securities, by that time it was obvious to Defendants that the *growth in assets was not resulting in a growth in earnings*. In fact, whereas the Company had earned $0.57 per share in 2Q:04 – at the time that the Company had only $1.05 billion of mortgage backed securities at fair value – by 4Q:04 the Company earned only $0.44 per share on MBS fairly valued at $2.91 billion.

42.     Regardless of the apparent weakness in the Company's plan and despite the other adverse conditions that existed at that time, which would prevent it from achieving the near-term guidance sponsored and endorsed by Defendants, in December 2004 Defendants proceeded with a Secondary Offering of an *additional* 4.6 million shares of common stock, including over-

subscription allotments, at a price of $15.50 per share, for gross proceeds of at least $71.3 million.

43.    Regardless of the conditions – which were actually *worse* than at the time of the IPO itself –existing at the time of the Secondary Offering, the Secondary Offering Registration Statement and Proxy-Prospectus conditioned investors to believe that Defendants would be able to grow revenues and expand profitability, despite the ever increasing percentage of interest expenses relative to interest income, by continuing to employ a variety of cost controls and procedures and an array of risk-management procedures. Thus, in addition to investing only in high-grade securities collateralized by government-backed prime mortgages as a means of controlling risk of loss, the Company also continued to purport to employ significant self-management and analysis tools that allowed Defendants and the Company to control costs and expand profitability.

44.    The Secondary Offering Registration Statement and Proxy-Prospectus, filed with the SEC on or about December 16, 2004, represented to investors that the Company continued to maintain an adequate "Risk Management Approach," an "Asset Acquisition Strategy," "Interest Rate Risk Management," and "Asset Tests" that continued to purport to allow the Company to operate according to plan despite increasing interest expenses. As evidence of this, the Secondary Offering contained statements that were substantially similar to, or the same as, those statements contained in the Company's IPO Offering statements.

45.    Examples of such similar statements include, in part, the following:

**Asset Acquisition Strategy**

***We seek to differentiate our company from other mortgage portfolio managers through our approach to risk management***. We invest in a limited universe of mortgage related securities, primarily those issued by Fannie Mae, Freddie Mac and Ginnie Mae. Payment of principal and interest underlying securities issued by

Ginnie Mae is guaranteed by the U.S. Government. Fannie Mae and Freddie Mac mortgage related securities are guaranteed as to payment of principal and interest by the respective agency issuing the security. *We seek to manage the risk of prepayments of the underlying mortgages by purchasing securities with prepayment characteristics that we expect to result in slower prepayments*, such as pools of mortgage-backed securities collateralized by mortgages with low loan balances, mortgages originated under Fannie Mae's Expanded Approval Program or agency pools collateralized by loans against investment properties.

*   *   *

*We have created and will maintain a diversified portfolio in order to avoid undue loan originator, geographic and other types of concentrations. We seek to manage the effects on our income of prepayments* of the mortgage loans underlying our securities, at a rate materially different than anticipated, *by structuring a diversified portfolio with a variety of prepayment characteristics* and investing in mortgage related securities or structures with prepayment protections.

## Leverage Strategy

We use leverage in an attempt to increase potential returns to our stockholders... We generally borrow between eight to 12 times the amount of our equity.... We use repurchase agreements to borrow against existing mortgage related securities and use the proceeds to acquire additional mortgage related securities. As of September 30, 2004, we had 17 master repurchase agreements (and outstanding balances under 13 of these agreements) and our repurchase agreements totaled $1.5 billion, or 7 times our equity capital at that date.

*We seek to protect our capital base through the use of a risk-based capital methodology that is patterned on the general principles underlying the proposed risk-based capital standard* for internationally active banks of the Basel Committee on Banking Supervision. *We use our methodology to calculate an internally generated risk measure for each asset in our portfolio*. This measure is then used to establish the amount of leverage we use. *The goal of our approach is to ensure that our portfolio's leverage ratio is appropriate for the level of risk inherent in the portfolio.*

## Interest Rate Risk Management

*We believe the primary risk inherent in our investments is the effect of movements in interest rates*. This risk arises because the effects of interest rate changes on our borrowings will not be perfectly coordinated with the effects of interest rate changes on the income from, or value of, our investments. We therefore follow an interest rate risk management program designed to offset the potential adverse effects resulting from the rate adjustment limitations on our

mortgage related securities. *We seek to minimize differences between interest rate indices and interest rate adjustment periods of our adjustable-rate securities and related borrowings by matching the terms of assets and related liabilities both as to maturity and to the underlying interest rate index used to calculate interest charges.* [Emphasis added.]

46.     The statements made by Defendants and contained in the Company's Secondary Offering Registration Statement and Proxy-Prospectus were each materially false and misleading at the time of the Secondary Offering, for the following reasons, among others:

(a)     At the time of the Secondary Offering, it was not true that the Company was operating according to plan, because interest costs were already rising and because interest expenses were already growing as a percentage of interest income, such that it was already foreseeable to Defendants that their ability to generate profits simply by raising more money and obtaining more leverage was already in jeopardy;

(b)     At the time of the Secondary Offering, because interest costs were already continuing to rise well above plan and because interest expenses were already growing as a percentage of interest income beyond plan as well, it was not true that the Company's "Risk Management Approach," "Asset Acquisition Strategy," Interest Rate Risk Management," "Asset Testing" or "Hedging Strategy" provided investors reasonable protection against loss, as Defendants reported;

(c)     At the time of the Secondary Offering, it was also not true that the Company contained adequate systems of internal operational or financial controls, such that the statements in the Registration Statement and Proxy-Prospectus were true, accurate, or reliable; and

(d)     As a result of the aforementioned adverse conditions which Defendants failed to disclose, at the time of the Secondary Offering, Defendants lacked any reasonable basis

to claim that the Company was operating according to plan, or that it could achieve guidance sponsored and/or endorsed by Defendants and provided to the media or to investors in interviews, one-on-one presentations, and road-show demonstrations preceding this Offering.

47.     In addition to the foregoing, as interest rates continued to rise following the IPO and Secondary Offerings, by the end of 2Q:05 interest expenses had risen to over 72% of interest income, almost three times the rate when the Company began operations in 4Q:03. Moreover, by that time, as Defendants raised more and more money from investors, the Company had acquired over $3.90 billion in mortgage-backed securities reported at fair value, yet earnings per share had fallen all the way to $0.39 per share, a decline of 25% sequentially.

48.     In addition to the foregoing, as interest expenses expanded to over 75% of interest income by mid 2005, the price of Company shares also began to decline significantly. Thus, from July 25, 2005 (the time the Company reported results for 2Q:05) through the beginning of September 2005 (immediately prior to the end of 3Q:05), shares of the Company declined precipitously, as indicated by the chart below:



### Background to the OFS Acquisition

49.     Thus, it was against the background of receding net interest margins and rate spreads and a declining stock price that, on September 29, 2005, the Company announced its

intention to purchase OFS.[4] After watching its stock decline to about $12.00 per share from a near-term high of almost $16.00 in early-March 2005, at the time the OFS transaction was announced Defendant Zimmer stated that *the OFS acquisition represented "an excellent opportunity for both companies. From our standpoint, we are diversifying our revenue stream while remaining in our area of expertise - the residential mortgage market. At the same time, we are establishing a broader base for future growth."*

50.    The terms of the OFS acquisition were described by Defendants in a September 29, 2005 release, in part, as follows:

**Terms of the Agreement**

Under the terms of the agreement, Bimini has agreed to issue **3,717,242** shares of Class A Common Stock and **1,800,000** Convertible Preferred Shares in the merger to the stockholders of Opteum. The new class of preferred shares would be convertible into Class A Common Stock of Bimini if Bimini's shareholders approve the conversion at a future shareholder meeting. In addition, Bimini has agreed to lend approximately **$65 million** to Opteum to repay existing debt. Bimini has also agreed to pay the Opteum stockholders a contingent cash earn-out of up to **$17.5 million** over the next five years, based on achievement by Opteum of certain specific financial objectives. In return, *Opteum has agreed that at the time of the merger it will have a book value of $60 million*. Opteum will operate from their headquarters in Paramus, New Jersey and as a taxable subsidiary of Bimini, which will retain corporate headquarters in Vero Beach, Florida. The three most senior executives of Opteum Financial Services have entered into long term employment contracts.

*    *    *

**Management**

Jeffrey J. **Zimmer** will continue as chairman, president and chief executive officer of Bimini. Peter R. **Norden** will continue as chairman, president and chief executive officer of Opteum and will become senior executive vice president and a director of Bimini. Robert E. **Cauley**, currently chief financial officer and chief investment officer of Bimini, will become vice chairman of the board of Bimini Mortgage [Mgmn't.], Inc. Martin J. **Levine**, co-founder of Opteum, will continue in his role as chief operating officer of Opteum. Rick E. Floyd, an Opteum

---

[4] The same date, Opteum also announced the second private placement of $50 million of Trust Preferred securities, in a private placement.

shareholder, shall continue in his role as head of all origination and production operations. Jason Kaplan, who represents the family which provided a major portion of Opteum's financing, will join the Bimini board for a one-year term. [Emphasis added.]

51.     Commenting on this transaction, the Company's September 29, 2005 release also quoted Defendants Zimmer and Norden, as follows:

Commenting on the agreement, Jeffrey J. **Zimmer**, chairman, co-founder, president and chief executive officer of the Company, said, "*This transaction represents an excellent opportunity for both companies. From our standpoint, we are diversifying our revenue stream while remaining in our area of expertise - the residential mortgage market. At the same time, we are establishing a broader base for future growth.* We have known members of Opteum's management team for a number of years and believe they are among the best and most experienced in the home mortgage business. We are excited about the opportunity to commit capital to them as all of our shareholders will benefit."

Peter R. **Norden**, chairman, co-founder, president and chief executive officer of Opteum Financial Services, added, "*We believe this transaction offers an excellent opportunity for our company and our associates on many fronts.* The management team at Bimini is highly regarded for their in-depth knowledge of mortgage backed securities, their liquidity management skills, their capital markets expertise and their commitment to the application of best practices and low cost operations. *We can continue to grow as opportunities present themselves as part of this very well run publicly held company and attract capital at more favorable rates.* That in turn will create new jobs and improved opportunities for our existing associates." [Emphasis added.]

52.     While Defendants stated that the combination of OFS and the Company were likely to produce synergies, new revenue streams, and additional value for shareholders, in fact OFS was a company with a radically different – *and much higher risk* – business plan than the Company prior to the merger. Unlike the Company (that traditionally invested *only* in assets collateralized by government-backed mortgages) OFS was a company that invested in non-guaranteed, much higher risk, subprime, no-document, limited-document, and interest-only high loan-to-value ratio mortgages.

53.     In fact, so concentrated was OFS' business in subprime and Alt-A loans that, by year-end 2004, OFS was named as one of the top 15 Alternative-A lenders, and one of the top 15 wholesale lenders, in the country. During 2004 alone, OFS increased loan production by approximately 40%, despite a projected industry decline of just over 30%. While OFS described these Alternate-A loans as being made primarily to borrowers with good credit and alternate documentation, in fact, the majority of these loans were stated income, the quality of which ultimately rested upon the veracity of the borrower. In the industry, these loans were universally known as "liar loans," because of the high incidence of overstated incomes listed on the loan applications supporting these loans.[5]

54.     Moreover, at the time the acquisition was announced OFS was an extremely aggressive subprime mortgage lender that had engaged in, and was continuing to engage in, untested and very speculative loan originations, including adjustable rate Interest Only ("IO") loans to subprime borrowers. Thus, while loan products like IO loans historically have been reserved for conforming borrowers with very good credit, it was OFS that introduced IO loans to subprime borrowers. The October 2005 issue of *Origination News* reported on OFS purported innovations, in part, as follows:

**Bringing IOs to the Subprime Niche**

Untraditional, subprime borrowers are becoming more mainstream in times when, according to experts, interest-only loans also are very much top of the list. ***Until recently, many adjustable-rate loans, and especially IOs, were reserved for the conforming type of borrowers with really good credit scores***. Cautiously the industry started to trickle IOs down to alt-A borrowers and now many lenders, ***Opteum Financial Services, Paramus, N.J., included, are offering IOs that are designed mostly for subprime borrowers.***

\*     \*     \*

---

[5] In fact, at the time of the OFS acquisition, only 22% of OFS reported loan originations were full document loans, and at least 11% were stated income *and* stated asset loans.

