UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. PIERCE DIVISION

Case No. 07-14278-CIV-GRAHAM/LYNCH

IN RE:

OPTEUM, INC. SECURITIES LITIGATION,

_____/

## ORDER

**THIS CAUSE** comes before the Court upon the Motion to Dismiss
that was filed by Defendants Kevin L. Bespolka, Maureen A.
Hendricks, W. Christopher Mortenson, Buford H. Ortale, Flagstone
Securities, LLC and BB&T Capital Markets [D.E. 46], and the Motion
to Dismiss that was filed by Defendants Robert E. Cauley, Peter R.
Norden, Jeffrey Zimmer and Opteum, Inc. [D.E. 49].

**THE COURT** has considered the Motions, the pertinent portions
of the record, and is otherwise fully advised in the premises.

I.    **BACKGROUND**

Lead Plaintiff, the Kornfeld Group (comprised of William F.
Kornfeld, Jr., John A. Burns, and David Cottun), and Plaintiff
James Winn brought this securities class action on behalf of two
classes. The first class, "the Securities Act Class", is comprised
of all those who purchased Opteum, Inc. ("Opteum") securities in
connection with its September 17, 2004 Initial Public Offering
("IPO") and/or its December 16, 2004 Secondary Offering ("SPO").

The Securities Act Class Period runs from September 17, 2004 through July 24, 2005 [D.E. 42 at ¶ 2]. The second class, "the Exchange Act Class", is comprised of all persons who purchased Opteum shares on the open market between September 29, 2005 and August 10, 2007 [D.E. 52 at ¶ 43].

Defendant Opteum is a Real Estate Investment Trust ("REIT") that invests primarily in residential mortgage related securities that are issued by the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Government National Mortgage Association ["Ginnie Mae") [D.E. 42 at ¶ 12]. Opteum was formed on November 3, 2005, when Bimini Mortgage Management, Inc. ("Bimini") acquired Opteum Financial Services, LLC ("OFS").

Defendants Flagstone Securities LLC ("Flagstone") and BB&T Capital Markets ("BB&T") (collectively the "Underwriter Defendants") served as lead underwriters for the September 17, 2004 IPO, and the December 16, 2004 SPO [D.E. 42 at ¶ 21]. In addition to Opteum, Flagstone and BB&T, there are seven individual Defendants in this case. Defendant Robert Cauley ("Cauley") was and is the Vice Chairman of the Board of Directors, Senior Executive Vice President, Chief Financial Officer, and Chief Investment Officer of Opteum [D.E. 42 at ¶ 13]. Defendant Peter Norden ("Norden") was a member of the Board of Directors and Executive Vice President of Opteum. He was also President and CEO

of OFS and served as Co-Head of Capital Markets after the acquisition. He resigned his positions in June 2007 [D.E. 42 at ¶ 14]. Defendant Jeffrey Zimmer ("Zimmer") was and is Chairman of the Board of Directors and Chief Executive Officer of Opteum [D.E. 42 at ¶ 15]. Defendant Kevin Bespolka ("Bespolka") was a member of the Board of Directors and a member of the Audit, Governance and Compensation Committees of the Board [D.E. 42 at ¶ 16]. Defendant Maureen Hendricks ("Hendricks") was a member of the Board of Directors and the Audit and Compensation Committees of the Board [D.E. 42 at ¶ 17]. Defendant W. Christopher Mortenson ("Mortenson") was a member of the Board of Directors [D.E. 42 at ¶ 18]. Defendant Buford H. Ortale ("Ortale") was a member of the Board of Directors and the Audit and Governance Committees of the Board [D.E. 42 at ¶ 19].