Executives recognize the product addresses a niche market segment only. "*A typical subprime product, that because of requirements on mortgage history or seasoning of bankruptcies, was left out. A number of these people out there are without credit availability and this product addresses their needs*," [Joe Amoroso, manager OFS wholesale division] said. [Emphasis added.]

55. According to Company spokesman Amoroso, OFS too had *already* adopted significant risk management and loss mitigation technologies so as to be able to introduce such high-risk loans without exposing the Company to an unreasonable risk of loss. As evidence of this, the *Origination News* report cited above also quoted spokesman Amoroso, in part, as follows:

> *The company continually mitigates the risk to make sure that the product performs well*, he explained, "When you read its parameters, it seems like a very aggressive subprime product, but while it has some such features, it also has a *payment shock feature and reserves* that in some cases are required but are not required in other subprime products."

> Aggressive features include the IO option, a pretty aggressive credit score requirement, he said, or "a middle score of three of the lower two primary borrowers. With that credit score, borrowers need to have a minimum of three active credit lines within the last six months, and two reported credit lines within the last 24 months of credit history." *Also, the accounts have to be open and reviewed, he added, so "it's an attainable credit-debt requirement."* [Emphasis added.]

56. Thus, the combination with OFS marked a significant change in the Company's business. In fact, during the conference call hosted by Defendants on September 30, 2005, at least one analyst, Chelia Donahue from Marlin Capital, was very critical of this change, and stated that, "I'm a portfolio manager who has held your stock since your IPO. *I see this as a great change in your business model…. and you have credit exposure that you did not have before. Every time I pick up a financial newspaper I'm told about the risks of just this kind of mortgage banking, and its troubling*." [Emphasis added.]

57.     In response to this objection, however, Defendants then advised investors that the Company was well-situated to make these changes, that controls and procedures were *already* in place, and that management *already* possessed the requisite ability to effectuate this transition and manage the integration of OFS. Accordingly, in response to analyst Donahue, and in other statements made during the merger conference call, Defendants stated the following:

- Prior to announcing the merger, Defendants had *already* "worked diligently" on a merger and business plan that reasonably provided for future growth opportunities and a *stronger position than either company could achieve individually.*

- The merger would *foreseeably be accretive to earnings in 2006* – and possibly as early as the fourth quarter of 2005.

- The transition of OFS from "gain on sale" accounting to an "on balance sheet financing" business model for securitizations, prior to 2Q:06, provided a "more *reliable return pattern to shareholders over a long period of time.*"

- *"With the merger, both companies become part of a stronger diversified model whose parts complement each other.*" (Quoting Defendant Norden).

- *OFS risk exposure was "fully hedged,*" and its loan portfolio was both geographically and structurally diversified – thereby reducing risks further.

- OFS exposure to securities rated below triple-A was "very, very small."

- *Defendants were "very very comfortable with [OFS loan] origination*" as well as all of Defendants' credit and mortgage expertise.

- Despite recent market volatility, *OFS was continuing to achieve results in line with plan as a result of OFS disciplined lending practices and significant "in-house" expertise* and operational controls.

- Defendants *had adopted very conservative assumptions* to create a unified business plan for OFS and the Company – including assuming a 5% *reduction* in 2005 - 2006 loan originations.

- *Following the merger, OFS was poised for substantial growth,* having been constrained previously only because of its limited access to capital.[Emphasis added.]

58.     During the September 30, 2005 Conference Call Defendant Norden also stated, in part, the following:

Most of our product is Alt-A, what is considered Alt-A origination. And I would say primarily our Alt-A originations represent 65%, 65 to 70% of our overall production. We also produce a fair amount of prime business as well, Fannie Mae, Freddie Mac type business, and *we do a small amount, and it is really the smallest piece of credit challenged individual. It really is a very small number, and all of those loans that are produced I will tell you are also all servicing released right after we originate those loans.*

*   *   *

Everything that we do we try -- *I have a trading background myself years ago -- and everything we do is built to make sure that we hedge ourselves and make sure that we cover ourselves in every way that we possibly can*. So geographic diversity is very important to us, as well as product diversity so that we avoid the cycles of the mortgage banking business, which I think we have all seen. Anyone involved in a mortgage banking business has seen volatility in mortgage banking P&Ls. *We really I think do a great job in leveling out those P&Ls by diversifying our product and diversifying geographically.* [Emphasis added.]

59.     Moreover, in addition to the foregoing, immediately prior to the Merger Defendants also hosted a presentation for analysts and investors after which they filed with the SEC, pursuant to Form 8-K, the materials presented during the conference included, in part, that:

**Opteum Strengths** 

- Strong & experienced executive management team;

- Full spectrum origination channels - Retail, Wholesale & Conduit;

- Nationwide originations with geographic diversification;

- Originations for 2005* : $4.6 Billion; 2004: $4.6 Billion; and 2003: $2.8 Billion; 2002: $1.2 Billion

- Issued securitizations in the amount of $6.6 Billion (includes Alt 'A', Subprime, and 2ND mortgage loans)

- $8.8 Billion Servicing Portfolio as of August 2005;

- 986 Opteum employees;

- Technology driven company.  All origination channels incorporate an integrated systems throughout operations with edits that insure compliance for regulatory and predatory lending requirements;

- $3.4 Billion in available credit lines to fund production.

\* 2005 production numbers reflected as of August 31, 2005

Page 4

**Opteum Products – Underwriting Guidelines**



★ ★ ★ **FIVESTARSERIES**™
★ ★
SECOND LIEN PROGRAM

- Purchase, Rate Term, Cash Out Transactions

- 30 year Amortized due in 15 years:  15 year fixed Fully Amortized

- Credit Requirements:
    - 2 years history, minimum 5 trades
    - Minimum 12 months Mortgage / Rent History with 0x30 lates
    - All Documentation Types, Full, Sated Income / Verified Assets (SIVA), Stated Income / Stated Assets (SISA), No Income / Verified Assets (NIVA)

- Min. Credit Score 620 on all Doc Types except NIVA CLTV >95%  requires 660

- Maximum Loan Amount:  $300,000

- Maximum CLTV 100% - Owner Occupied - 1 Unit only under Full, SIVA, NIVA and SISA Documentation

- Maximum CLTV 100% - Second Home & Investment Property - Owner Occupied - 1 Unit only under Full Documentation

Page 15

60.     In addition to the "diligent" work done by Defendants regarding the combination of the companies prior to the merger announcement, from September 29, 2005 until November 3, 2005, when the merger closed, Defendants conducted a purported significant "due diligence" investigation into OFS and its lending and mortgage business and operations. This due diligence investigation was a critical component of the merger, and this was supposed to provide investors with important safeguards and protections.

61.     The due diligence investigation that was required by Defendants included a detailed investigation into OFS sales, accounting, controls, and procedures, and it also required Defendants to test the assumptions and verify the projections adopted or ratified by Defendants, to the extent a reasonable investor with access to such confidential corporate information would. The due diligence investigation afforded each of the Defendants access to the adverse undisclosed information about OFS' business, operations, products, operational trends, financial

28

it allowed Defendants to later convince Citibank to invest up to $8 million of cash directly into the Company in exchange for an equity investment

## Materially False & Misleading Statements
## Made During the Class Period : With Scienter

63.     On November 3, 2005, the inception of the open market purchaser Class Period, following the end of their due diligence investigations, Defendants announced that the Company had finalized the acquisition of OFS. At the time this transaction closed, Opteum continued to purport that it had a book-value of at least $60 million, and also at that time Defendants published a release that stated, in part, the following:

> Commenting on the closing of the transaction, Jeffrey J. **Zimmer**, chairman, co-founder, president and chief executive officer of the Company, said, *"We are very pleased to have completed this transaction in a timely manner. This merger benefits both companies. It allows Bimini to diversify its revenue stream while remaining in the Company's area of expertise.* For Opteum, the merger provides increased access to capital to fund expanded growth opportunities. Ultimately, we believe *this merger will add long-term value for all of our shareholders."*

> Under terms of the agreement, Bimini has issued approximately **3.7 million** shares of Class A Common Stock and **1.8 million** Convertible Preferred Shares in the merger to the stockholders of Opteum. The new class of preferred shares would be convertible into Class A Common Stock of Bimini if Bimini's shareholders approve the conversion at a future shareholder meeting. In addition, Bimini has lent to Opteum approximately **$65 million** to repay existing debt and Bimini may pay to Opteum stockholders a contingent earn-out of up to **$17.5 million**, payable partially in cash and partially in Convertible Preferred Shares, over the next five years, based on achievement by Opteum of certain specific financial objectives. [Emphasis added.]

64.     Taking immediate advantage of the artificial inflation in the price of Company shares caused as a result of the publication of Defendants' materially false and misleading statements, on January 27, 2006, the former owners of OFS registered for sale all of the shares received in the merger. A review of this Registration Statement demonstrates that, of the 5.538 million shares registered by the former OFS shareholders, at least 2.658 million shares were

statements, markets, and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith.

62.    Moreover, a reasonable due diligence investigation would have extended well beyond a mere casual view of OFS books and records, and its accounting, financial reports, and operational and financial controls. Thus, as a result of the due diligence investigation conducted by Defendants immediately prior to the close of the merger, and at all times thereafter, Defendants knew or recklessly disregarded, but failed to disclose, in part, the following:

* The acquisition of OFS represented a significant departure from the Company's prior business plan, such that it was wholly unreasonable to continue to rely on its pre-merger risk management systems and procedures – each designed for significantly lower risk government-backed securities – and such that the post-merged Company would be wholly dependent upon OFS' systems of control and risk management to manage any growth that was supposed to result from this combination.

* OFS did not contain adequate risk controls or procedures, and OFS had achieved remarkable revenue growth (from $13.5 million in 2003, to $28.1 million reported in 2005, prior to the merger) by ignoring its stated underwriting criteria and by originating loans that were very low quality and, foreseeably, would contribute to significant losses.

* Defendants were willing to subject shareholders to the extreme risks of acquiring OFS, despite its lack of procedures and risk controls, because they were unable to grow the business following the Company's 2004 IPO and, rather than risk embarrassment and admit the severe limitations and failure of their initial business plan, Defendants "threw caution to the wind" and made plans to acquire the voracious alternate and subprime mortgage lender with few controls and an unreasonable tolerance to risk.

* Defendants were also willing to effectuate the acquisition of OFS because it resulted in millions of dollars in additional compensation, bonus payments and stock grants – that were conditioned upon the completion of the acquisition – and

registered by Defendants Norden or Levine (or several trusts held in the name of family members of Defendant Norden) as follows:

**Shares Beneficially Owned as of December 27, 2005**

| Name of Selling Stockholders | Number of Shares Beneficially Owned Prior to the Offering | Percent | | Shares Being Registered Hereby | Percentage Beneficial Ownership After the Offering(1) |
|---|---|---|---|---|---|
| Alyssa Blake **Norden** Trust of 1993 | 248,883 | 1.0 | % | 248,883 | — |
| Amy Suzanne **Norden** Trust of 1933 | 174,218 | * | | 174,218 | — |
| **Levine**, Martin J. | 468,000 | 2.0 | % | 448,000 | * |
| Michael Jared **Norden** Trust of 1993 | 248,883 | 1.0 | % | 248,883 | — |
| **Norden**, Peter R. | 1,518,213 | 6.4 | % | 1,518,213 | — |
| Total Sales Norden, Levine & Trusts | **2,658,197** | **10.4** | **%** | **2,638,197** | |
| Total All Sales | 5,538,462 | 20.4 | % | 5,517,242 | * |

65.    Following the purported successful completion of this acquisition, on February 6, 2006, Defendants also published a release announcing the formal name change of the Company to Opteum. At that time, Defendants stated that this change was being made, in substantial part, to commemorate the seamless integration of OFS with and into the Company. This release also stated, in part, the following:

> *"This name change leverages Opteum's current brand identity and further enhances the seamless integration of our two companies,"* said Jeffrey J. **Zimmer**, Chairman, Chief Executive Officer and President of Opteum Inc. "Our branding effort now represents a unified image on all fronts with investors, customers and associates as we work toward *our corporate mission of providing superior returns to our shareholders."*

> Peter R. **Norden**, Chief Executive Officer of Opteum Financial Services, added that "*this change reaffirms our brand position to be a company that is guided by integrity* and strives to exceed our customers' and investors' expectations. When we re-branded our company as Opteum in 2003, we knew that we were creating a brand that would represent our company for the long-term." [Emphasis added.]