In their Amended Complaint, Plaintiffs allege violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. With respect to their Securities Act claims, Plaintiffs allege that Defendants failed to disclose that the risk management strategies that were described in the prospectuses were already not working and, therefore, their statements regarding their beliefs, expectations and goals were false and misleading. With respect to their Exchange Act claims, Plaintiffs allege that Defendants failed to disclose that OFS made high risk loans, the percentage of OFS's

business that dealt with high risk loans, and that the company was engaging in improper lending and underwriting practices. Furthermore, Plainitffs allege that Defendants misrepresented the condition of their internal controls over financial reporting, falsely stated that their financial reports complied with GAAP, and misrepresented the effects of the Bimini/OFS merger.

Before the Court is the Motion to Dismiss that was filed by Defendants Bespolka, Hendricks, Mortenson, and Ortale (the "Outside Directors"), and the Underwriter Defendants [D.E. 46], and the Motion to Dismiss that was filed by Defendants Cauley, Norden, and Zimmer (the "Inside Directors"), and Opteum [D.E. 49].

## II.   LAW AND DISCUSSION

### A.   Standards of Review

#### 1.   Motion to Dismiss Standard

In examining a motion to dismiss, a court accepts the plaintiff's allegations as true and construes the complaint in the plaintiff's favor. See, generally, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)(noting that on a motion to dismiss there is an assumption that all allegations in the complaint are true). The complaint must contain "only enough facts to state a claim to relief that is plausible on its face." Id. at 1974. The factual allegations "must be enough to raise a right to relief above the speculative level." Id. at 1965. "[A] plaintiff's obligation to provide the 'grounds' of his

4

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65.

### 2. Federal Securities Laws

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission ["SEC"] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, which was promulgated by the SEC, states that:

> It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any devise, scheme or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To allege a securities fraud claim under Rule 10b-5, the Plaintiff must plead: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or

omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" <u>Mizarro v. Home Depot, Inc.</u>, 544 F.3d 1230 (11th Cir. 2008).

### 3.      Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act

Like other fraud claims, securities fraud claims are subject to Fed. R. Civ. P. 9(b)'s requirement to "state with particularity the circumstances constituting fraud." To comply with Rule 9(b), the complaint must state "(1) precisely what statements were made in what documents or oral representations or what omissions were made, (2) the time and place of each such statement and the person responsible for making (or in the case of omissions, not making) same, (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." <u>Mizarro</u>, 544 F.3d at 1237 (quoting <u>Tello v. Dean Witter Reynolds, Inc.</u>, 494 F.3d 956, 972 (11th Cir. 2007). In other words, the Complaint must set forth the "who, what, when, where, and how: the first paragraph of any newspaper story." <u>Carpenters Health and Welfare Fund v. The Coca Cola Co.</u>, 2002 U.S.Dist. Lexis 28072, at *17 (N.D.Ga., Aug. 19, 2002).

The Private Securities Litigation Reform Act ("PSLRA") further increased the pleading standard in securities fraud cases by requiring that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is

6

misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

### 4.    Scienter Pleading Standard

The PSLRA also raised the standard for pleading scienter. Mizarro, 544 F.3d at 1238. Specifically, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Eleventh Circuit has interpreted this language to require that the plaintiff "allege facts supporting a strong inference of scienter 'for each defendant with respect to each violation.'" Mizarro, 544 F.3d at 1238 (quoting Phillips v. Scientific Atlanta, Inc., 374 F.3d 1015, 1016 (11th Cir. 2004).

Although it raised the pleading standard for scienter, the PSLRA did not modify the substantive intent requirements. Mizarro, 544 F.3d at 1238.    According to the Eleventh Circuit, "§ 10(b) and Rule 10b-5 require a showing of either an 'intent to deceive, manipulate or defraud,' or 'severe recklessness.'" Mizarro, 544 F.3d at 1230 (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1284 (11th Cir. 1999). The Eleventh Circuit has described "severe recklessness" as being "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or

7

even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." <u>Mizarro</u>, 544 F.3d 1230, 1238 (quoting Bryant, 187 F.3d at 1284).