66.    On February 23, 2006, Defendants published a release announcing results for the fourth quarter and full year 2005, the period ended December 31, 2005. This release stated, in part, the following:

As previously announced on November 3, 2005, Opteum closed its acquisition of Opteum Financial Services, LLC ("OFS"). Therefore, for the fourth quarter, the consolidated Company includes the results of Opteum's new taxable REIT subsidiary ("TRS"), OFS, for the period from November 3, 2005 through December 31, 2005. During the quarter, Opteum recorded a net loss according to generally accepted accounting principles ("GAAP") of approximately $2.7 million or $0.12 per diluted Class A Common Share as of December 31, 2005. Included in those consolidated results are fourth quarter earnings from Opteum's REIT segment of $3.9 million or $0.17 per Class A Common Share. OFS recorded a net loss of $6.6 million for the fourth quarter of 2005. *The loss at OFS is partially a result of the effects of the purchase accounting rules applied to OFS' assets at the date of the acquisition. The most significant effect was the OFS asset, "loans held for sale," which was adjusted to their fair value as of November 3, 2005. This fair value was higher than the book value of the loans prior to the acquisition. OFS subsequently sold many of the loans at approximately the same value as recorded on the acquisition date. Thus, the Company realized no gain on the subsequent sale of the loans, but the operating expenses of OFS remained*.

For the full year 2005, Opteum had net income of approximately $24.3 million. [Emphasis added.]

67.    The February 23, 2006 release also quoted Defendant Zimmer, in part, as follows:

"As of December 31, 2005, the Company held $3.5 billion of REIT eligible mortgage-backed securities at fair value. As of December 31, 2005, the weighted average yield on these assets was 4.21% and the weighted average borrowing cost was 4.15% representing a "snapshot" net interest spread of 6 basis points. However, the average net interest spread for the fourth quarter of 2005 was 0.63%. The weighted average constant prepayment rate for this portfolio was 28.4% for December 2005. The effective duration of the portfolio at the end of the fourth quarter was 1.28.

*    *    *

Mr. Zimmer continued: "*The Board is pleased with the speed at which the successful integration of OFS is taking place and views the opportunity for diversified sources of income as a great benefit to all shareholders*. During the fourth quarter of 2005 OFS successfully issued its first securitization in REMIC form since being acquired by Opteum Inc...." [Emphasis added.]

68.    Thereafter, on March 10, 2006, Defendants filed with the SEC the Company's

2005 year-end report pursuant to Form 10-K, for the period ended December 31, 2005 signed by

all Defendants and certified by Defendants Zimmer and Cauley. In addition to making statements

that were substantially similar to those that had been published previously concerning Opteum's operations, the integration of OFS, and the effects thereof, the 2005 Form 10-K also stated that the Company had adopted GAAP accounting, as well as several significant accounting policies, in part, as follows:

### Critical Accounting Policies

Opteum's financial statements are prepared in accordance with U.S. generally accepted accounting principles ("GAAP")….. *Opteum believes that all of the decisions and assessments upon which its financial statements are based were reasonable at the time made based upon information available to it at that time.* Management has identified its most critical accounting policies to be the following:

### Mortgage Backed Securities

Opteum's investments in mortgage backed securities (the REIT investment portfolio) are classified as available-for-sale securities. As a result, *changes in fair value are recorded as a balance sheet adjustment to accumulated other comprehensive income (loss)*…

*Valuations of Opteum's mortgage backed securities are carried on the balance sheet at fair value.* Statement of Financial Accounting Standards No. 107, Disclosures about the Fair Value of Financial Instruments , defines the fair value of a financial instrument as the *amount at which the instrument could be exchanged in a current transaction between willing parties.* Opteum's mortgage backed securities have *fair values determined by management* based on the average of third-party broker quotes received and/or by independent pricing sources when available…..

When the fair value of an available-for-sale security is less than amortized cost, management considers whether there is an other-than-temporary impairment in the value of the security (for example, whether the security will be sold or repaid by the borrower prior to the recovery of fair value). *If, in management's judgment, an other-than-temporary impairment exists, the cost basis of the security is written down to the then-current fair value, and this loss is realized and charged against earnings….*

*The decline in fair value of investments held in the portfolio at December 31, 2005 is not considered to be other than temporary.* Accordingly, the write down to fair value is recorded in other comprehensive loss as an unrealized loss (see Note 1 to the financial statements). *The factors considered in making this determination included the expected cash flow from the investment and the*

*magnitude and duration of the historical decline in market prices, as well as Opteum's capacity and intention to hold such securities owned.*

Interest income on mortgage related securities is accrued based on the actual coupon rate and the outstanding principal amount of the underlying mortgages. Premiums and discounts are amortized or accreted into interest income over the estimated lives of the securities using the effective yield method adjusted for the effects of estimated prepayments based on Statement of Financial Accounting Standards ("SFAS") No. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases; an amendment of Financial Accounting Standards Board ("FASB") Statements No. 13, 60, and 65 and a rescission of FASB Statement No. 17. *Adjustments are made using the retrospective method to the effective interest computation each reporting period based on the actual prepayment experiences to date and the present expectation of future prepayments of the underlying mortgages. To make assumptions as to future estimated rates of prepayments, Opteum currently uses actual market prepayment history for the securities and for similar securities that Opteum does not own and current market conditions. If the estimate of prepayments is incorrect; Opteum is required to make an adjustment to the amortization or accretion of premiums and discounts that would have an impact on future income.*

**Mortgage Loans Held for Sale**

Mortgage loans held for sale represent mortgage loans originated and held pending sale to investors. *The mortgages are carried at the lower of cost or market as determined by outstanding commitments from investors or current investor yield requirements calculated on the aggregate loan basis.* OFS generally sells or securitizes loans with servicing rights retained. *Gains or losses on such sales are recognized at the time legal title transfers to the investor based upon the difference between the sales proceeds from the final investor and the allocated basis of the loan sold,* adjusted for net deferred loan fees and certain direct costs and selling costs....

**Valuation Allowance**

*A valuation allowance is maintained to adjust mortgage loans held for sale to the lower of cost or market.* [Emphasis added.]

69.    This Form 10-K reiterated the Company's purported Investment Strategy, Asset

Acquisition Strategy, Leverage Strategy, Interest Rate Risk Management, and Risk Management

Approach, which were each supposed to insulate investors from massive, catastrophic losses and

to moderate the risk taken by Defendants in managing the assets avoid monitoring the collateral of the Company. As evidence of this, the 2005 Form 10-K stated, in part, the following:

### Risk Management Approach

*Opteum seeks to differentiate itself from other mortgage portfolio managers through its approach to risk management.* It invests in a limited universe of mortgage related securities, primarily, but not limited to, those issued by Fannie Mae, Freddie Mac and Ginnie Mae. Payment of principal and interest underlying securities issued by Ginnie Mae is guaranteed by the U.S. Government. Fannie Mae and Freddie Mac mortgage related securities are guaranteed as to payment of principal and interest by the respective agency issuing the security. *Opteum seeks to manage the risk of prepayments of the underlying mortgages by creating a diversified portfolio with a variety of prepayment characteristics. Finally, Opteum seeks to address interest rate risks by managing the interest rate indices and borrowing periods of its debt, as well as through hedging against interest rate changes.*

*Opteum has implemented a risk-based capital methodology patterned on the general principles underlying the proposed risk-based capital standards for internationally active banks* of the Basel Committee on Banking Supervision, commonly referred to as the Basel II Accord. The Basel II Accord encourages banks to develop methods for measuring the risks of their banking activities to determine the amount of capital required to support those risks. Similarly, *Opteum uses its methodology to calculate an internally generated risk measure for each asset in its portfolio. This measure is then used to establish the amount of leverage it uses. Opteum expects its risk management program to reduce its need to use hedging techniques.* [Emphasis added.]

70.     The Company's 2005 Form 10-K also contained representations that attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

### Management's Report on Internal Control over Financial Reporting

Management of Opteum Inc. (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. *The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.* The Company's internal control over financial reporting includes those policies and procedures that:

(i)    pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

(ii)    *provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles*, and that receipts and expenditures of the Company are being made only in accordance with authorization of management and directors of the Company; and

\* \* \*

*Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2005*…. In making its assessment of the effectiveness of internal control, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework. Based on our assessment and those criteria, *management believes that the Company maintained effective internal control over financial reporting as of December 31, 2005.* [Emphasis added.]

71.    In addition to the foregoing, the Company's 2005 Form 10-K also contained certifications by Defendants Zimmer and Cauley attesting to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

**CERTIFICATION PURSUANT TO RULE 13A-14(A) OF THE SECURITIESEXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THESARBANES-OXLEY ACT OF 2002**

1.    I have reviewed this annual report on Form 10-K of Opteum Inc. (the "registrant");

2.    *Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;*

3.    *Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;*

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

       a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

       b)     *designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principals*;

       c)     *evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;* and

       d)     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a)     *all significant deficiencies and material weakness in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 10, 2006

/s/ *JEFFREY J. ZIMMER*
Name: Jeffrey J. Zimmer
Title: Chief Executive Officer and President

\* \* \*

Date: March 10, 2006

/ s/ *ROBERT E. CAULEY*
Name: Robert E. Cauley
Title: Chief Financial Officer

## CERTIFICATION PURSUANT TO
## 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Opteum Inc. (the "Company") on Form 10-K for the fiscal year ended December 31, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, **Jeffrey J. Zimmer,** Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.      The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2.      *The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the* Company.

March 10, 2006

/s/ *JEFFREY J. ZIMMER*
Jeffrey J. Zimmer
Chief Executive Officer

In connection with the Annual Report of Opteum Inc. (the "Company") on Form 10-K for the fiscal year ended December 31, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, **Robert E. Cauley,** Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.      The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2.      ***The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.***

March 10, 2006

*/s/ **ROBERT E. CAULEY***
Robert E. Cauley
Chief Financial Officer                               [Emphasis added.]

72.     The statements contained in Opteum's November 3, 2005, February 6, 2006, and February 23, 2006 releases and those statements contained in the Company's 2005 Form 10-K, referenced above, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)     At all times during the Class Period, it was not true that the integration of OFS was preceding according to plan, and Defendants repeatedly overstated the speed at which the integration was occurring when, in fact, as Defendants knew or recklessly disregarded, the Company's previous risk management controls and procedures were incompatible with OFS business, OFS continued to lack adequate controls or had ignored its stated underwriting criteria, and such that OFS had created loans that were designed to produce short-term results at the expense of subjecting Opteum to the unreasonable risk of hundreds of millions of dollars in loss;

(b)     That, in addition to the foregoing, during the Class Period, Defendants had propped up he Company's results by failing to properly value and monitor collateral and under-reporting loan loss reserves, and failed to report other material information about the Company. Moreover, Defendants' efforts to allocate more resources to adjustable rate mortgages did little

or nothing to offset the huge risk of loss to which OFS had subjected the Company as a result of its knowing and/or reckless disregard of reasonable risk management and hedging control strategies;

        (c)    At all times during the Class Period, unbeknownst to investors Defendants had materially overstated the Company's Book Value and projected cash flow – critical metrics used by investors to evaluate the financial health, stability and profitability of the Company – by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results. By failing to adequately hedge the Company's exposure, Defendants also materially understated operating costs and overstated net interest income;

        (d)    Throughout the Class Period, it was also not true that Opteum contained adequate systems of internal operational or financial controls, such that Opteum's reported financial statements were true, accurate, or reliable. Moreover, OFS' then-recent introduction of Interest Only subprime loans did **not** represent a unique business opportunity for the Company, as Defendants represented, but rather an even higher-risk effort – motivated by desperation – to create artificial demand for OFS products;

        (e)    As a result of the foregoing, throughout the Class Period it was also not true that the Company's financial statements and reports were prepared in accordance with GAAP ad SEC rules; and

        (f)    As a result of the aforementioned adverse conditions which Defendants failed to disclose, throughout the Class Period, Defendants lacked any reasonable basis to claim that Opteum was operating according to plan, or that Opteum could achieve guidance sponsored and/or endorsed by Defendants – including forecasting profits in 2007.