In sum, the Plaintiff must plead "with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." <u>Mizarro</u>, 544 F.3d at 1238. A "strong inference" of scienter is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Tellabs, Inc. V. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 127 S.Ct. 2499, 2510, 168 L.E.2d 179 (2007). When determining whether a "strong inference" of scienter exists, the Court "must consider the complaint in its entirety." <u>Tellabs</u>, 127 S.Ct. at 2509. Furthermore, "omissions and ambiguities count against inferring scienter." <u>Tellabs</u>, 127 S.Ct. at 2511.

**B.   The Underwriters and Outside Directors' Motion to Dismiss**

According to the Underwriters and the Outside Directors, the Securities Act Claims should be dismissed because: (1) Bimini made no false or misleading statements in the prospectuses, (2) the alleged misstatements and omissions are immaterial, and (3) the claims are time-barred. With regard to the Exchange Act claims,

8

Defendants argue that: (1) the Underwriters had no involvement beyond the IPO and SPO and, therefore, cannot be liable for any post-IPO/SPO statements, and (2) group pleading is insufficient to allege a claim against the Outside Directors.

1.  **Securities Act Claims**

     a.   **Whether the claims are time-barred**

According to 15 U.S.C.A. § 77m, "[n]o action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C.A. § 77m. "Discovery occurs when a potential plaintiff has inquiry or actual notice of a violation." Theoharous v. Fong, 256 F.3d 1219, 1228 (11th Cir. 2001). "Inquiry Notice is the term used for knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed." Theoharous, 256 F.3d at 1228. Since this lawsuit was filed on September 17, 2007, the Securities Act claims will be time-barred if Plaintiffs had notice before September 17, 2006.

According to Defendants, it is clear from the allegations of the Complaint that Plaintiffs were on actual or inquiry notice of the alleged untrue statements and/or omissions as of July 25, 2005.

9

On that day, Bimini issued a press release that stated in relevant part:

> [T]he second quarter was a period when very short-term rates went up, resulting in lower net income compared with the first quarter of 2005.  The Company began over a year ago to take steps to mitigate the continued impact of further interest rate movements initiated by the Federal Reserve by adding a greater proportion of adjustable-rate securities to the portfolio.  But there is no assurance that net interest spreads will not be compressed further.

[D.E. 46-7, Exh. F].  The press release further stated:

> As of June 30, 2005, the Company held $3.9 million of mortgage backed securities at fair value.  Interest income was $36.7 million and interest expense was $26.5 million for the second quarter of 2005.  As of June 30, 2005, the weighted average yield on assets was 3.81% and the weighted average borrowing cost was 3.14%.  The weighted average constant prepayment rate for the portfolio was 28.4% for June 2005.  The effective duration of the portfolio at the end of the second quarter was 0.57.

[D.E. 46-7, Exh. F].

Furthermore, per the allegations in the Amended Complaint, Bimini issued a press release on August 24, 2005, which stated in relevant part:

> However, continued aggressive increases in the Federal Funds Target Rate will inevitable put pressure on earnings to the extent that our funding rates increase faster than the income on our adjustable rate mortgage related assets.  In particular, while yields on our adjustable rate assets will ultimately move in response to movements in short terms rates, they will do so with a lag owing to reset frequencies that are often greater than monthly and owing to interim and lifetime securities maximum coupon reset rates that may preclude a security from achieving its fully indexed rate.

[D.E. 42, at ¶ 82].

In a section entitled "The Truth is Revealed Regarding the IPO and SPO," Plaintiffs state that "Bimini's disclosure that interest expense was now 72% of interest income, on top of Bimini's disclosure that its business plan from over a year ago has not actually worked to mitigate the impact of interest rate increases and that Bimini was not making any assurances that interest rate expenses would not further increase" caused the stock to drop from $14.15 to $12.26.  The stock further fell to $12.30 after the disclosures in the August 25, 2009 press release [D.E. 42, ¶¶ 79-83].  Furthermore, Plaintiffs state that "[t]he disclosures in the press releases made it clear that Bimini's risk management approach was not adequately protecting investors against loss and Bimini was not operating according to its own plan that it put in place prior to the IPO and SPO, when it was already the case that the business plan was not effective and would not be effective to mitigate the effect of the interest rates on Bimini's revenues" [D.E. 42, ¶ 85].