73.   Rather than reveal the true, impaired financial and operational condition of the Company, Defendants continued to publicize Opteum's purported success with its "Affordable Products" lending business and, on March 28, 2006, Defendants published a release that also stated, in part, the following:

**Opteum Reports Strong Demand for 'Affordability Products' as Home Prices Hold Steady and Interest Rates Continue to Climb**

*"The sharp upward trend in 'affordability products' this season is clear,"* says Alex Koutouzis, senior vice president for Opteum Financial Services, one of the nation's fastest growing mortgage lenders. *"In fact, interest-only loans now make up almost 50 percent of the total share of mortgages in major competitive housing markets* like San Diego, Atlanta and San Francisco."

*Interest-only (IO) loans have become one of the industry's most popular products* as they can help buyers afford a larger home and enjoy substantially lower payments for the initial term. The program is *best suited for those who exhibit a proven track record for managing their finances well and understand the product's pros and cons.* Opteum anticipates that 10-year IO products will continue to gain popularity, whereas demand for the two to three year (or shorter) IO term will drop dramatically.

In addition, Opteum is experiencing a strong demand for the 40-year fixed rate balloon. This loan offers a payment nearly halfway between interest-only and 30-year fixed. The 40-year fixed works for buyers focused on the long-term value of their property and who want to build equity each month. [Emphasis added.]

74.   On May 8, 2006, Defendants also published a release announcing results for the first quarter of 2006, the period ended March 31, 2006. This release stated, in part, the following:

For the quarter ended March 31, 2006, Opteum had REIT net income of $0.9 million, or $0.04 per weighted average Class A Common Share outstanding. The REIT had estimated taxable earnings of $1.3 million, or $0.06 per weighted average Class A Common Share outstanding... *Included in those consolidated results are first quarter operating results from OFS, which posted a GAAP net loss of $6.0 million after tax, or approximately ($0.26) per weighted average Class A Common Share outstanding for the first quarter of 2006. This loss was due to two specific accounting charges.*

First, the Company chose early adoption of SFAS 156, which pertains to the valuation of Originated Mortgage Servicing Rights (OMSR). The Company has elected to use the fair value method for valuing all OMSRs. As a result of this

41

adoption, changes in the fair value of the OMSRs over a given period will be reflected in earnings. More importantly, *this change will allow the Company to hedge the OMSRs using the alternate accounting treatment to SFAS 133*. Although the initial adoption of SFAS 156, as of January 1, 2006, resulted in an increase in the value of the OMSRs by $4.3 million (pre-tax), which was booked to retained earnings, *the March 31, 2006 valuation resulted in a charge in OFS's earnings of $2.5 million (pre tax), or approximately ($0.11) per weighted average Class A Common Share outstanding.*

*   *   *

*The Company has not made any significant changes to its portfolio strategy since the summer of 2004, when the Company determined to substantially increase the asset allocation to adjustable-rate mortgages* - those mortgages that reset within 12 months. By the fall of 2004, this was accomplished. *Following this change, the Company has had the highest cumulative dividends and the highest cumulative return on equity for the following six quarters compared with the Company's 2005 RMBS peer group,* as spelled out by the equity research analysts who cover the sector.

*   *   *

In September of 2004 and December of 2004, respectively, the Company completed an IPO and a public secondary offering. Many of the assets that were purchased as a result of those successful offerings are now resetting to higher coupons. In addition, because the longer end of the yield curve has increased in rate, the homeowner is not as readily in a position to refinance an adjustable-rate mortgage into a fixed-rate mortgage - as had been the case in previous quarters when the yield curve was flatter. *The Company believes that its strategy of owning low-duration adjustable-rate assets has proven to be successful. As of this date, the Company has not realized any permanent losses to book value as a result of portfolio restructuring....* [Emphasis added.]

75.    In addition to the foregoing, this release purported to explain that the loss experienced at OFS during 1Q:06 was primarily the result of the Company's conservative accounting policies. As evidence of this, the May 8, 2006 release also stated, in part, the following:

The GAAP net loss at OFS is also a result of the change in the value of retained interests in securitizations that OFS has issued from its two private-label shelves. The change in the value of these residuals flows through the statement of operations of OFS. The increase in one-month LIBOR of 44 basis points during the first quarter of 2006 was the primary reason for the valuation decline and

42

resulting charge of $4.2 million (pre-tax) in the first quarter of 2006. This decline represents non-cash charges to earnings and is reflective of market conditions at the time. The valuation is subject to fluctuation over time due to the differences between actual and projected prepayments, losses on the underlying loans and the changing value of LIBOR. *Accordingly, management has made slight changes to the assumptions underlying the valuation as part of the implementation of the Company's hedging strategy in order to align the assumptions used in its hedge strategy with the valuation methodology.*

*The change in value of the OMSRs and the change in value of the residual interests represent approximately $6.7 million (pre-tax) of the $20.2 million decline in book value for Opteum Inc. from December 31, 2005 to March 31, 2006.* The book value of Opteum Inc. as of March 31, 2006, was approximately $223.2 million or $9.67 per Class A Common Share outstanding on that date. [Emphasis added.]

76.    While the Opteum Board had previously determined not to provide forward guidance, at that time, in part, as a show of Defendants' confidence in the business and operations of the Company, Defendants did issue forward guidance for the second quarter of 2006, in part, as follows:

Previously, the Board had determined not to provide earnings guidance for future periods unless the estimates by the equity analyst community were clearly out of line with management estimates. As a result of this policy, *the Board has determined that the Company should indeed provide earnings guidance for the REIT taxable income for the second quarter of 2006. The Company estimates that approximately $0.25 to $0.35 will be available to pay dividends from second quarter taxable earnings from the REIT*. This estimate does not incorporate any second quarter results from OFS. The Board has authorized management to update the public with this information if new data makes the estimates fall outside this range. [Emphasis added.]

77.    Commenting on the results, Defendant Zimmer, Chairman, President and Chief Executive Officer of the Company stated, in part, the following:

*"The Opteum Board of Directors is pleased both to be able to pay favorable dividends for the first quarter of 2006 and to present expectations of favorable earnings for the second quarter 2006*; but we are eagerly anticipating the time when the increases in short-term funding rates come to a halt. The uncertainty of future funding rates, however, means that we still cannot give any assurances that net interest spreads will not be compressed further in future quarters."

\*   \*   \*

*"The Board is pleased with the speed at which the successful integration of OFS is taking place and views the opportunity for diversified sources of income as a great benefit to all shareholders. Moreover, the Board anticipates the hedging program for OMSRs and residuals to commence during the second quarter of 2006 so as to reduce the volatility of the earnings results at OFS.* During the first quarter, OFS successfully issued its first 2006 securitization in REMIC form. The underlying collateral for the $934.4 million issuance was loans originated or purchased by OFS, and it was issued using OFS's securitization shelf called Opteum Mortgage Acceptance Corporation (OPMAC). Originations through the first quarter of 2006 were approximately 8% less than the first quarter of 2005 and less than OFS management had budgeted for the first quarter of 2006. Both the retail and the wholesale origination units closed fewer loans than had been anticipated, while at the same time, the applications were substantially higher than those of the first quarter of 2005. We attribute the difference between closings and applications to be the result of borrowers filing numerous applications for one loan in an increasingly competitive environment."

Mr. Zimmer went on to say, "The competition in mortgage originations has continued into the second quarter. *Although the Company does not expect origination levels to remain below expectations throughout the entire year, we have taken steps to reduce costs at OFS.* In the first quarter of 2006, the Company reduced non-origination personnel expenses at OFS by over $3.5 million as measured on an annual basis. Additional efficiencies are in the process of being implemented. In addition, as a taxable REIT subsidiary of Opteum Inc., OFS has been able to take advantage of significant reductions in the rate it pays to finance its mortgage pipeline and owned assets. On an annualized basis, OFS has reduced borrowing costs by approximately $3.5 million per year. *Finally, we believe that OFS financial results will benefit on an ongoing basis from the capital markets expertise that the REIT management team is rigorously applying to the OFS securitization strategy."* [Emphasis added.]

78.     The same day, May 8, 2006, Defendants filed with the SEC the Company's quarterly report for the first quarter 2006, the period ended March 31, 2006, pursuant to Form 10-Q, signed and certified by Defendants Zimmer and Cauley. In addition to making statements that were substantially similar to those that had been published previously concerning the Company's operations, the integration of OFS, and the effects thereof, the 1Q:06 Form 10-Q also provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation. In addition, the Company's 1Q:06 Form 10-Q also contained

representations and Certifications that attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as had been reproduced herein, *supra*.

79.     The statements made by Defendants and contained in the Company's May 8, 2006 release and in the Company's 1Q:06 Form 10-Q were each materially false and misleading when made and were know by Defendants to be false at that time, or were recklessly disregarded as such, thereby, for the reasons stated herein, *supra*.

80.     On August 8, 2006, Defendants published a release announcing results for the second quarter of 2006, the period ended June 30, 2006. This release stated, in part, the following:

### Opteum Inc. Reports Second Quarter 2006 Results

For the quarter ended June 30, 2006, Opteum had REIT net income of $7.52 million, or $0.31 per weighted average Class A Common Share outstanding. The REIT had estimated taxable income of $9.99 million, or $0.42 per weighted average Class A Common Share. Taxable income includes payments made by the Company's taxable REIT subsidiary, Opteum Financial Services (OFS), to the REIT of approximately $2.2 million of interest on the loans that the REIT has made to OFS, which is eliminated in consolidation of the subsidiary.

Opteum Inc., which includes *the results of OFS, recorded a consolidated net loss for the second quarter of 2006, on a GAAP basis, of approximately $3.69 million*, or ($0.15) per weighted average Class A Common Share as of June 30, 2006.

*The Company's reported net loss for the second quarter is mainly a result of the change in value of assets held by OFS*, which flow through the consolidated statement of operations, some of which have increased in value and some of which have decreased in value.

\*   \*   \*

*The Company has not made any significant changes to its portfolio strategy since the summer of 2004, when the Company determined to substantially increase the asset allocation to adjustable-rate mortgages* - those mortgages whose coupons reset within 12 months. By the fall of 2004, this was accomplished. Following this change, *the Company has had the highest cumulative dividends and the highest cumulative return on equity for the*

*following seven quarters compared with the Company's 2005 RMBS peer group*, as spelled out by the equity research analysts who cover the sector. [Emphasis added.]