Despite the assertions in their Amended Complaint that the press releases "made it clear" that the risk management plans were not working prior to the IPO and SPO, Plaintiffs argue that they were not placed on inquiry notice of the misrepresentations and omissions in the offering documents until September 29, 2005, when Bimini announced its acquisition of OFS.  According to Plaintiffs, the acquisition announcement "essentially conced[ed] that Bimini's core business model was defunct and that the various risk

11

management plans Defendants had described in the Offering Documents were illusory at the time of the Offerings" [D.E. 50 at 20]. Furthermore, Plaintiffs argue that any dispute regarding whether Plaintiffs were on inquiry notice before September 29, 2005 would be a factual dispute that is not properly resolved on a motion to dismiss. See Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1283 (11th Cir. 2005). However, even if Plaintiffs did receive inquiry notice on September 29, 2005, which appears unlikely given the allegations in the Amended Complaint, the action would still be time-barred, since the Complaint was filed on September 17, 2007.

Based on the foregoing, this Court finds that the Securities Act claims are barred by the statute of limitations.

### 2.   Exchange Act Claims

#### a.   Underwriters

Defendants argue that the Underwriters were not involved with the acquisition of OFS in November 2005, and the subsequent statements and public filings that followed. Plaintiffs fail to respond to this argument in their Opposition, nor do they address the assertion that no statements during the Exchange Act Class Period are attributed to the Underwriters.

Based on the foregoing, the Court finds that the Exchange Act claims against the Underwriters should be dismissed.

### b.   Outside Directors

With respect to the Outside Directors, Defendants argue that Plaintiffs have failed to meet the requirements of Fed. R. Civ. P. 9(b) because they improperly invoke the group pleading doctrine to attribute press release statements to the Outside Directors.

"Federal Rule of Civil Procedure 9(b) requires a plaintiff to attribute fraudulent acts or statements to a particular defendant." In re Sunbeam Securities Litigation, 89 F.Supp.2d 1326, 1340 (S.D.Fla. 1999). However, under the group pleading doctrine, "a securities fraud plaintiff may impute false and misleading statements appearing in annual reports, quarterly and yearly financial statements, press releases, or other group published information to all inside corporate officers and directors, who are presumed to have knowledge of and involvement in the day to day affairs of the company." In re: Sensormatic Electronics Corp. Securities Litigation, No. 018346-CIV-Hurley, 2002 WL 1352427, at * 4.

Since Bespolka, Hendricks, Mortenson and Ortale are Outside Directors, Defendants argue that the group pleading doctrine will only apply if the complaint alleges that the Outside Directors participated in the day-to-day operations of Opteum, or had some special relationship with the company, such as the preparation or communication of group published information at a particular time. See Sensormatic, 2002 WL 1352427, at *5.

13

In their Amended Complaint, Plaintiffs allege that:

> The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of various SEC filings, press releases and other public statements pertaining to the Company during the Exchange Act Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

[D.E. 42, ¶ 275].

Based on Plaintiffs' assertions that the Individual Defendants controlled the content of the public statements that were issued during the Exchange Act Class Period, the Court finds that the group pleading doctrine applies to the Outside Directors. <u>See</u> <u>Sunbeam</u>, 89 F.Supp.2d at 1341. Therefore, Plaintiffs have satisfied the particularity requirement of Fed. R. Civ. P. 9(b), and Defendants' request to dismiss the Exchange Act claims against the Outside Directors on this basis will be denied.

### C.   The Inside Directors and Company's Motion to Dismiss

According to these Defendants, the Exchange Act claims should be dismissed because they fail to satisfy the particularity requirements of Rule 9(b) and the PSLRA, and because Plaintiffs do not adequately plead a strong inference of scienter.