81.   In part, this release again purported to explain that the loss experienced at OFS during the quarter was primarily the result of the Company's conservative accounting policies. As evidence of this, the August 8, 2006 release also stated, in part, the following:

> First, the Company's adoption of SFAS 156 during the first quarter of 2006, which pertains to the valuation of Originated Mortgage Servicing Rights (OMSR), requires the Company to use the fair value method for valuing all OMSRs. As a result of this adoption, changes in the fair value of the OMSRs over a given period will be reflected in earnings. *This change allows the Company to more effectively hedge the OMSRs compared with the treatment available under SFAS 133.* OMSR's resulted in an increase in OFS's earnings of $3.3 million (pre-tax), or approximately $0.14 per weighted average Class A Common Share during the second quarter of 2006.
>
> Secondly, the net change in the value of retained interests in securitizations that OFS has issued from its two private-label shelves declined in value during the second quarter of 2006. *The change in the value of these residuals flows through the statement of operations of OFS. The increase in one-month LIBOR of 50.5 basis points during the second quarter of 2006, as well as related movements in forward LIBOR, were the primary reasons for the valuation decline and the resulting non-cash charge of $15.8 million (net and pre-tax) in the second quarter of 2006 or $0.69 (net and pre-tax) weighted average Class A Common Share.* The valuation is subject to fluctuation over time due to the differences between actual and projected prepayments, losses on the underlying loans and the changing value of LIBOR.
>
> Although the Company estimates that the book value per weighted average Class A Common Share outstanding as of the close of business yesterday, August 7, 2006, was between $8.45 and $8.60, the book value of the Company as of June 30, 2006 was $8.22 per weighted average Class A Common Share outstanding or approximately $200 million. *The recovery in book value per weighted average Class A Common Share outstanding can be attributable to favorable changes in the forward LIBOR curve and lower treasury rates since the end of the second quarter, offset by application of the effective yield method adjustment for the third quarter.* [Emphasis added.]

82.   Commenting on the results, Defendant Zimmer, Chairman, President and Chief Executive Officer of the Company stated, in part, the following:

"The Opteum Board of Directors is pleased to be able to pay favorable dividends for the second quarter of 2006, but we are eagerly anticipating the time when the increases in short-term funding rates come to a halt. The Board was pleased to see forward funding rates decline in the first month of the third quarter of 2006, which will lower borrowing costs for future transactions and increase book value now."

*     *     *

*"Although the Board is pleased that the changes in value during the second quarter of 2006 of the REIT portfolio, the OMSR's and the retained interests in securitizations were within expectations as described in the Company's Form 10-Q for Q1 2006,* the Board is also acutely focused on the negative aspects of the net book value volatility inherent in the OFS OMSR's and retained interests in securitizations, despite the fact they are non-cash charges. As stated previously, the Board authorized hedging program for OMSRs and residuals to commence during the second quarter of 2006. *Hedging will continue to be utilized as a tool to curtail balance sheet volatility when proper pricing opportunities present themselves.*

*     *     *

"OFS residential originations this year through the second quarter of 2006 were approximately 10% less than in the first two quarters of 2005. Both the retail and the wholesale origination units closed fewer loans than had been anticipated, although at the same time, applications continue to be substantially higher than those of the first two quarters of 2005. *The Board is pleased that OFS had July 2006 loan closings of approximately $628.4 million, which exceeded the Company's expectations."*

Mr. Zimmer went on to say, "The competition in mortgage originations continued throughout the second quarter and now into the third quarter. But, in addition to the previously announced reductions in duplicative or underperforming personnel at OFS, which will result in over $3.5 million in annualized savings, the reduced borrowing costs the Company announced in the second quarter have now all been implemented and should save OFS approximately $3.5 million per year in the future. Finally, *we believe that OFS financial results will benefit on an ongoing basis from the capital markets expertise that the REIT management team is rigorously applying to the OFS securitization strategy."* [Emphasis added.]

83.   The same day, Defendants filed with the SEC the Company's quarterly report for the second quarter 2006, the period ended June 30, 2006, pursuant to Form 10-Q signed and certified by Zimmer and Cauley. In addition to making statements that were substantially similar to those published previously concerning the Company's operations, the integration of OFS, and

the effects thereof, the 2Q:06 Form 10-Q also reiterated similar statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation. In addition, the Company's 2Q:06 Form 10-Q also contained representations and Certifications which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as had been reproduced herein, *supra*.

84.     The statements made by Defendants and contained in the Company's August 8, 2006 release and in the Company's 2Q:06 Form 10-Q were materially false and misleading when made and were know by Defendants to be false at that time, or were recklessly disregarded as such, thereby, for the reasons stated herein, *supra*.

### Defendants' Add'l Materially False & Misleading Statements
### OFS' 1Q:06 – 2Q:06 Restatement : Additional Scienter

85.     On November 8, 2006, Defendants surprised investors after they announced that the Company would be forced to delay the filing of its results for 3Q:06, the period ended September 30, 2006, and that it would *restate its financial results for the first and second quarter 2006* – two of the three reported periods following the OFS acquisition. This release stated, in part, the following:

> *Opteum Inc. to Delay Filing Third Quarter Form 10-Q; Restate First and Second Quarter Financial Statements; Postpone Third Quarter Earnings Call;*
>
> *Previously Reported Year-to-Date Pre-Tax Results Estimated to Be Reduced by Less Than $1 Million after Restatement*
>
> Opteum Inc. (NYSE:OPX) ("Opteum" or the "Company"), a real estate investment trust ("REIT") that operates an integrated mortgage-related securities investment portfolio and mortgage origination platform, today announced that its *Quarterly Report on Form 10-Q for the quarter ended September 30, 2006, will be delayed and that it will restate its consolidated financial statements for the quarters ended March 31, 2006, and June 30, 2006, due primarily to the application of an accounting policy by the Company's subsidiary, Opteum Financial Services, LLC ("OFS"), that was not in accordance with U.S. generally accepted accounting principles ("GAAP").*

48

Although the Company's review of the full legal, accounting and tax impact of this accounting policy is ongoing, *the Company presently believes that, once restated, its consolidated results of operations before income taxes for the six month period ended June30, 2006, will be reduced by less than $1 million from the Company's year-to-date consolidated results of operations before income taxes previously reported*. The Company presently anticipates an offsetting increase to the Company's consolidated results of operations before income taxes for the quarterly period ended September 30, 2006. [Emphasis added.]

86.     In addition to the foregoing, the November 8, 2006 release also stated, in part, the following:

*The previous accounting policy relates to the manner in which OFS accounts for changes in the fair value of interest rate lock commitments ("IRLCs").* UnderStatement of Financial Accounting Standards No. 133 -Accounting for Derivative Instruments and Hedging Activities("SFAS No. 133"), *IRLCs are to be recorded on the Company's consolidated balance sheet at fair value with changes in fair value to be reflected in the Company's current period results of operations. OFS' prior accounting policy resulted in a misapplication of SFAS No. 133*, thereby generating non-cash, short-term timing differences that *overstated earnings in the first quarter of 2006 and understated earnings in the second quarter of 2006. Proper application of SFAS No. 133 would not, however, have changed the amount of dividends declared* by the Company year-to-date. Further, the Company's dividend policy of declaring dividends based on REIT taxable income remains unchanged.

*In light of the foregoing, the Company's consolidated financial statements, including the Company's consolidated balance sheet, statement of operations, statement of stockholders' equity, statement of cash flows and the notes thereto, as of, and for the periods ended, March 31, 2006, and June 30, 2006, should no longer be relied upon.* [Emphasis added.]

87.     In substantial part, however, because the full impact of this purported restatement was estimated to be, at most, only around one million dollars and because it did not ultimately impact paid dividends, investors did not penalize Company shares at that time. Conversely, the fact that Opteum shares did not materially decline at that time is evidence that investors did not consider this purported minor restatement to have a material adverse impact on the Company, its operations or near-term foreseeable earnings, profits or growth.

49

88.    On December 20, 2006, Defendants ultimately published a release announcing results for the third quarter of 2006, the period ended September 30, 2006. This release stated, in part, the following:

**Opteum Inc. Reports Third Quarter 2006 Results; Declares $0.05 Fourth Quarter 2006 Cash Dividend; Announces Filing of Amendments to Form 10-Qs for March 2006 and June 2006**

VERO BEACH, Fla.--(BUSINESS WIRE)--Dec. 20, 2006--Opteum Inc. (NYSE:OPX) ("Opteum" or "the Company"), a real estate investment trust ("REIT") that operates an integrated mortgage-related securities investment portfolio and mortgage origination platform, today announced financial results for the quarter ended September 30, 2006, and the declaration of a $0.05 fourth quarter 2006 cash dividend. This release should be read in conjunction with Opteum's Quarterly Report on Form 10-Q for the period ended September 30, 2006, which was filed this morning with the Securities and Exchange Commission. The Company also announced the filing of amendments to its Form 10-Qs for the periods ended March 31, 2006 and June 30, 2006.

**Results of Operations**

For the nine months ended September 30, 2006, Opteum had a consolidated net loss of $15.6 million, or $(0.64) per weighted average Class A Common Share outstanding, compared with net income of $27.0 million, or $1.27 per weighted average Class A Common Share outstanding, for the nine months ended September 30, 2005.

*For the three months ended September 30, 2006, Opteum had a consolidated net loss of $6.3 million, or $(0.25) per weighted average Class A Common Share outstanding, compared with third quarter 2005 net income of $7.9 million, or $0.37 per weighted average Class A Common Share outstanding.* [Emphasis added.]

89.    Commenting on the results, Defendant Zimmer, Chairman, President and Chief Executive Officer of the Company stated, in part, the following:

"We continue to experience extremely challenging operating conditions as our funding costs have accelerated faster than the yields on our portfolio assets over the last two years. Additionally, the aggregate demand for mortgage products and services has declined significantly during the year, which has negatively affected results at our taxable REIT subsidiary, Opteum Financial Services (OFS). *It has been five months since the Federal Reserve last implemented a rate hike. If this neutral policy continues or if the Federal Reserve relaxes monetary policy, the results from operations at both the Opteum REIT and OFS will have the*

*opportunity for improvement. In the meantime, we are aggressively pursuing various funding alternatives to lower our borrowing costs, increase our liquidity and better position us to effectively compete with larger financial institutions that have lower costs of capital.* [Emphasis added.]

90.    The December 20, 2006 release also stated that Defendants had taken the necessary and proper adjustments to Opteum's previously filed financial reports, as follows:

**Amendments to Earlier Form 10-Qs Now Filed**

Amendments to the Company's Form 10-Qs for the periods ended March 31, 2006, and June 30, 2006, were also filed this morning with the Securities and Exchange Commission containing restated consolidated financial statements. Consistent with the Company's estimates as disclosed on November 8, 2006, the Company's consolidated results of operations before income taxes for the six-month period ended June 30, 2006, were reduced by less than $1 million from the Company's previously reported consolidated results of operations before income taxes for such period.

*The Company's after-tax net loss as restated for the three-month period ended March 31, 2006, was $8.0 million*, reflecting changes in accounting for Interest Rate Lock Commitments (IRLCs) and corrections to computational errors made in the calculation of net interest income. *The Company had previously reported an after-tax net loss of $5.1 million for such period.*

*The Company's after-tax net loss as restated for the three-month period ended June 30, 2006, was $1.4 million*, reflecting changes to the accounting for IRLCs and corrections to computational errors made in the calculation of net interest income. *The Company had previously reported an after-tax net loss of $3.7 million for such period.*[6] [Emphasis added.]

91.    The same day, Defendants filed with the SEC the Company's quarterly report for the third quarter 2006, the period ended September 30, 2006, pursuant to Form 10-Q, signed and certified by Defendants Zimmer and Cauley. In addition to making statements that were substantially similar to those that had been published previously concerning the Company's operations, the integration of OFS, and the effects thereof, the 3Q:06 Form 10-Q again reiterated statements concerning the Company's Significant Accounting Policies and the Basis of its

---

[6] In fact, the effect of this restatement was to show stronger-than-reported results for 3Q:06.

Accounting Presentation. In addition, the Company's 3Q:06 Form 10-Q also contained representations and Certifications which attested to the purported effectiveness and sufficiency of the Company's controls and procedures as had been reproduced herein, *supra*.

92.    The statements made by Defendants and contained in the Company's December 20, 2006 release and in the Company's 3Q:06 Form 10-Q were materially false and misleading when made and were know by Defendants to be false at that time, or were recklessly disregarded as such, thereby, for the reasons stated herein, *supra*. In addition to the foregoing, the statements regarding the Company's 1Q:06 and 2Q:06 Restatement were also materially false and misleading because, at that time, Defendants failed to disclose that this Restatement was actually evidence of the significant control deficiencies within the Company, and it was not a benign action taken to support the financial health and well-being of Opteum.