14

## 1.   Safe Harbor for Forward-Looking Statements

Defendants argue that many of the statements regarding the benefits, opportunity, and long-term value of the OFS merger are protected by the PSLRA's safe harbor for forward-looking statements. "In that safe harbor, corporations and individual defendants may avoid liability for forward-looking statements that prove false if the statement is 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" Harris v. IVAX, 182 F.3d 799, 803 (11th Cir. 1999). The PSLRA defines a forward looking statement as:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

      (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

      (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

Defendants first argue that statements made in the November 3, 2005 press release are forward looking.  That press release stated in relevant part:

> We are very pleased to have completed this transaction in a timely manner. **This merger benefits both companies.  It allows Bimini to diversify its revenue stream while remaining in the Company's area of expertise ... Ultimately, we believe this merger will add long-term value for all of our shareholders.**

[D.E. 42 at ¶ 135].  The Court finds that the highlighted statements are forward-looking.  The statement: "[t]his merger benefits both companies.  It allows Bimini to diversify its revenue stream while remaining in the Company's area of expertise" expresses the plans and objectives of management for future operations.  The last statement: " we believe this merger will add long-term value for all of our shareholders" is a statement of future economic performance.

On February 23, 2006, Defendants issued a press release announcing the results for the fourth quarter of 2005 and the full

year of 2005.  This press release stated in relevant part: "The
Board is pleased with the speed at which the successful integration
of OFS is taking place **and views the opportunity for diversified
sources of income as a great benefit to all shareholders**" [D.E. 42
at ¶ 140].  This same statement appears in the press release issued
on May 8, 2006.  The Court finds that the statement: "and views the
opportunity for diversified sources of income as a great benefit to
all shareholders" is a statement of future economic performance
and, therefore, forward looking.

On August 8, 2006, Defendants issued a press release for the
second quarter of 2006.  That release stated in relevant part:

> in addition to the previously announced reduction in
> duplicative or underperforming personnel at OFS, **which
> will result in over $3.5 million in annualized savings**,
> the reduced borrowing costs of the company announced in
> the second quarter have all now been implemented **and
> should save OFS approximately $3.5 million per year in
> the future.    Finally, we believe that OFS financial
> results will benefit on an ongoing basis from the capital
> markets expertise that the REIT management team is
> rigorously applying to the OFS securitization strategy**.

[D.E. 42 at ¶ 150].  The highlighted statements are statements of
income savings, the plans and objectives of management for future
operations, and future economic performance.  They are therefore
forward-looking.

On December 20, 2006, Opteum issued a press release in
conjunction with its 2006 third quarter report.  The press release
stated in relevant part: "If this neutral policy continues or if

17

the Federal Reserve relaxes monetary policy, the results from operations at both the Opteum REIT and OFS will have the opportunity for improvement" [D.E. 42 at ¶ 159].  This statement is a statement of future economic performance and, therefore, forward looking.

On December 21, 2006, Opteum issued a press release discussing Citigroup Realty's purchase of an interest in Opteum.  The press release states in relevant part: "With lower funding costs and even greater access to capital, we are well positioned to profitably increase our market share as we leverage our multi-channel mortgage origination platform" [D.E. 42 at ¶ 161].  This statement is a statement of future economic performance and, therefore forward looking.

Finally, in a press release issued on February 14, 2007, Opteum stated in relevant part: "The Board of Directors and our senior management team believe that the implementation of recent operating changes will lead to positive operating results during 2007" [D.E. 42 at ¶ 170].  This statement is a statement of the plans and objectives of management for future operations and, therefore, forward-looking.

These forward-looking statements were accompanied by meaningful cautionary statements.