93.    Despite reporting having turned from profits to a $6.3 million loss in the 3Q:06, the following day December 21, 2006, the Company also announced that a division of Citibank, Citibank Reality, had paid $4.1 million for a 7.5% non-voting interest in Opteum. At that time, the Company also granted Citigroup the option, exercisable at any time before December 21, 2007, to purchase an additional 7.49% non-voting limited liability company membership interest in OFS for an additional $4.1195 million. Becides stating that this deal would foreseeably result in substantial cost savings at OFS as a result of amendments to its funding facilities with Citigroup, the Company's release announcing this deal also quoted Defendants, in part, as follows:

> "We are thrilled that Citigroup Realty, a subsidiary of a world-class financial institution, has partnered with us to drive profitable growth at OFS," said Jeffrey J. **Zimmer**, Chairman, President and Chief Executive Officer of Opteum Inc. ***"We continue to believe in the value of the OFS franchise and are excited by Citigroup Realty's strong vote of confidence."***

"At OFS, we have long considered Citigroup Realty a strategic business partner and are eager to expand our relationship with them," added Peter R. **Norden**, Senior Executive Vice President of Opteum Inc. and President and Chief Executive Officer of OFS. "*With lower funding costs and even greater access to capital, we are well positioned to profitably increase our market share as we leverage our multi-channel mortgage origination platform.*" [Emphasis added.]

94.    On January 9, 2007, Defendants published a release announcing the unscheduled departure of OFS Co-Founder, Defendant Levine, from his position as Executive Vice President and Chief Operations Officer of the Company's wholly owned subsidiary, effective March 31, 2007.

95.    On February 14, 2007, when the Company reported results for the fourth quarter and year end December 31, 2006, losses from OFS continued to weigh down results. According to this release, results for the quarter and year end were impacted, in part, as follows:

**Summary of Results of Operations**

*For the quarter ended December 31, 2006, Opteum reported a consolidated net loss of approximately $33.9 million, or $(1.38) per Class A Common Share. This includes a $10.0 million loss attributable to an other than temporary impairment as of December 31, 2006, of certain mortgage-backed security ("MBS") portfolio assets that we have sold or intend to sell during the first quarter of 2007.* Accumulated Other Comprehensive Loss has been reduced by a corresponding amount and these MBS assets will be reflected on our balance sheet at fair market value as of December 31, 2006. Any difference between the fair market value of these MBS assets as of December 31, 2006, and the amounts ultimately realized upon the sale of such MBS assets will be reflected as a gain or loss in our first quarter 2007 earnings. *We currently estimate that our first quarter 2007 earnings will include a loss of approximately $1.1 million related to the sale of these MBS assets.* For the fourth quarter of 2005, Opteum reported a consolidated net loss of $2.7 million, or $(0.12) per Class A Common Share.

*For the year ended December 31, 2006, Opteum reported a consolidated net loss of approximately $49.5 million, or $(2.02) per Class A Common Share, compared with consolidated net income of $24.3 million, or $1.03 per Class A Common Share, for the year ended December 31, 2005.*

Book Value per Share

53

The Company currently estimates that its Book Value per Share as of December 31, 2006, was approximately $7.85 compared with $8.41 as of September 30, 2006. Book Value per Share is regularly used as a valuation metric by various equity analysts that follow the Company and may be deemed a non-GAAP financial measure pursuant to Regulation G. The Company computes Book Value per Share by dividing total stockholders' equity by the total number of shares outstanding of the Company's Class A Common Stock.

96.     Regarding its continuously deteriorating OFS business, the Company's February 14, 2007 release also stated, in part, the following:

**Opteum Financial Services**

*Actual margins associated with sales of mortgage loans at OFS during 2006 were less on average during the year than had been anticipated due largely to stiff competition in the marketplace for mortgage originations*. The difference in actual margin represents the largest component of operating losses incurred in 2006. *Exacerbating these lower-than-expected loan sale margins was an increase in loan loss reserves as a result of increases in early payment defaults on fourth quarter 2006 originations*, a decline in value of OFS's retained interests in securitizations, and net losses on hedge transactions related to both mortgage servicing rights and the retained interests.

In response to these results and to the secular development of brokerage firms acquiring mortgage lenders that are then provided with significantly lower funding costs, the Company's management team worked closely with key lenders to improve asset funding rates and initial margin rates. In late December 2006, the Company announced the sale to Citigroup Global Markets Realty Corp. ("Citigroup Realty") of a 7.5% non-voting Class B limited liability company membership interest in OFS and amendments to OFS's financing facilities with Citigroup Realty that *the Company currently believes, based on 2007 projected production levels, will lead to approximately $5.5 million to $6 million in savings at OFS.*

*Over the course of 2006, the Company carefully reviewed all positions at OFS in order to assess the criticalness of each job position to OFS's operations. This resulted in the elimination of 272 positions at OFS*. However, OFS's expansion into northern Florida, the Midwest and San Diego resulted in the addition of 78 new sales or sales-support personnel. *As of December 31, 2006, OFS employed 882 associates, which is a net reduction of 194 positions from December 31, 2005*. The combined savings from staff reductions and new lending agreements should result in *significantly leaner operations at OFS in 2007 than in the past.*

54

The expected recovery in the Company's Book Value per Share discussed above will not be fully realized if OFS's results do not improve. However, *the OFS management team believes the combination of its new funding terms, cost savings associated with its reduction in staff, and access to Citigroup Realty's capital markets expertise will lead to breakeven or positive monthly results at OFS by mid-2007.* [Emphasis added.]

97.     Commenting on these results, Defendant Zimmer stated, in part, the following:

Management Commentary

Commenting on the Company's 2006 fourth quarter and full-year results, Jeffrey J. **Zimmer**, Chairman, President and Chief Executive Officer, said, "There is nothing we dislike more than reporting negative operating results. *The Company had one of the best records of earnings and dividends among our New York Stock Exchange-traded peer group during 2004 and 2005, but in 2006 we underperformed much of the peer group,* which was understandably reflected in our stock price. Challenging business and operating conditions during 2006 resulted in inferior financial performance in both of our business units. *The Company's investment portfolio produced losses during the second half of the year as higher borrowing costs* - the result of two years of increases in the Federal Funds Rate - *finally surpassed the gross yield on our portfolio assets.* The sale of certain MBS assets during the first quarter of 2007 is intended to enable the Company to realize a positive net interest margin profit at a faster pace. The Company's taxable REIT subsidiary and mortgage origination platform, Opteum Financial Services, LLC (*"OFS"), has posted losses for four consecutive quarters, primarily due to four reasons: stiff competition for mortgage loans during a period when the number of loans originated declined nationwide, high debt costs, certain operating inefficiencies and a substantial increase during the fourth quarter in loan loss reserves due to anticipated increases in early payment defaults* on fourth quarter 2006 originations. Despite the Company's recent operating losses, however, *we are optimistic about the opportunities that lie ahead in 2007. Actions have been taken and additional actions are being evaluated to create a path to profitability in the near future.*"

*   *   *

"Separately, over the last few months, investors have inquired whether the Company has been repurchasing stock, given that it has been trading at close to a 15% discount to Book Value per Share. The Board authorized a stock buyback program in 2005 that was limited to one year in duration, and the authorization has expired. As a small-cap company, Opteum prizes its liquidity and its ability to support growth and future profitability. *Shrinking the Company's capital beyond the original stock buyback program would hinder the Company's ability to invest and to grow, and is not deemed to be in the long-term best interest of all shareholders.*

*"The Board of Directors and our senior management team believe that the implementation of recent operating changes will lead to positive operating results during 2007.* I look forward to making that promise a reality so all of our shareholders can realize a positive return on their investment," Zimmer concluded. [Emphasis added.]

98.    Later, on March 14, 2007, Defendants filed with the SEC the Company's annual report for full year 2006, the period ended December 31, 2006, pursuant to Form 10-K signed by all Defendants and certified by Defendants Zimmer and Cauley. In addition to making statements that were substantially similar to those that had been published previously concerning the Company's operations, the integration of OFS and the effects thereof, the 2006 Form 10-K again reiterated statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation. In addition, the Company's 2006 Form 10-K also contained representations and Certifications that attested to the purported effectiveness and sufficiency of the Company's controls and procedures as has been reproduced herein, *supra*.

99.    In addition to the foregoing, the 2006 Form 10-K also contained the following selected financial data that demonstrated the weakened operating and financial condition of the Company, beginning to be evidenced at that time:

| Selected Financial Data | 2006 | 2005 | 2004 |
|---|---|---|---|
| Interest Income | 255,088,719 | 160,640,830 | 49,633,548 |
| Interest Expense | (241,483,310) | (123,658,778) | (22,634,919) |
| Net Interest Income | 13,525,409 | 36,928,102 | 26,998,629 |
| Total Net Revenues | 28,996,929 | 41,293,348 | 27,094,176 |
| Total Expenses | 97,809,289 | 21,230,677 | 4,237,266 |
| Net (Loss)/Income | (49,545,862) | 24,283,671 | 22,856,910 |

100.    The statements made by Defendants and contained in the Company's February 14, 2007 release and in the Company's 2006 Form 10-K were each materially false and misleading when made and were know by Defendants to be false at that time, or were recklessly

56

disregarded as such, thereby, for the reasons stated herein, *supra*. Defendants statements forecasting profitability during 2007 were especially misleading and lacking in any reasonable basis given the true financial condition of the Company at that time.

### Defendants' Add'l Materially False & Misleading Statements
### Criticism of FBR Report : Additional Scienter

101.   In addition to the other materially false and misleading statements about the true financial health, profitability, and value of OFS, on March 20, 2007 Defendants took the unusual step of publishing a release that purported to respond directly to a negative analyst report, published by Friedman Billings Ramsey & Co., Inc., the prior day.[7] The Company's release stated, in substantial part, the following:

**Opteum Inc. Comments on FBR Research Report**

Inc. (NYSE:OPX) wishes to make several observations in response to a research report released this morning by Friedman Billings Ramsey and Company, Inc.

1. The report questions whether the Company will continue to be able to secure covenant waivers on its warehouse lines of credit. As the Company stated in its Form 10-K filed March 14, 2007 with the Securities and Exchange Commission, *the Company has secured all waivers needed to date.*

2. The Company has incurred a total of just $8 million of margin calls on its warehouse lines in 2007.

3. The Company has produced approximately $44 million of sub prime mortgages in 2007 which represents approximately 4.8% of 2007 year to date loan production of approximately $916 million. Forty-four percent of the $44 million (approximately $19 million) subprime mortgages were underwritten by a third party buyer and sold directly to that buyer. *The Company no longer underwrites sub prime mortgages. The Company believes that it is adequately reserved for*

---

[7] In the FBR research note, analyst Ross downgraded Opteum's stock to "Underperform," from "Market Perform," and lowered the near-term price target by $8.50 to $1 – after speculating that Opteum might no longer be able to obtain covenant waivers on its warehouse lines, as it has done over the past four quarters – in a less tolerant market environment – and after speculating that it may face losses on originated loans, and that servicing rights were subject to write-downs.

*early payment defaults related to sub prime mortgages as well as all other mortgages.*

4. The research report questions whether Opteum Inc. (NYSE: "OPX") is a going concern. The Company completed its 2006 audit last week and the Company received a clean audit opinion and is a going concern. The Company continues to believe it has very adequate liquidity. *The Company currently owns approximately $3 billion in agency mortgage related assets, the value of which has increased during 2007 as rates have declined. These agency assets are guaranteed by an agency of the Unites States Government.*

5. *The Company continues to believe that the carrying value of the servicing rights on its balance sheet correctly reflects the value of the servicing rights.* The changes in the value of the servicing rights have been related to changes in prepayment speed assumptions. The changes in prepayment assumptions also apply to our retained interests in securitizations. *Losses continue to run, in the aggregate, in line with expectations.* [Emphasis added.]

102.    As a result of the Company's public repudiation and rebuke of the FBR report, the following day, March 21, 2007, the *American Banker* reported that FBR analyst Ross had issued a "revised report," which acknowledged that the Company had already received covenant waivers. Moreover, the same analyst, after stating that FBR accepted the Company's assurances that it had adequate liquidity, raised the near-term price target to $4.00 per share.