For example, in its 10-K for the fiscal year ending December 31, 2005, Opteum identified the percentage of loans that were Alt-

18

A, and defined such loans as "first lien mortgage loans made to borrowers whose credit is generally within typical Fannie Mae or Freddie Mac guidelines, but have loan characteristics that do not conform under those guidelines." Opteum added: "From a credit risk standpoint, Alt-A borrowers present a profile comparable to that of conforming loan borrowers, but entail special underwriting considerations, such as a higher loan-to-value ratio or limited income variation.   The most significant portion of the loans originated or purchased by OFS are Alt-A." [See Opteum 2005 10-K, at 10].

Opteum also identified the number of loans that were subprime, and defined such loans as "first and second lien mortgage loans secured by one-to-four family residences, made to individuals with credit profiles that do not qualify them for a prime loan." Id. at 10.  Opteum disclosed that for some of its loan products, it did not receive full documentation of the borrower's income and assets, relying instead on the borrower's credit score, credit history, the value of the property securing the loan, and the loan's effect on the borrower's debt service requirements.  Id. at 36.  In fact, Opteum specifically stated that in 2004 and 2005, it did not receive full documentation on the borrower's income and/or assets on approximately 62.6% and 62.4%, respectively, of its mortgage loans.  Id. at 36.  Opteum informed investors that there was a higher risk of default on loans where income was not fully

19

documented.  Id. at 36.   It also informed investors that its ability to sell its mortgage loans could be harmed by the unavailability of an active secondary market.  Id. at 36.

Opteum further noted that it is dependent on the securitization market for the sale of its loans and that a number of factors could affect this market, including general economic conditions, conditions in the securities market, and conditions in the securitization capital market.  Id. at 36-37, 57.   Opteum identified factors that could affect the securitizations market, including a liquidity crisis, a terrorist attack, war, and defaults of comparable securitizations.  Id. at 57.  Also in the 2005 10-K, Opteum noted fraudulent statements on loan applications exposed it to losses, since it relies heavily on information provided by third parties.   Opteum noted that if any of the information on the application is false, and it is not detected prior to funding, the value of the loan may be much lower than expected.  This risk would be born by Opteum.  Id. at 63.   Finally, even though Opteum identified its underwriting guidelines, it noted that exceptions were granted in some cases, with manager approval.  Id. at 11.

The same and/or similar cautionary language appears in the 2006 Form 10-K, and the quarterly reports for 2006 that followed the acquisition of OFS [D.E. 49-5, Exh. D at 8, 28; D.E. 49-6, Exh. E at 47, 49; D.E. 49-7, Exh. F at 43; D.E. 49-8, Exh. G at 46].

To come within the safe harbor, Defendants did not need to warn of every factor that ultimately caused the statement not to come true. Harris v. IVAX Corp., 998 F.Supp. 1449, 1454 (S.D. Fla. 1998). "It is sufficient that the cautionary statements identify meaningful and important factors that could affect future performance. Harris, 998 F.Supp. at 1454.

Based on the foregoing, the Court finds that the aforementioned statements fall within the safe harbor for forward-looking statements.

### 2.   Pleading Scienter

Plaintiff must "allege facts supporting a strong inference of scienter 'for each defendant with respect to each violation.'" Mizarro, 544 F.3d at 1238. According to Defendants, Plaintiffs have failed to plead scienter because the Complaint does not demonstrate that Defendants had knowledge of the high risk loans, the lax underwriting and lending standards, or the GAAP violations.

With regard to the high risk loans, Plaintiffs offer the statements of a confidential witness, a capital markets analyst who worked in Secondary Marketing during the Exchange Act Period [D.E. 42 at ¶ 119]. According to this witness, Defendant "Norden knew exactly what was going on at the time of the fall 2005 sale and thereafter." The confidential witness added that one of the best traders in Structured Finance at the Company, Adam Tessler, was very close to Norden and he and Norden discussed the business all

21

the time.   Tessler continuously informed the confidential witness that Opteum was a high-risk operation and that he, Tessler, was going to get out of there as soon as possible.   Tessler resigned in 2007 [D.E. 42 at ¶ 119].   These confidential witness statements support the allegation that Norden knew that OFS was making a large percentage of high risk loans.   Norden's knowledge of the high risk loans gives rise to a strong inference that he was severely reckless in failing to disclose the existence of this fact to the public.   The Court finds that "this inference is cogent and at least as compelling as any opposing inference once could draw from the facts alleged."   See Tellabs, 551 U.S. 308, 127 (2007).