103.    The statements made by Defendants and contained in the Company's March 20, 2007 release were materially false and misleading when made and were know by Defendants to be false at that time, or were recklessly disregarded as such thereby for the reasons stated herein, *supra.*

104.    On April 20, 2007, Defendants again surprised investors after they announced that Opteum would exit the money-losing wholesale mortgage loan origination business. At that time, Defendants published a release that stated, in part, that:

Opteum to Exit Conduit and Wholesale Lending BusinessVERO BEACH, Fla., Apr 20, 2007 (BUSINESS WIRE) -- Opteum Inc. (NYSE:OPX) ("Opteum" or the "Company"), a real estate investment trust ("REIT") that operates an integrated mortgage-related investment portfolio and mortgage origination platform, *today*

*announced that its subsidiary, Opteum Financial Services, LLC ("OFS"), intends to exit its Conduit and Wholesale mortgage loan origination businesses. OFS has ceased accepting new applications in each of these origination channels, effective immediately.* These actions are due primarily to the deterioration in the secondary market for closed mortgage loans and continuing weakness in consumer demand for mortgage products and services.

\*   \*   \*

"Recently, some secondary market investors in closed mortgage loans have changed their terms and have delayed settling whole loan trades involving certain Alt-A mortgage products. *This has forced OFS to re-market loans in respect of which it believed it had already obtained purchasing commitments, and has resulted in an estimated $22 million pre-tax loss associated with mortgage loans originated by OFS.* This loss will be reflected in the Company's first quarter results. Because we believe that the current adverse market environment may continue in coming quarters, *we intend to exit the Conduit and Wholesale mortgage origination businesses,"* Mr. Zimmer continued.* [Emphasis added.]

105.    These statements stood in stark contrast to the statements made when Citigroup Reality announced that it had partnered with the Company – at which time Defendants stated that its lowered cost of funding and greater access to capital rendered OFS "well positioned to profitably increase its market share as it leveraged its multi-channel mortgage origination platform." This sudden and extreme reversal in such a short period of time was also *not* consistent with the moderate decline that had occurred in the secondary market for mortgage loans at that time, as the Company's lax underwriting standards culminated in increased market volatility, early payment defaults, and high delinquency rates involving its subprime mortgages.

106.    Thereafter, on May 7, 2007, Defendants also revealed that Opteum would sell its money-losing retail mortgage loan origination business. At that time, Defendants published a release that stated, in part, the following:

**Opteum to Sell Retail Mortgage Origination Platform for an Estimated $5 Million Plus Assumption of Certain Liabilities**

Opteum Inc. (NYSE:OPX) ("Opteum" or the "Company"), a real estate investment trust ("REIT"), today announced that its subsidiary, Opteum Financial

Services, LLC ("OFS"), has entered into a definitive agreement with Prospect Mortgage Company, LLC, concerning *the sale of substantially all of the assets related to OFS's retail mortgage origination business (the "Business") and certain other assets associated with OFS's corporate staff functions for an estimated aggregate purchase price of $5 million* plus the assumption of certain lease and other liabilities related to the Business and the assets being sold. The transaction, which is subject to certain closing conditions, is scheduled to be completed during the second quarter of 2007.

"Given the reduced demand for mortgage products and services and the deterioration in the secondary market for closed mortgage loans, this transaction will enable us to refocus our energies on managing and growing our RMBS portfolio, while stemming OFS's losses associated with mortgage originations," said Jeffrey J. **Zimmer**, Chairman, President and Chief Executive Officer. "Upon completion of this transaction and the wind down of OFS's Conduit and Wholesale mortgage origination divisions, we will be out of the mortgage origination business entirely. *Certain costs associated with exiting the mortgage origination business will be reflected in our first quarter and second quarter results,"* Mr. Zimmer added.* [Emphasis added.]

107.    The two units shuttered – wholesale and conduit (whole loan) purchasing operations – amounted to almost 70% of Opteum's 2006 production. In connection with this exit, Defendants also announced that they would incur at lest $4.53 million in exit and disposal costs. These costs were in addition to the $22 million pretax quarterly loss related to Defendants alt-A loan "remarketing."

108.    Despite the downward momentum in Opteum's business, at that time Defendants again garnered significant bonuses and millions of dollars in stock awards from the Company. The chart below evidences these bonus paid throughout the Class Period – much of which was based upon the merger with OFS or contingent upon earnings and upon the successful integration of OFS, as follows:

**Summary Compensation Table**

| Name and Position | Year | Salary | Bonus | Other | Restricted / Stock Awards | Securities Underlying Options/ SARs | Payouts LTIP | All Other Compensation |
|---|---|---|---|---|---|---|---|---|
| | | **Annual Compensation** | | | **Long-Term Compensation** | | **Payouts** | |
| | | | | | **Awards** | | | |
| Jeffrey J. Zimmer, President and Chief Executive Officer | 2005 2006 | $ 400,000 500,000 | $ 684,177 500,000 | — — | $ 1,008,700(1) 1,614,529 | — — | — — | $ 22,204 196,119 |
| Robert E. Cauley, Chief Financial Officer, Chief Investment Officer and Secretary | 2005 2006 | $ 267,500 400,000 | $ 456,118 400,000 | — — | $ 672,464(2) 1,067,423 | — — | — — | $ 23,487 131,586 |
| Peter R. Norden, President and Chief Executive Officer (OFS); Senior Executive Vice President | 2005 2006 | $ 118,791 750,000 | — $ 750,000(3) | — — | — — | — — | — — | $ 11,723 58,067 |

(1)   This represents a grant of 110,000 shares with dividend equivalent rights awarded in 2006 as 2005 compensation, none of which vested in 2005.

(2)   This represents a grant of 73,333 shares with dividend equivalent rights awarded in 2006 as 2005 compensation, none of which vested in 2005.

(3)   Non-discretionary cash bonus.

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF OPTEUM IS BELATEDLY DISCLOSED

109.   It was only days later, on May 10, 2007, the final day of the Class Period, that Defendants shocked and alarmed investors after they published a release that revealed, for the first time, that as a result of the complete failure of the OFS merger, the Company would be forced to take almost **$9.0 million** in asset write-downs and another **$50 million** in negative value adjustments – almost all of which were related to OFS, and that it would report a net loss of over **$78.0 million** for the first quarter 2007. At that time, Defendants published a release that stated, in part, the following:

**Opteum Inc. Reports First Quarter 2007 Results;**

**76.5% of First Quarter Net Loss Attributable To:;**

> **$37.4 Million Valuation Allowance on OFS's Deferred Tax Assets;**
>
> **$12.2 Million Negative Fair Value Adjustment to OFS's Mortgage Servicing Rights;**
>
> **$1.3 Million Negative Fair Value Adjustment to OFS's Residuals;**
>
> **$8.8 Million in Asset Write Downs at OFS**

Opteum Inc. (NYSE:OPX) ("Opteum" or the "Company"), a real estate investment trust ("REIT"), today reported a consolidated net loss of $78.1 million, or $(3.14) per Class A Common Share for the three month period ended March 31, 2007, compared to a consolidated net loss of $8.0 million, or $(0.34) per Class A Common Share, for the prior year period. The Company's first quarter results were significantly impacted by operations at the Company's majority-owned subsidiary, Opteum Financial Services, LLC ("OFS").

*Nearly 50% of the Company's first quarter net loss, or $37.4 million, was attributable to a valuation allowance on OFS's deferred tax assets. Nearly 17.5% of the first quarter net loss was attributable to negative fair value adjustments to OFS's mortgage servicing rights and retained interests in securitizations. Slightly more than 10% of the first quarter net loss was attributable to asset write downs at OFS* due in part to the Company's decision to exit the mortgage origination business.

**Details of Results of Operations**

The Company's first quarter consolidated results include net interest income of $1.9 million, other income of $1.4 million, gross servicing fee income of $7.6 million, a $12.2 million negative fair value adjustment to mortgage servicing rights (inclusive of $4.7 million of run-off), an $18.0 million loss on mortgage banking activities, $0.8 million in losses on the sale of mortgage-backed securities, a $17.8 million provision associated with an increase in the Company's loan loss reserve, $8.8 million in asset write downs at OFS, $20.6 million in operating expenses, an income tax provision of $11.5 million (inclusive of a $37.4 million valuation allowance on deferred tax assets) and $0.8 million of minority interest in OFS's loss.

*The Company's $18.0 million first quarter loss on mortgage banking activities includes a $14.1 million negative fair value adjustment to mortgage loans held for sale and interest rate lock commitments, a $1.3 million negative fair value adjustment to retained interests in securitizations and hedging losses of $4.6*

*million.* As of March 31, 2007, the Company's loan loss reserve was $17.9 million, compared with $8.0 million as of December 31, 2006, and $2.2 million as of December 31, 2005.[Emphasis added.]

110.    The revelations that the Company had materially misrepresented its financial and operational condition, its controls and procedures, and its results of operations, belatedly revealed on May 10, 2007, caused shares of Opteum stock to fall precipitously. As evidence of this, the following day, after publication of Defendants' release, shares of the Company collapsed almost 20% in a single trading day – falling to approximately $4.00 per share from approximately $5.50 per share the prior day, on volume of over 1.79 million shares traded – many times the Company's daily average trading volume.

111.    Thereafter, on July 2, 2007 – in final demonstration of the total failure of the OFS acquisition – Defendants announced that the Company had completed the sale of the money-losing retail mortgage loan origination business. At that time, Defendants revealed that in exchange for substantially all of the assets related to OFS' retail mortgage loan origination business, and certain other assets associated with OFS' corporate staff functions, the Company received $1.5 million cash plus the assumption of approximately $4 million in lease obligations and other liabilities related to the business. At that time, investors also learned that, in conjunction with the sale of this business, Defendant Norden resigned his position as Senior Executive Vice President of Opteum Inc. effective June 29, 2007, and also resigned his position as President, Chief Executive Officer, and Co-Head of Capital Markets of OFS.

112.    Unfortunately for investors, this was not the last of the bad news about the Company that they would learn. On August 10, 2007, investors also learned that results for 2Q:07 would be even worse than previously stated – *with a massive net loss of approximately $162.5 million or over $6.50 per share, and with a write down in the Company's book-value to*

*approximately $1.17 per share at June 30, 2007*, compared with the $4.80 book-value reported on March 31, 2007. This massive charge also included *a loss from continuing operations of at least $82 million, and losses from discontinued operations, net of tax, of $80.5 million*.

113.    The chart below demonstrates the material decline in the price of the Company's shares immediately following the publication of Defendants' May 10, 2007 release and thereafter as more adverse facts about the Company began to become known to investors:



## CAUSATION AND ECONOMIC LOSS

114.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Opteum's stock price and operated as a fraud or deceit on Class Period purchasers of Opteum's stock by misrepresenting the Company's financial results and the purpose and effect of the acquisition of OFS in early-November 2005. Over a period of approximately eighteen months, Defendants improperly published a series of materially false and misleading statements about Opteum and inflated the

Company's financial results by failing to take adequate reserves or properly hedge or value assets and collateral.

115.   Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors – including the ruinous consequences of Defendants total failure to integrate OFS into the Company – shares of Opteum declined precipitously – evidence that the prior artificial inflation in the price of Opteum's shares was eradicated. As a result of their purchases of Opteum stock during the Class Period, Plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

116.   By improperly characterizing the Company's financial results and misrepresent-ing its prospects, Defendants presented a misleading image of Opteum's business and future growth prospects. During the Class Period, Defendants repeatedly emphasized the ability of the Company to integrate OFS and to monitor and control costs and expenses and monitor collateral value and risk, and consistently reported expenses and expense ratios within expectations and within the range for which the Company was adequately reserved. These claims caused and maintained the artificial inflation in Opteum's stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

117.   The decline in Opteum's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market. The timing and magnitude of Opteum's stock price decline negates any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

118.    Defendants' false and materially misleading statements had the intended effect of causing Opteum's shares to trade at artificially inflated levels throughout the Class Period – reaching a Class Period high of over $10.00 per share in early 2006. However, as a direct result of investors learning the truth about the Company beginning on May 10, 2007, Opteum's stock price collapsed to below $4.00 per share – a decline of 20%, compared to the prior day's close of approximately $5.50 per share, on very heavy trading volume of almost 2 million shares – many times the average daily trading volume. This dramatic share price decline eradicated much of the artificial inflation from Opteum's share price, causing real economic loss to investors who purchased this stock during the Class Period.