According to the same confidential witness, one of the reasons that loan officers were approving high risk loans was that Defendant Zimmer made it very clear that if employees did not make their numbers, they would be out the door [D.E. 42 at ¶ 122]. According to this witness, Defendant Zimmer increased quotas, making it hard for the loan officers to keep up [D.E. 42 at ¶ 122]. The witness added that this environment "encouraged loan officers to get what they could so they could get their commissions" [D.E. 42 at ¶ 122].   According to the witnesses, loan officers made "basically no money, they needed those commissions" [D.E. 42 at ¶ 122].   According to Plaintiffs, the foregoing demonstrates that Defendants knew that they "fostered an environment in which loan officers pushed and approved high-risk liar loans" [D.E. 42 at ¶

22

122]. The Court is in partial agreement. The witness statements do not support the allegation that <u>all</u> Defendants were aware of this environment, but they do support the allegation that Zimmer was aware. Zimmer's knowledge of the high risk loans gives rise to a strong inference that he was severely reckless in failing to disclose the existence of this fact to the public. The Court finds that "this inference is cogent and at least as compelling as any opposing inference once could draw from the facts alleged." <u>See</u> <u>Tellabs</u>, 551 U.S. 308, 127 (2007).

With respect to the GAAP violation allegations, Plaintiffs point to a statement made by a confidential witness who began as a business analyst for the servicing group before being promoted to asset operations manager [D.E. 42, at ¶ 196]. This confidential witness indicated that she provided internal reports to higher-level management, including Bimini executives, that detailed payout expenses from the trust that held loans in the pool, delinquencies, and prepayment penalties [D.E. 42 at ¶ 196]. This confidential witness added that the information provided in the normal investor reports were more standardized and less detailed. The witness indicated that "around October or November 2006, Opteum started to change how it classified subprime mortgages. The result of this change would have been that when an investor looked at the prospectus for a securitized pool of loans, the percentage of subprime mortgages in the pool was much smaller than it would have

23

previously been" [D.E. 42 at ¶ 196].   The statements of the
confidential witness do not explain why the information provided in
the internal reports should have alerted Defendants to the alleged
fraud.   Furthermore, there is no allegation that Defendants were
aware that the information provided to investors was different than
that contained in the internal reports, or that Defendants knew
that the classification of subprime mortgages had changed.

   "[C]ourts have held that allegations of violations of GAAP or
GAAS, coupled with allegations of ignoring 'red flags' can be
sufficient to state a claim for securities fraud."   Ziemba v.
Cascade International, Inc., 256 F.3d 1194, 1210 (11th Cir.
2001)(citing In re Sunbeam Securities Litigation, 89 F.Supp.2d
1326, 1344-47 (S.D.Fla. 1999)).   "In order to plead fraudulent
accounting practices with particularity, a complaint should show
facts that support the inference that the defendants 'recklessly
disregarded the deviance   [from GAAP] or acted with gross
indifference to the misrepresentations in its financial
statements.'"   In re Scientific -Atlanta, Inc. Securities
Litigation, 239 F.Supp.2d 1351, 1366 (N.D.Ga. 2002).   "Relevant
facts are the magnitude of the accounting error, whether the
defendants had prior notice of the error, and whether the
defendants played any role in calculating and disseminating the
financial statement."   Scientific-Atlanta, 239 F.Supp.2d 1366.

None of the alleged facts demonstrate that the named Defendants had knowledge of the accounting errors.  As a result, Plaintiffs have failed to adequately plead scienter with respect to the GAAP violation allegations.