119.    The economic loss, *i.e.* damages suffered by Plaintiff and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Opteum's stock and the subsequent significant decline in the value of the Company's shares when Defendants' prior misstatements and other fraudulent conduct was revealed. In addition to the chart provided herein, *supra*, the artificial inflation in the price of Company shares during the Class Period is evidenced by the chart below:



## Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

120.    At all relevant times, the market for Opteum's common stock was an efficient market for the following reasons, among others:

(a)    Opteum's stock met the requirements for listing, and was listed and actively traded on the NYSE national market exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Opteum filed periodic public reports with the SEC and the NYSE;

(c)    Opteum regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Opteum was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

121.    As a result of the foregoing, the market for Opteum securities promptly digested current information regarding Opteum from all publicly available sources and reflected such information in Opteum stock price. Under these circumstances, all purchasers of Opteum common stock during the Class Period suffered similar injury through their purchase of Opteum common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

122.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Opteum who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

123.    Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of SEC filings by Opteum as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I

### (Against All Defendants)
### For Violation of Section 11 of the Securities Act

124.   Plaintiff incorporates by reference each and every allegation contained above, as if set forth herein *only* to the extent, however, that such allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff or members of the Class. This count is predicated upon Defendants strict liability for making false and materially misleading statements in the Registration Statement and Proxy-Prospectus. This Count is asserted by Plaintiff against all Defendants by and on behalf of persons who acquired shares of the Company pursuant to the false Registration Statement and Proxy issued in connection with the IPO and Secondary Offerings.

125.   The Company is the issuer of the stock issued *via* each false Registration Statement and Proxy-Prospectus. As such, Opteum is strictly liable for each false and misleading statement contained therein.

126.   The individuals identified as Defendants herein *supra*, are each signatories of the IPO and Secondary Offering Registration Statements; therefore, each of these Defendants had a duty to make a reasonable investigation of the statements contained in each Registration Statement and Proxy-Prospectus to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, Defendants should have known of the material misstatements and omissions contained each Registration Statements and Proxy and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. As such, each of these Defendants are liable to Plaintiff and the Class.

127.    Each of the Defendants identified in Count I issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public which were contained each Proxy-Prospectus and Registration Statement which misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct alleged herein, each Defendant violated, and/or controlled a person who violated §11 of the Securities Act. As a direct and proximate result of Defendants' wrongful conduct, the price for Company common stock sold in the IPO and Secondary Offering was artificially inflated, and Plaintiff and the Class suffered substantial damages in connection with their purchase of Company common stock.

128.    Plaintiff and other members of the Class acquired their Company stock without knowledge of the untruths and/or omissions alleged herein. Plaintiff and the other members of the Class were thus damaged by Defendants' misconduct and by the material misstatements and omissions of each aforementioned Proxy and Registration Statement.

129.    This action was brought within one year after the discovery of the untrue statements and omissions and within 3 years of the IPO and Secondary Offering of Company common stock.

## COUNT II

### (Against All Defendants)
### For Violation of Section 15 of the Securities Act

130.    Plaintiff incorporates by reference each and every allegation contained above as if set forth herein. This Count is asserted against all Defendants.

131.    At the time of the IPO and Secondary Offering, all Defendants acted as controlling persons of the Company within the meaning of §15 of the Securities Act. By reason of their stock ownership, senior management positions and/or directorships at the Company, as

alleged above, these Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause the Company to engage in the unlawful acts and conduct complained of herein.

132.   By reason of such conduct, the Defendants named in this Count are liable pursuant to §15 of the Securities Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and the Class suffered damages in connection with their acquisition of the Company common stock.

## ADDITIONAL SCIENTER ALLEGATIONS

133.   As alleged herein, Defendants acted with scienter in that each Defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Opteum, their control over and/or receipt and/or modification of Opteum's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Opteum, participated in the fraudulent scheme alleged herein.

134.   Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because the scheme: (i) deceived the investing public regarding Opteum's business, operations, management and the intrinsic value of Opteum common stock; (ii) enabled Defendants to artificially inflate the price of Opteum shares; (iii)

enabled Opteum insiders to register millions of their privately held Opteum shares while in possession of material adverse non-public information about the Company; (vi) allowed Defendants to raise as much as $8.2 million in cash through the sale of equity to investment bank Citigroup – Realty; (v) allowed Defendants to obtain millions of dollars in salary increases, bonuses and stock awards that were tied to the acquisition and false financial reporting by Defendants within the Class Period; and (vi) caused Plaintiff and other members of the Class to purchase Opteum common stock at artificially inflated prices.

## COUNT III

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

135.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

136.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Opteum's business, operations, management and the intrinsic value of Opteum common stock; (ii) enable Defendants to artificially inflate the price of Opteum shares; (iii) enabled Opteum insiders to register millions of their privately held Opteum shares while in possession of material adverse non-public information about the Company; (vi) allow Defendants to raise as much as $8.2 million in cash through the sale of equity to investment bank Citigroup – Realty; (v) allow Defendants to obtain millions of dollars in salary increases, bonuses and stock awards that were tied to the acquisition and false financial reporting by Defendants within the Class Period; and (vi) caus Plaintiff and other members of the Class to purchase Opteum common stock at artificially inflated prices.

72

137.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

138.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Opteum's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

139.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Opteum as specified herein.

140.    These Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Opteum's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Opteum and its business operations and future prospects in the light of the circumstances under which they were made not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a

course of business which operated as a fraud and deceit upon the purchasers of Opteum common stock during the Class Period.

141. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

142. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessly for the purpose and effect of concealing Opteum's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by

recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

143.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Opteum common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Opteum's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Opteum common stock during the Class Period at artificially high prices and were damaged thereby.

144.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Opteum was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Opteum common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

145.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

146.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT IV

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

147.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

148.    The Individual Defendants acted as controlling persons of Opteum within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

149.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

150. As set forth above, Opteum and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 17, 2007

John H. Genovese, Esq.
Florida Bar No. 280852
Johnathan Perlman, Esq.
Florida Bar No. 773328

**GENOVESE JOBLOVE & BATTISTA, P.A.**
Bank of America Tower at Int'l Place
100 Southeast Second St., 44th Floor
Miami, Florida 33131
Telephone: 305.349.2300
Facsimile: 305.349.2310

Kim E. Miller
**KAHN GAUTHIER SWICK, LLC**
12 E 41st Street, 12th Floor
New York, NY 10017
Telephone: (212) 696-3730

Lewis Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street - Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Attorneys for Plaintiff and the Class*

## CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF

_____(name) ("plaintiff") declares, as to the claims asserted under the federal securities law, that:

1.  Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

2.  Plaintiff did not purchase securities of Opteum, Inc. at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  During the Class Period, plaintiff has executed transactions in the securities of Opteum, Inc. as follows.  See Attached Schedule.

5.  In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.  Plaintiff will not accept payment for serving as a lead plaintiff beyond their pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: ____9/12/____, 2007

_____

Plaintiff

Cases where Representative Class Position Sought:

New Century Financial

Luminent Mortgage Capital Inc.

Accreded Home Lenders Holding Co.

## William Kornfeld Opteum, Inc.Transactions

## Buys

**Sells**

**Account 1**

| Date | Shares | Price |
|------|--------|-------|
| 3/24/2005 | 1100 | 14.35 |
| 3/28/2005 | 100 | 13.91 |
| 3/28/2005 | 300 | 13.84 |
| 3/28/2005 | 100 | 13.83 |
| 3/28/2005 | 500 | 13.92 |
| 3/28/2005 | 500 | 13.98 |
| 3/28/2005 | 1000 | 13.97 |
| 3/28/2005 | 3000 | 14.02 |
| 3/28/2005 | 2000 | 14.16 |
| 3/29/2005 | 2500 | 13.85 |
| 4/1/2005 | 200 | 13.44 |
| 4/1/2005 | 2800 | 13.48 |
| 4/1/2005 | 2800 | 13.48 |
| 4/8/2005 | 2000 | 13.71 |
| 4/11/2005 | 2000 | 13.48 |
| 4/12/2005 | 2000 | 13.3 |
| 4/12/2005 | 1000 | 13.22 |
| 4/25/2005 | 3000 | 13.2 |
| 5/27/2005 | 2000 | 14.48 |
| 7/26/2005 | 1500 | 14.01 |
| 7/27/2005 | 600 | 13.37 |
| 7/27/2005 | 1000 | 13.84 |
| 7/27/2005 | 400 | 13.36 |
| 7/27/2005 | 600 | 13.37 |
| 7/28/2005 | 2000 | 13.26 |
| 7/28/2005 | 700 | 13.12 |
| 8/4/2005 | 300 | 12.84 |
| 8/4/2005 | 1000 | 12.93 |
| 8/29/2005 | 750 | 12.35 |
| 8/30/2005 | 750 | 12.27 |
| 9/29/2005 | 1000 | 11.37 |
| 10/4/2005 | 1500 | 11.17 |
| 10/12/2005 | 2000 | 9.86 |
| 11/3/2005 | 2000 | 9.48 |
| 2/21/2006 | 100 | 8.69 |
| 2/21/2006 | 2900 | 8.73 |
| 3/20/2007 | 3900 | 4.19 |
| 3/20/2007 | 100 | 4.17 |

| Date | Shares | Price |
|------|--------|-------|
| 5/11/2007 | 6000 | 4.23 |
| 5/11/2007 | 6000 | 4.56 |
| 5/14/2007 | 4000 | 4.21 |
| 5/14/2007 | 2000 | 4.22 |
| 5/15/2007 | 2000 | 4.28 |
| 5/15/2007 | 4000 | 4.26 |
| 5/16/2007 | 4000 | 4.29 |

Account 2

| Date | Shares | Price |
|------|--------|-------|
| 1/5/2005 | 4000 | 15.4 |

# William Kornfeld Opteum, Inc.Transactions

| | | |
|---|---|---|
| 1/6/2005 | 2000 | 15.1 |
| 1/25/2005 | 3000 | 15 |
| 1/28/2005 | 3000 | 15.007 |
| 2/1/2005 | 3000 | 14.839 |
| 2/9/2005 | 3000 | 14.77 |
| 2/10/2005 | 3000 | 14.9297 |
| 2/25/2005 | 4000 | 14.9 |
| 7/6/2005 | 2000 | 13.96 |
| 7/27/2005 | 3000 | 13.57 |
| 8/11/2005 | 2000 | 12.52 |

# CIVIL COVER SHEET

JS 44 (Rev. 11/05)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS
WILLIAM KORNFELD, Individually And
On Behalf of All Others Similarly Situated

**(b)** County of Residence of First Listed Plaintiff   Clark County, NV
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
John H. Genovese, Esq.
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
305-349-2300

**DEFENDANTS**
OPTEUM INC., et. al.

County of Residence of First Listed Defendant   Indian River
IN U.S. PLAINTIFF CASES ONLY
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

07-14278

CIV-GRAHAM MAGISTRATE JUDGE LYNCH

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☑ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☑ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

2:  2007cv 14278 /DLG/FJL

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
  **Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☒ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

FILED by DKTG

SEP 17 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## V. ORIGIN (Place an "X" in One Box Only)
☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

a) Re-filed Case ☐ YES ☐ NO    b) Related Cases ☐ YES ☐ NO

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):   JUDGE ___   DOCKET NUMBER ___

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
Securities and Exchange Act of 1934

LENGTH OF TRIAL via ___ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ ___

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE 9/17/07

FOR OFFICE USE ONLY
AMOUNT $350.00   RECEIPT # 966682

09/17/07