There are no allegations demonstrating that Defendant Cauley (or the Outside Directors) had knowledge of the prevalence of high risk loans. Furthermore, there are no allegations demonstrating that any of the Defendants had knowledge of the lax underwriting and lending standards, or the GAAP violations.  Thus, Defendants' Motion to Dismiss is granted with respect to Defendants Cauley and the Outside Directors, and with respect to the underwriting, lending and GAAP allegations against Defendants Zimmer and Norden.

3.   **Whether the Loan Quality Allegations are pled with particularity**

Defendants argue that the loan quality allegations should be dismissed because there are no allegations to support Plaintiffs' pejorative label. Specifically, Defendants suggest that Plaintiffs must identify which loans were risky, in what amount, who made them, whether the Officer defendants knew about them, when the loans were made, and whether they went into default.  The Court does not agree.

Rule 9(b) requires the Plainitffs to state "(1) precisely what statements were made in what documents or oral representations or

25

what omissions were made, (2) the time and place of each such statement and the person responsible for making (or in the case of omissions, not making) same, (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." Mizarro, 544 F.3d at 1237 (quoting Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 972 (11th Cir. 2007). Furthermore, the PSLRA requires Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

After reviewing the loan quality allegations, the Court finds that they satisfy the particularity requirements of Rule 9(b) and the PSLRA.

### 4.   Plaintiff's Section 20(a) Claim

Defendants argue that Plaintiffs' Section 20(a) claim should be dismissed due to their failure to adequately assert an underlying violation of the Exchange Act. See Brown v. Enstar Group, Inc., 84 F.3d 393, 396-97 (11th Cir. 1996). However, this Court has found that Plaintiffs have adequately alleged a violation of the Exchange Act with respect to the loan quality allegations against Defendants Norden and Zimmer. As a result, Defendants'

26

request to dismiss the Section 20(a) claim will be denied with respect to those Defendants.

## III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED AND ADJUDGED** that the Underwriters and Outside Directors' Motion to Dismiss the Amended Complaint [D.E. 46] is **GRANTED in part and DENIED in part**.  It is further

**ORDERED AND ADJUDGED** that the Insider Directors' and Company's Motion to Dismiss [D.E. 49] is **GRANTED in part and DENIED in part**. Accordingly, it is

**ORDERED AND ADJUDGED** that Counts I and IV are **DISMISSED** against Defendant Opteum. It is further

**ORDERED AND ADJUDGED** that Counts II, IV and VI are **DISMISSED** against Defendants Flagstone Securities LLC and BB&T Capital Markets (collectively the "Underwriter Defendants").  It is further

**ORDERED AND ADJUDGED** that Counts III, IV, V, VI, and VII are **DISMISSED** against Defendants Bespolka, Hendricks, Mortenson and Ortale (collectively, the "Outside Directors").  It is further

**ORDERED AND ADJUDGED** that Counts III, IV, V, VI and VII  are **DISMISSED** against Defendant Cauley.  It is further

**ORDERED AND ADJUDGED** that Counts III, IV and V are **DISMISSED** against Defendant Zimmer.  It is further

27

**ORDERED AND ADJUDGED** that Count VI is **DISMISSED in part** against Defendants Opteum, Zimmer and Norden. The loan quality allegations shall remain, but the underwriting, lending, and GAAP violation allegations shall be stricken. It is further

**ORDERED AND ADJUDGED** that the statements regarding the benefits, opportunity, and long-term value of the OFS merger that were determined to be protected by the PSLRA's safe harbor for forward-looking statements shall be stricken. It is further

**ORDERED AND ADJUDGED** that Plaintiffs shall file an amended Complaint by October 12, 2009, and Defendants shall respond by October 23, 2009.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 30th day of September, 2009.

DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE

cc:  U.S. Magistrate Judge Lynch
     All Counsel of Record