**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

| | |
|---|---|
| )<br>)<br>**IN RE OPTEUM, INC. SECURITIES** )<br>**LITIGATION** )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 07-14278-<br>CIV-GRAHAM<br><br>CONFORMING CONSOLIDATED<br>AMENDED CLASS ACTION<br>COMPLAINT FOR<br>VIOLATIONS OF<br>FEDERAL SECURITIES LAWS[1]<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.      Lead Plaintiff, the Kornfeld Group (comprised of William F. Kornfeld, Jr., John A. Burns, and David Cottun), and additional plaintiff James Winn, bring this federal securities law class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the Class.

2.      The Class consists of all persons who purchased Opteum shares in the open market between September 29, 2005 and August 10, 2007, inclusive ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act").

---

[1]  On September 30, 2009, the Court dismissed in part the Amended Complaint and directed Plaintiffs to replead. Dkt. # 63.  This Conforming Amended Complaint alleges only those allegations sustained by the Court in its September 30, 2009 Order.  To the extent necessary, Plaintiffs hereby adopt the remaining allegations of the Amended Complaint solely for the purpose of preserving their appellate rights.

## JURISDICTION AND VENUE

**3.**     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

**4.**     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, or Section 27 of the Exchange Act [15 U.S.C. § 78aa].

**5.**     Defendants named herein have sufficient minimum contacts with this District, state, or the United States so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

**6.**     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and Section 22 of the Securities Act [15 U.S.C. § 77v] or Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Opteum maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

**7.**     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

**8.**     The Class representatives are the members of the Kornfeld Lead Plaintiff Group - - William Kornfeld, John Burns, and David Cottun – who purchased the common stock of Opteum at artificially inflated prices during the Class Period, and have been damaged thereby

(collectively, "Plaintiffs").  Certifications for each member of Lead Plaintiff are attached to the Kornfeld Group's motion for appointment as lead plaintiff and incorporated herein by reference.

## Corporate Defendant

9.      Defendant **OPTEUM INC.** is a Maryland corporation with its principal place of business located at 3305 Flamingo Drive, Vero Beach, Florida 32963.   The Company was formed when Bimini Mortgage Management, Inc. ("Bimini") acquired Opteum Financial Services, LLC ("OFS") on November 3, 2005.  The newly-merged entity subsequently changed its name to Opteum, Inc. on February 10, 2006.  In the IPO and SPO Registration Statement and Prospectus, as well as in SEC filings issued during the Class Period, the Company (then known as Bimini) described itself as "self-managed and self-advised."  The Company operated as a real estate investment trust ("REIT")[2] and invested primarily in residential mortgage related securities ("MBS") issued by the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Government National Mortgage Association ("Ginnie Mae").  During the Class Period, the Company presented itself as a mortgage portfolio manager that sought to be different from other mortgage portfolio managers through the Company's risk management approach.  During the Class Period, the Company touted that the post-merger entity represented part of a stronger diversified model whose parts complemented each other and would position the Company for substantial growth.

## Individual Defendants

10.      Defendant **PETER R. NORDEN** ("Norden") was, during the Class Period, a member of the Board of Directors and Senior Executive Vice President of the Company.

---

[2] Opteum qualifies as a REIT for federal income tax purposes and is generally exempt from federal corporate income taxes if it distributes at least 90% of its taxable income to stockholders.  The Company is self-managed and self-advised, and elected to be taxed as a REIT commencing with taxable year ended December 31, 2003.

Defendant Norden was also President and CEO of OFS since 1999 and, following the acquisition of OFS by the Company, served as Co-Head of Capital Markets.  In conjunction with the sale of the Retail Mortgage Origination Business on July 2, 2007, Defendant Norden resigned his positions with the Company effective June 29, 2007.  During the Class Period, Defendant Norden signed Opteum's SEC filings, including but not limited to its 2005 and 2006 Form 10-K. Following the acquisition of OFS, Defendant Norden obtained a massive 500% + salary increase ($118,000 in 2005 *vs.* $750,000 in 2006) and bonuses of $750,000 in 2006.

11.     Defendant **JEFFREY J. ZIMMER** ("Zimmer") is, and during the Class Period was, Chairman of the Board of Directors and Chief Executive Officer of the Company. Defendant Zimmer signed and certified the Company's SEC filings, including but not limited to Opteum's 2005 and 2006 Forms 10-K, its Forms 10-Q for interim periods, as well as the Registration Statement and Prospectus filed in connection with the IPO and SPO.  Following the acquisition of OFS, Defendant Zimmer also obtained a 25% salary increase (2006 *vs.* 2005), and bonuses of $685,000 and $500,000, in 2005 and 2006, respectively, as well as stock awards of 1 million and 1.6 million shares, respectively.

## OVERVIEW

### Background to Bimini's Acquisition of OFS

12.     Against a background of receding net interest margins and rate spreads, and a declining stock price, on September 29, 2005, Bimini announced its intention to purchase OFS after watching its stock decline to about $12.00 per share from a near-term high of almost $16.00 in early March 2005, mere months after the 2004 Offerings.  After a purported due diligence, on November 3, 2005, Bimini acquired OFS which, upon the closing of the transaction, became a wholly-owned taxable REIT subsidiary of Bimini.

4

13.     Although due diligence was a critical component of the merger, and this was supposed to provide investors with important safeguards and protections, Defendants completely abandoned their duties in this regard.  Defendants' purported significant pre-merger "due diligence" investigation into OFS and its lending and mortgage business and operations was, as evident when the truth became known, a canard.  One confidential witness ("CW"), CW2, who worked as an assistant vice-president and operations manager in the California office throughout the Class Period, confirmed that Bimini never performed due diligence in Opteum's California office, which was responsible for at least 40% of the business.  As CW2 recounts, "I thought it was extremely odd considering how much business we did."  Another confidential witness, CW9, a loan officer with management responsibilities who worked closely with Alex Koutouzis, one of Opteum's co-founders during the relevant time period, also confirmed that there was no due diligence done in Atlanta when Bimini bought Opteum in 2005.  CW9 further indicated, "I don't think they were diligent about their due diligence, that's the truth."

14.     In any event, after the merger transaction, on February 10, 2006, in an effort to more fully leverage OFS's national brand identity, Bimini changed its name to Opteum Inc. and the merged entity would undertake both mortgage-backed securities (Bimini's forte) and origination and securitization.  As noted by Defendant Zimmer in a conference call held with analysts and investors on September 30, 2005:

> When Bimini's RMBS investment business is combined with Opteum's mortgage banking business, we expect that the negative effect of movements in short-term funding rates will be diminished.  The combined Company will have greater flexibility to operate profitably by having a cash flow REIT subsidiary.

15.     At the time the OFS transaction was announced, Defendant Zimmer stated in a release issued on September 29, 2005 that ***the OFS acquisition represented "an excellent opportunity for both companies.  From our standpoint, we are diversifying our revenue stream***

*while remaining in our area of expertise - the residential mortgage market. At the same time, we are establishing a broader base for future growth."* This release continued, "We can continue to grow as opportunities present themselves as part of this very well run publicly held company and attract capital at more favorable rates. *That in turn will create new jobs and improved opportunities for our existing associates*." [Emphasis added.]

16.     While Defendants publicly stated that the combination of Bimini and OFS was likely to produce synergies, new revenue streams, new jobs, and additional value for shareholders, in fact OFS was a company with a radically different – *and much higher risk* – business plan than Bimini.  Unlike Bimini (that traditionally invested *only* in assets collateralized by government-backed mortgages) OFS invested in non-guaranteed, high risk, subprime, no-document, limited-document, and interest-only high loan-to-value ratio mortgages.

17.     OFS was an extremely aggressive subprime mortgage lender that had engaged in, and was continuing to engage in, untested and very speculative loan originations, including adjustable rate Interest Only ("IO") loans to subprime borrowers.  Thus, while loan products like IO loans historically have been reserved for conforming borrowers with very good credit, it was OFS that introduced IO loans to subprime borrowers.

18.     So concentrated was OFS' business in subprime and so-called "Alt-A" loans, however, that by year-end 2004, OFS was named as one of the top 15 Alternative-A lenders, and one of the top 15 wholesale lenders, in the country.  During 2004 alone, OFS increased loan production by approximately 40%, despite a projected industry decline of just over 30%.  Significantly, while OFS described these Alternate-A loans as being made primarily to borrowers with good credit and alternate documentation, in fact, the majority of these loans were

based solely on "stated" income, the quality of which ultimately rested upon the veracity of the borrower.

19.     In a September 30, 2005 pre-merger conference call, Defendant Norden stated, in part, the following:

> Most of our product is Alt-A, what is considered Alt-A origination.  And I would say primarily our Alt-A originations represent 65%, 65, to 70% of our overall production.  We also produce a fair amount of prime business as well, Fannie Mae, Freddie Mac type business, and *we do a small amount, and it is really the smallest piece of credit challenged individual.  It really is a very small number,* and all of those loans that are produced I will tell you are also all servicing released right after we originate those loans.  [Emphasis added.]

Defendants Norden and Zimmer confirmed that the FICO score for Alt-A loans was in the 690s, and for prime loans between 710 and 720, with the average loan size between $215,000 to $220,000.  Defendant Norden added, in response to a question by an analyst whether the above product mix would change over the course of the merger business plan, "The anticipation is it will stay that way, yes.  Our concentration is on the Alt-A and on the (inaudible) side for the most part."  What Defendants knew or severely recklessly disregarded was that the Company's loans would comprise high-risk loans to those with exceptionally weak credit, income, or asset characteristics, relying not on verifiable criteria for approving loans, but simply on what the loan applicant represented, even if it was plainly untrue.

20.     During the conference call, at least one analyst, Shelia Donahue from Marlin Capital, was very critical of this change, and stated that, "I'm a portfolio manager who has held your stock since your IPO.  *I see this as a great change in your business model…. and you have credit exposure that you did not have before.  Every time I pick up a financial newspaper I'm told about the risks of just this kind of mortgage banking, and its troubling.*"  [Emphasis added.]  Despite Analyst Donahue's concerns, in order to allay concerns and further hype the

supposed soundness of the merger and the quality of loan products offered by the Company, Defendants advised investors that the Company was well-situated to make these changes, that controls and procedures were *already* in place, and that management *already* possessed the requisite ability to effectuate this transition and manage the integration of OFS.  Accordingly, in response to analyst Donahue, and in other statements made during the merger conference call, Defendants stated, among other things, the following:

- Prior to announcing the merger, Defendants had *already* "worked diligently" on a merger and business plan that reasonably provided for future growth opportunities and a *stronger position than either company could achieve individually.*

- OFS exposure to securities rated below AAA was "very very small."[3]

- Defendants *had adopted very conservative assumptions* to create a unified business plan for OFS and the Company – including assuming a 5% *reduction* in 2005 - 2006 loan originations.

- *Following the merger, OFS was poised for substantial growth,* having been constrained previously only because of its limited access to capital. [Emphasis added.]

Furthermore, Defendant Zimmer noted, "Bimini has also been purchasing pools and mortgages directly from Opteum, formally called Homestar, for over a year now.  *We know and understand the quality of the originations and the quality of the associates at Opteum*." [Emphasis added.]

## Adverse True Facts Concealed by Defendants
## During The Class Period

21.    In spite of the foregoing and additional misrepresentations and omissions detailed herein, Defendants knew or were severely reckless in disregarding that the acquisition of OFS

---

[3] AAA indicates "[t]he highest grade assigned to a debt obligation by a rating agency.  It indicates an unusually strong capacity to pay interest and repay principal."  *Available at http://financial-dictionary.thefreedictionary.com/aaa* (last accessed Oct. 28, 2008).

marked a significant departure from prior practices and the prior business model, a highly material fact which Defendants failed to disclose.  Ultra high-risk loans did not represent a "small piece," but rather, as investors later learned, such loans represented a sizeable chunk of the Company's business, as a result of the Company's disclosure in May 2007 of a $78 million net loss for the first quarter of 2007 and an even more massive net loss of $162.5 million for the following quarter.

22.     Once Bimini acquired OFS, Bimini opted to utilize OFS' business strategy to its detriment and without full disclosure to shareholders.  No longer were government-backed mortgages the standard.  Instead, so important were the high-risk loans to the newly-merged Company's business model that granting "Alt-A" took on greater importance, and this impelled Defendants into, at a minimum, being severely reckless in disregarding that the toxic atmosphere they created in pushing these loans negatively affected morale and loan approval criterion.  So-called "Alt-A" loans (including those that did not meet Alt-A standards but were falsely labeled as "Alt-A" by the Company) and subprime mortgages consistently comprised approximately 70% of all mortgages originated by the Company during the Class Period.  As CW1, who worked as the wholesale area sales manager of Opteum for southern Florida during the Class Period, confirmed, Alt-A loans "were mostly stated income" and given to individuals with a "credit score of around 660," markedly lower than the 690 FICO score mentioned by Defendants in the pre-merger conference call of September 30, 2005.  CW3, who started as a business analyst for the servicing group before being promoted to asset operations manager, indicated that around October or November of 2006, Opteum started to change how it classified subprime mortgages.  The result of this change would have been that when an investor looked at a

9

prospecuts for a securitized pool of loans, the percentage of subprime mortgages in the pool was much smaller than it would have previously been.

23.     As a result of the Company's new high-risk, concealed business model, the majority of the Company's loans during the Class Period constituted "liar loans" because of the high incidence of overstated incomes listed on the loan applications supporting these loans. These were, in effect, loans given to those with exceptionally weak credit, income, or asset characteristics.  Defendants were eager to sign any borrower, as confirmed by CW4, a retail loan officer who worked for the Company during the Class Period.  CW4 stated that it was *unusual for a loan to be turned down and if one underwriter said no, it was usually possible to find another underwriter or the manager to say yes* to the same loan.  As further confirmed by CW12, who worked as a senior sales manager for Opteum at relevant times during Class Period, oversaw a group of approximately 20 loan originators, and reported directly to the Company's senior management, the kinds of mortgages granted to Opteum's customers during CW12's tenure were "liar loans," or "stated" or "stated income, stated assets."

24.     CW11 worked as a senior underwriter in the Conduit Division of Opteum during the Class Period.  CW11 reviewed and approved mortgages that Opteum bought from smaller mortgage firms.  During CW11's tenure, if CW11 discovered that buyers lied about their job titles, CW11 would deny the application.  However, *management consistently overrode the denials and instructed CW11 to accept the loan anyway*.  CW11 described the loans as "*foreclosures looking for a place to happen*."  CW11 recounted one situation when Opteum bought a $700,000 loan that was granted "literally [to] a maid and a cherry picker."  CW11 reported to Quin An Pham ("Pham"), whose boss, Senior Vice-President Mary Glass told Pham to "*push all of the loans through…it did not matter how risky they were*."  Glass, who was

10

touted as part of senior management in SEC filings (including the Company's free writing prospectus filed on January 26, 2007), reported to Defendant Norden.

25.     Further demonstrating the Company's dangerously destructive attitude with respect to high-risk loans, CW8, a loan officer who worked for Opteum at relevant times during the Class Period, recalled one particular issue.  It was increasingly prevalent at the Company, particularly in the Northeast, to encourage and permit potential borrowers to misrepresent their adjusted gross income.  Just before leaving the Company in February 2007, CW8 learned that it was common for loan applicants to misrepresent their adjusted gross incomes by having their accountants prepare one tax return for the IRS and another for loan officers.  The return to the loan officers did not reflect the write-offs taken in the one sent to the IRS, and it thus showed that the individual had a much higher income than that expressed in the IRS return (adjusted for deductions and write-offs).

26.     Despite the foregoing, Defendants knew, or were severely reckless in disregarding that the Company would be taking on even more high-risk loans and steering away from a purportedly conservative business model that Defendants represented.  CW10, a capital markets analyst who worked in Secondary Marketing throughout the Class Period said that the most senior executives – from Bimini, Defendant Zimmer, and from Opteum, Defendant Norden – were "close, old friends."  CW10 stated that Norden knew "exactly" what was going on at the time of the fall 2005 sale and thereafter.  To support this statement, CW10 stated that one of the best traders in Structured Finance at the Company, Adam Tessler, dated Defendant Norden's daughter.  According to CW10, Tessler and Defendant Norden were "very close" and Tessler discussed the business with Norden all of the time.  Tessler told CW10 "all of the time" that

Opteum was a high-risk operation and that he, Tessler, was "going to get the hell out of there" as soon as possible.  Indeed, Tessler resigned in 2007.

27.     The merger thus represented a high-risk gamble that Defendants took, all the while luring investors into believing that the Company had a measured, controlled, and non-risky business model but, in the process, deceiving them.  The Company's loan review standards were so lax as to be virtually non-existent, and its so-called "Alt-A" loans were actually subprime, given to loan applicants with insufficient income and asset documentation, high debt-to-income ratios, or a low credit history.  Defendants knew or were severely reckless in disregarding that the Company did not verify documentation to determine that their Alt-A borrowers did in fact meet the standards for Alt-A loans.  CW1 confirmed, for example, that Alt-A loans "were mostly stated income" and given to individuals with a "credit score of around 660," which directly contravenes Defendants' own representations at the September 30, 2005 conference call that Alt-A loans were meant for individuals with a 690 FICO score.

28.     As another example, loans reviewed by CW10 for pooling were either originated by Opteum or purchased by Opteum from smaller mortgage companies and then filtered through Opteum's Conduit Department based in California.  CW10 received "boxes, and boxes, and boxes" of loans from the Conduit Department, then reviewed and coded each loan so it could be pooled accurately.  During this manual process, CW10 saw "loan after loan" that made no sense, noting that these were "stated loans" to people who "clearly could not afford them."  CW10 recalled that there were clearly "gardeners and low wage employees" getting loans for hundreds of thousands of dollars.  The majority of loans CW10 reviewed for pooling during his entire time at the Company fell into ***subprime or "stated" categories***, such as NINA (no income, no Asset), SISA (stated income, stated asset), and NIVA (no income, verified asset).

29.     According to CW10, one of the reasons loan officers were approving "high risk" loans was because Defendant Zimmer made it "very clear" that if people did not make their numbers, they were out the door.   Zimmer increased quotas and made it "very hard for these guys" to keep up.   CW10 said that this environment encouraged loan officers to get what they could so they could get their commissions.   Without commissions, CW10 said that loan officers made "basically no money, they needed those commissions."   It was thus evident that Defendants (including Defendant Zimmer) knew during the Class Period that they fostered an environment in which loan officers pushed and approved high-risk "liar loans."   At a minimum, Defendants were severely reckless in disregarding that they created such an environment.   CW6, a manager in the loan processing department throughout the relevant time period and who spent a significant amount of time closing loans for Opteum's loan officers (those who were based in states where they did not have the proper licensing to close a loan themselves) indicated that Opteum loan officers were concerned in 2006 about getting the loans in the door so they could make their commissions before they were fired.

30.     Defendants created a falsely positive portrayal of the merger in statements throughout the Class Period, including that the merger led to a "successful integration," a "broader base for future growth," and would "create new jobs."   In truth, however, the merger was an abject failure because it exposed the Company to massive risk and a new, dangerously high-risk business plan that could not succeed as it was grounded almost entirely on the granting of liar loans.   Defendants knew (or severely recklessly ignored) at the time of the purported due diligence and after the merger what they were getting into.   Defendants Norden and Zimmer had a long friendship extending over 20 years, and Bimini had a prior business relationship with OFS (in which the former bought MBS from the latter).

31.     Furthermore, evidence of the already seething financial problems pervading the Company at the time of the merger, according to CW6, occurred by December 2005.  Employees either did not get their promised holiday bonuses that year or the bonuses were quite small. Further, all raises from that point on were frozen.  Between January 2006 and November 2006, Opteum's New Jersey offices were relocated three times to save money.  Opteum started in a large office space in Paramus, then moved to Maywood, New Jersey, and then the office was moved back just a few months later to a "teeny tiny office" with low rent in Paramus where, as CW6 noted, "everyone was piled on top of each other."

32.     CW10 also stated that after Bimini bought Opteum, *i.e.,* as a result of the merger, "things did seem to go downhill quickly."   CW7, a mortgage banker who worked with the Company during relevant times of the Class Period, said that Opteum began to struggle financially soon after Bimini took over.  Despite "grandiose promises" of a cash infusion at the time of the merger, Bimini never produced and CW7 was laid off in March 2006.  As recounted by CW7, the decline of Opteum happened "very, very quickly" and CW7 was stunned upon losing the job.  CW7 opined that the Company faltered so soon after Bimini took over because Bimini did not understand the mortgage business well enough to gauge the risks of buying a mortgage company.  As early as the first quarter of 2006 "there was a subtle slowdown in applications."  Thus, clearly, despite Defendants' representations related to the merger, in fact, they had not successfully integrated a company that was for all intents and purposes of an entirely different corporate culture and business philosophy.

33.     In addition to the above, stated income loans lingered on the Company's books and thus had a material effect on financials and results.  CW10 created mortgage backed securities in loan pools that were ultimately sold on the free market to commercial banks such as

Lehman Brothers, IndyMac, Washington Mutual ("WaMu"), and Wachovia. CW10 stated that the Company kept "liar loans" on its books for "servicing." Thus, to CW10 it was clear that Opteum was "taking risks" and the "disturbing business practices" "increased" when Bimini took over.

34. Opteum sold loans to banking institutions, but some were returned because the loans sold were not what the Company represented. Once returned, the dubious loans remained on Opteum's books, thereby increasing the Company's high-risk portfolio. CW6 noted, as early as the second quarter of 2006, some of the loans generated by Opteum "were not what they should have been." CW6 indicated that Opteum sold its loans to banks such as WaMu, IndyMac, and Countrywide. After Bimini took over, CW6 said these banks were returning Opteum's loans because they were not what the Company represented.

35. For example, CW6 recalled that in either the second or third quarter of 2006, CW6 was contacted by WaMu about a loan Opteum had sold to WaMu. CW6 had closed this loan; when CW6 originally reviewed the paperwork, the originating loan officer had declared in writing that the loan was for a residential property, specifically, a dual family home that would be used by the customer. However, when WaMu investigated, it turned out that the property was not for the customer's use, but it was an "investment property." WaMu returned the loan and it sat on Opteum's books. CW6 confirmed that this was *not* an isolated incident. Increasingly during 2006, Opteum's banking customers who bought the loans were returning them. CW6 estimated that by November 2006, about 10% of the loans that had been sold to banks such as WaMu and Countrywide had been returned and were "just sitting on our books." Furthermore, there were loans generated by Opteum that were never sold to other banks because they were "shaky" so they too simply sat on the books. Thus, with the accumulated amount of loans

remaining on the Company's books as a result of loans the Company voluntarily chose to keep on the books *plus* the aggregate of loans returned by servicing banks and kept involuntarily on the books, Defendants placed the Company's very existence in jeopardy.

36.    Defendants had concealed the above adverse facts until the truth became known through a partial disclosure on May 10, 2007 and then a subsequent disclosure on August 10, 2007.

## MATERIALLY FALSE & MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

37.    On November 3, 2005, following the end of their "due diligence" investigations, Defendants announced that the Company had finalized the acquisition of OFS, which at the time, had a purported book-value of at least $60 million.  On that day, Defendants published a release in which Defendant Zimmer, commenting on the closing of the merger transaction, stated, in part, the following:

> **We are very pleased to have completed this transaction in a timely manner**. .
> . .  For Opteum, the merger provides increased access to capital to fund expanded
> growth opportunities.  [Emphasis added.]

38.    Following the purported successful completion of the acquisition, on February 6, 2006, Defendants published a release announcing the formal name change of the two merged businesses (OFS and Bimini) to Opteum.  At that time, Defendants stated that this change was being made, in substantial part, to commemorate the "seamless integration" of OFS.

39.    The November and February statements were materially false and misleading when made because the integration of Opteum was not proceeding according to plan. Defendants overstated the speed at which the integration was occurring when, in fact, the Company's previous risk management controls and procedures were totally incompatible with OFS's business, OFS continued to lack adequate controls or had ignored its stated underwriting

criteria, and OFS had created loans that were designed to produce short-term results at the expense of subjecting the Company to great risk.

40.    In particular, the statement that the transaction was completed in a "timely manner" was materially misleading because Defendants failed to disclose the fact that virtually no pre-acquisition due diligence had taken place, which, if fully and completely undertaken would have meant a probing review of the merger transaction.  As discussed in detail in ¶106, CW2 confirmed that Bimini never performed due diligence in OFS's California office, which was responsible for approximately 40% of the business.  CW9 also confirmed that the Company undertook no due diligence in the Atlanta, Georgia office.  Even the most basic due diligence would have uncovered that OFS was engaged in high-risk liar loans incompatible with Bimini's business model.

41.    On February 23, 2006, Defendants published a release announcing results for the fourth quarter and full year 2005.  Despite announcing negative financial results, including a loss of approximately $2.7 million, the release quoted Defendant Zimmer, in part, as follows:

> **The Board is pleased with the speed at which the successful integration of OFS is taking place. . . .** During the fourth quarter of 2005 OFS successfully issued its first securitization in REMIC form since being acquired by Opteum Inc…. [Emphasis added.]

42.    This statement was materially false and misleading for the reasons discussed above (*See, e.g.,* ¶¶16-18, 21, 23, 26-27, 30-32), including that the merger was not proceeding according to plan, but rather was a disaster from the start because the business plans of the two companies were starkly different and OFS could not be properly integrated even at the most basic levels because its highly risky "liar loans" were dramatically at odds with the risk management protocol of the Company.  As CW6 further confirmed (*see* ¶29), management

pressure was placed on employees to meet quotas at any cost and loan officers were forced to lower their standards to get loans in the door regardless of the ability of the borrower to repay.

43.     As early as December 2005, it was clear that there were severe financial problems at the Company. *See, e.g.,* ¶¶31-32.  In addition, OFS had undertaken high-risk "liar loans."  *See* ¶¶ 23-24.  According to CW4, *see* ¶23, even if one underwriter found a loan too risky, another underwriter or manager could be found to approve the same loan.

44.     Rather than disclose the truth that the merger had caused severe integration problems, Defendants simply kept touting and hyping the success of the merger and in an attempt to show that the Company was growing, Defendants devised programs and schemes to bring in still more ultra-risky loans and hide the tension within the Company.  For example, CW7 explained that Opteum offered customers a $500 refund if they were not satisfied with their mortgage service and also that Opteum developed loan/lender partnership programs with building companies.  One company called Venture Homes had a deal with Opteum to send their customers to Opteum in turn for financial compensation.

45.     Rather than reveal the true, impaired financial and operational condition of the Company, Defendants continued to publicize Opteum's purported success with its "Affordable Products" lending business and, on March 28, 2006, Defendants published a release that stated, in part, that "[t]he sharp upward trend in 'affordability products' this season is clear."  In addition, the release continued, "[IO loans are] best suited for those who exhibit a proven track record for managing their finances well and understand the product's pros and cons. Opteum anticipates that 10-year IO products will continue to gain popularity, whereas demand for the two to three year (or shorter) IO term will drop dramatically."

46.     On May 8, 2006, Defendants published a release announcing results for the first quarter of 2006, the period ended March 31, 2006.  While the Opteum Board had previously

determined not to provide forward guidance, in part, as a show of Defendants' confidence in the business and operations of the Company, Defendants did issue forward guidance for the second quarter of 2006, in part, as follows:

> Previously, the Board had determined not to provide earnings guidance for future periods unless the estimates by the equity analyst community were clearly out of line with management estimates. As a result of this policy, **the Board has determined that the Company should indeed provide earnings guidance for the REIT taxable income for the second quarter of 2006. The Company estimates that approximately $0.25 to $0.35 will be available to pay dividends from second quarter taxable earnings from the REIT**. This estimate does not incorporate any second quarter results from OFS. The Board has authorized management to update the public with this information if new data makes the estimates fall outside this range.  [Emphasis added.]

47.    Commenting on the results, Defendant Zimmer stated, in part, the following:

> **The Board is pleased with the speed at which the successful integration of OFS is taking place and views the opportunity for diversified sources of income as a great benefit to all shareholders. Moreover, the Board anticipates the hedging program for OMSRs and residuals to commence during the second quarter of 2006 so as to reduce the volatility of the earnings results at OFS**.  [Emphasis added.]

48.    The optimistic statements touted in the Company's March and May 2006 statements were materially false and misleading because, as detailed above, ¶35, Opteum's loans "were not what they should have been" as early as Q2:06.  Banks had returned Opteum's loans because the Company misrepresented the terms and quality of the loans and failed to fully verify information provided by borrowers.  By November 2006, 10% of the Company's loans had been returned and were sitting on the Company's books; other loans were so "shaky" they could never be sold to banks.

49.    After Bimini took over, CW6 said these banks were returning Opteum's loans because they were not what the Company represented.  For example, CW6 recalled that in either the second or third quarter of 2006, CW6 was contacted by WaMu about a loan Opteum had sold

to it.  CW6 had closed this loan; when CW6 originally reviewed the paperwork, the originating loan officer had declared in writing that the loan was for a residential property, specifically, a dual family home that would be used by the customer.  However, when WaMu investigated, it turned out that the property was not for the customer's use, but it was an "investment property." CW6 noted that while some customers do lie to get a loan, had the proper paperwork been demanded by this loan officer, this would not have happened.  WaMu returned the loan and it sat on Opteum's books.  CW6 confirmed that this was not an isolated incident.  Increasingly during 2006, Opteum's banking customers who bought the loans were returning them.  CW6 estimated that by November 2006, about 10% of the loans that had been sold to banks such as WaMu and Countrywide had been returned and were "just sitting on our books."  Furthermore, there were loans generated by Opteum that were never sold to other banks because they were "shaky" so they too simply sat on the books.

50.     On August 8, 2006, Defendants published a release announcing results for the second quarter of 2006, the period ended June 30, 2006. At that time, Opteum reported a Q2:06 net loss of $3.69 million – claiming the loss was "**mainly a result of the change in value of assets held by OFS**, which flow through the consolidated statement of operations, some of which have increased in value and some of which have decreased in value."  [Emphasis added.]

51.     Commenting on the results, Defendant Zimmer, Chairman, President and Chief Executive Officer of the Company stated, in part, the following:

> The Opteum Board of Directors is pleased to be able to pay favorable dividends for the second quarter of 2006, but we are eagerly anticipating the time when the increases in short-term funding rates come to a halt. The Board was pleased to see forward funding rates decline in the first month of the third quarter of 2006, which will lower borrowing costs for future transactions and increase book value now.

*     *     *

20

> OFS residential originations this year through the second quarter of 2006 were approximately 10% less than in the first two quarters of 2005. Both the retail and the wholesale origination units closed fewer loans than had been anticipated, although at the same time, applications continue to be substantially higher than those of the first two quarters of 2005. **The Board is pleased that OFS had July 2006 loan closings of approximately $628.4 million, which exceeded the Company's expectations.**

Mr. Zimmer went on to say:

> The competition in mortgage originations continued throughout the second quarter and now into the third quarter**. But, in addition to the previously announced reductions in duplicative or underperforming personnel at OFS, . . . the reduced borrowing costs the Company announced in the second quarter have now all been implemented . . . .** [Emphasis added.]

52.    In truth, the Company's personnel cuts would not result in savings, but were rather a necessary result of the Company's financial instability and inability to pay employees. Instead, the OFS acquisition was totally unraveling and yet Defendants continued to conceal the true fact that the integration of OFS and Bimini was still unsuccessful.

53.    On November 8, 2006, six months before the Company completely unraveled, Defendants announced in a press release that the Company would be forced to delay the filing of its 3Q:06 results and restate its financial results for the first and second quarters of 2006. According to the release, this restatement was "due primarily to the application of an accounting policy by the Company's subsidiary, [OFS], that was not in accordance with [GAAP]."

54.    The November 8, 2006 release stated that "[t]he previous accounting policy relates to the manner in which OFS accounts for changes in the fair value of interest rate lock commitments ('IRLCs')." In accordance with financial accounting standards:

> IRLCs are to be recorded . . . at fair value with changes in fair value to be reflected in the Company's current period results of operations. **OFS' prior accounting policy resulted in a misapplication of SFAS No. 133, thereby generating non-cash, short-term timing differences that overstated earnings in the first quarter of 2006 and understated earnings in the second quarter of 2006**. . . . [Emphasis added.]

21

55.     As a result, the Company announced its "consolidated financial statements…
consolidated balance sheet, statement of operations, statement of stockholders' equity, statement
of cash flows and the notes thereto, as of, and for the periods ended, March 31, 2006, and June
30, 2006, should no longer be relied upon."

56.     The Company reported that it believed, once restated, its consolidated results of
operations before income taxes would be reduced by less than $1 million. The Company also
announced in that release that the proper application of SFAS No. 133 would not have changed
the amount of dividends declared by the Company, and that the Company's dividend policy
would remain unchanged.

57.     The fact that Opteum shares did not materially decline at that time is evidence that
investors did not consider this purportedly minor (less than $1 million with no impact on paid
dividends) restatement to have a material adverse impact on the Company.

58.     Still unknown to investors, however, Defendants knew and/or severely recklessly
disregarded that this restatement was evidence of the significant control deficiencies within the
Company.  Opteum had failed to conduct adequate due diligence into OFS and the integration of
the Company was failing.  The fact that high-risk liar loans could be made (and be touted as
secure Alt-A loans, no less) without any verification of borrower information and in complete
disregard of borrowers' ability to repay further evidences that no internal controls were present
whatsoever to prevent the issuance of overly risky loans.

59.     On December 20, 2006, Defendants published the delayed Form 10-Q for Q3:06.
For the Q3:06 in particular, Opteum reported a loss of $6.3 million, down from net income of
$7.9 million in Q3:06.  This release also announced a net loss of $15.6 million for the nine

months ending September 30, 2006 compared with an income of $27 million for the same period of the prior year.

60.     Commenting on the results, Defendant Zimmer stated, in part, the following:

We continue to experience extremely challenging operating conditions as our funding costs have accelerated faster than the yields on our portfolio assets over the last two years. Additionally, **the aggregate demand for mortgage products and services has declined significantly during the year, which has negatively affected results at our taxable REIT subsidiary, Opteum Financial Services (OFS).** It has been five months since the Federal Reserve last implemented a rate hike. . . .  In the meantime, we are aggressively pursuing various funding alternatives to lower our borrowing costs, increase our liquidity and better position us to effectively compete with larger financial institutions that have lower costs of capital. [Emphasis added.]

61.     Instead of acknowledging the true undisclosed condition of the Company, Opteum blamed federal rates and policies for its losses.  Known to and/or severely recklessly disregarded by Defendants, OFS would not experience an "opportunity for improvement" regardless of federal rates.  Rather, OFS was stuck with risky loans that the Company had previously failed to pawn off onto banks.

62.     Despite falling from a previously profitable financial position to reporting a $6.3 million loss in Q3:06, the Company announced the following day, December 21, 2006,  that a division of Citibank, Citigroup Realty, had paid $4.1 million for a 7.5% non-voting interest in Opteum.  At that time, the Company also granted Citigroup the option, exercisable at any time before December 21, 2007, to purchase an additional 7.49% non-voting limited liability company membership interest in OFS for an additional $4.1195 million.  Besides stating that this deal would result in substantial cost savings at OFS as a result of amendments to its funding facilities with Citigroup, the Company's release announcing this deal also quoted Defendants, in part, as follows:

"We are thrilled that Citigroup Realty, a subsidiary of a world-class financial institution, has partnered with us to drive profitable growth at OFS," said Jeffrey J. Zimmer, Chairman, President and Chief Executive Officer of Opteum Inc. **"We continue to believe in the value of the OFS franchise and are excited by Citigroup Realty's strong vote of confidence."**

"At OFS, we have long considered Citigroup Realty a strategic business partner and are eager to expand our relationship with them," added Peter R. Norden, Senior Executive Vice President of Opteum Inc. and President and Chief Executive Officer of OFS.  [Emphasis added.]

63.     As known and/or severely recklessly regarded by Defendants, these statements were materially false and/or misleading because Defendants did not "continue to believe in the value of the OFS franchise" but, in fact, Defendants knew that OFS was an albatross to the Company.  Not only did OFS represent a virtual money pit full of suspect loans, but Defendants had to secure additional access to capital just to remain a going concern.  The "drive [to] profitable growth at OFS" was thus merely sham rhetoric designed to give investors the impression that all was fine at the Company.  By the time of the above statement, however, the Company had experienced, among other things, deep job cuts and an ever increasing flood of highly-risky loans backed only by the "stated" word of the applicant.

64.     Further, Defendants were not "well positioned to profitably increase market share because, in fact, the Company could not integrate OFS seamlessly, had no internal controls, and issued ultra-risky loans (as high as the $700,000 range), among others, to a "maid and cherry picker."  The Company's lax standards meant that anyone -- indeed, everyone -- who walked through Opteum's doors could obtain a loan with virtually no questions asked.

65.     On January 9, 2007, Defendants announced the unscheduled departure of OFS Co-Founder Levine from his position as Executive Vice President and COO of the Company's wholly owned subsidiary (OFS), effective March 31, 2007.  Calling Levine's departure a "retirement," this purported retirement of a key figure (in fact, co-founder) of OFS was

24

strategically timed after the good news regarding Citigroup, but came before the announcement of poor results leading to the Company's demise.  At this time, however, it was still undisclosed to investors that OFS was too riddled with risky loans to be salvageable, and the other co-founder of OFS would be forced to resign within the next six months.

66.     On February 14, 2007, when the Company reported results for the fourth quarter and year end December 31, 2006, losses from OFS continued to weigh down results.  According to this release, results for the quarter and year-end were impacted.  The Company reported a consolidated net loss of $33.9 million – including a $10 million loss "attributable to an other than temporary impairment…of certain mortgage-backed security ('MBS') portfolio assets."   The Company estimated that its Q1:07 earnings would "include a loss of approximately $1.1 million related to the sale of these MBS assets."  Its year-end 2006 results included a net *loss* of nearly $50 million, down from a net *income* of more than $24 million for 2005.  The Company's Book Value per Share was down to $7.85, compared with $8.41 just three months earlier.

67.     Despite its continuously deteriorating OFS business, the Company's February 14, 2007 release also stated that it expected the Company's sale to Citigroup would "lead to approximately $5.5 million to $6 million in savings at OFS."  Defendants also claimed that the Company had created "significantly leaner operations" at OFS by eliminating 272 positions.

68.     Though the Company acknowledged that "[t]he expected recovery in the Company's Book Value Per Share discussed above will not be fully realized if OFS's results do not improve,"  it claimed that "the OFS management team believes the combination of its new funding terms, cost savings associated with its reduction in staff, and access to Citigroup Realty's capital markets expertise will lead to breakeven or positive monthly results at OFS by mid-2007."

69.     Commenting on these results, Defendant Zimmer stated, in part, the following:

There is nothing we dislike more than reporting negative operating results. **The Company had one of the best records of earnings and dividends among our New York Stock Exchange-traded peer group during 2004 and 2005, but in 2006 we underperformed much of the peer group,** which was understandably reflected in our stock price. Challenging business and operating conditions during 2006 resulted in inferior financial performance in both of our business units. [Emphasis added].

70.     Defendant Zimmer cited four primary reasons for the Company's recent losses at OFS: "[a]ctual margins associated with sales of mortgage loans at OFS during 2006 were less on average during the year than had been anticipated due largely to stiff competition in the marketplace for mortgage originations[,]" "stiff competition for mortgage loans during a period when the number of loans originated declined nationwide, high debt costs, certain operating inefficiencies and a substantial increase during the fourth quarter in loan loss reserves due to anticipated increases in early payment defaults on fourth quarter 2006 originations."

71.     Defendant Zimmer attempted to stave off any reaction by investors to this negative news, touting the Company's potential and "path to profitability":

Despite the Company's recent operating losses, however, we are optimistic about the opportunities that lie ahead in 2007. **Actions have been taken and additional actions are being evaluated to create a path to profitability in the near future. . . .** I look forward to making that promise a reality so all of our shareholders can realize a positive return on their investment. [Emphasis added.]

72.     Defendants' statements forecasting profitability during 2007 lacked any reasonable basis given the true financial condition of the Company at that time. In truth, Defendants knew that OFS was doomed to fail. It had engaged in unreasonably risky loans, many of which it was unable to sell off to banks. Instead, Defendants would be forced to sell off the riskier mortgage divisions of OFS and to take almost $9.0 million in asset write-downs and another $50 million in negative value adjustments – almost all of which were related to OFS.

73.     Throughout the Class Period, Defendants continually made attempts to defend the Company and inflate Opteum stock despite knowledge of undisclosed materially adverse facts. In particular, on March 20, 2007 Defendants responded to a negative analyst report, published by Friedman Billings Ramsey & Co., Inc. ("FBR") the prior day, via a press release.[4]

74.     Among other topics, the Company's release stated, in substantial part, the following:

> The Company has produced approximately $44 million of sub prime mortgages in 2007 which represents approximately 4.8% of 2007 year to date loan production of approximately $916 million.   Forty-four percent of the $44 million (approximately $19 million) subprime mortgages were underwritten by a third party buyer and sold directly to that buyer**.   The Company no longer underwrites sub prime mortgages.   The Company believes that it is adequately reserved for early payment defaults related to sub prime mortgages as well as all other mortgages.**   [Emphasis added.]

75.     In defending itself against the report's question as to whether Opteum was a going concern, Opteum trumpeted its current financial position, noting that:

> The Company continues to believe it has very adequate liquidity.  **The Company currently owns approximately $3 billion in agency mortgage related assets, the value of which has increased during 2007 as rates have declined.  These agency assets are guaranteed by an agency of the United States Government**.

76.     As a result of the Company's public repudiation and rebuke of the FBR report, the following day, March 21, 2007, the *American Banker* reported that FBR analyst Ross had issued a "revised report" after stating that FBR accepted the Company's assurances that it had adequate liquidity and raised the near-term price target to $4.00 per share.

---

[4] In the FBR research note, analyst Ross downgraded Opteum's stock to "Underperform," from "Market Perform," and lowered the near-term price target by $8.50 to $1 – after speculating that Opteum might no longer be able to obtain covenant waivers on its warehouse lines, as it has done over the past four quarters – in a less tolerant market environment – and after speculating that it may face losses on originated loans, and that servicing rights were subject to write-downs.

77.     Undisclosed to investors, however, Opteum would be forced to exit its wholesale, conduit, and retail mortgage lending businesses within the next month and a half – bringing the Company out of the mortgage origination business *entirely*.

78.     Indeed, on April 20, 2007, Defendants announced that Opteum would exit the money-losing wholesale mortgage loan origination business.  At that time, Defendants published a release that stated, that OFS would "exit its Conduit and Wholesale mortgage loan origination businesses . . . due primarily to the deterioration in the secondary market for closed mortgage loans and continuing weakness in consumer demand for mortgage products and services."

79.     Commenting on the release, Defendant Zimmer stated, in part, the following:

> Recently, some secondary market investors in closed mortgage loans have changed their terms and have delayed settling whole loan trades involving certain Alt-A mortgage products.  **This has forced OFS to re-market loans in respect of which it believed it had already obtained purchasing commitments, and has resulted in an estimated $22 million pre-tax loss associated with mortgage loans originated by OFS.**  This loss will be reflected in the Company's first quarter results.   Because we believe that the current adverse market environment may continue in coming quarters, **we intend to exit the Conduit and Wholesale mortgage origination businesses[.]**  [Emphasis added.]

80.     The release further stated:

> **OFS continues to originate high-quality loans** through its network of 230 retail loan professionals located in 24 offices throughout Georgia, Florida, Illinois, New Jersey and Massachusetts.  Additionally, the Company's $2.9 billion REIT portfolio today consists entirely of Ginnie Mae, Fannie Mae and Freddie Mac agency securities.  [Emphasis added.]

81.     Less than a month later, on May 7, 2007, Defendants also revealed that Opteum would sell its money-losing retail mortgage loan origination business for an estimated $5 million.  At that time, Defendants published a release in which Defendant Zimmer commented, stating, in part, the following:

> Given the reduced demand for mortgage products and services and the deterioration in the secondary market for closed mortgage loans, this transaction

28

will enable us to refocus our energies on managing and growing our RMBS portfolio, while stemming OFS's losses associated with mortgage originations[.] **Upon completion of this transaction and the wind down of OFS's Conduit and Wholesale mortgage origination divisions, we will be out of the mortgage origination business entirely. Certain costs associated with exiting the mortgage origination business will be reflected in our first quarter and second quarter results[.]** [Emphasis added.]

82.     These statements stood in stark contrast to the statements made when Citigroup Realty announced that it had partnered with the Company – at which time Defendants stated that its lowered cost of funding and greater access to capital rendered OFS "well positioned to profitably increase its market share as it leveraged its **multi-channel mortgage origination platform**." This sudden and extreme reversal in such a short period of time was also ***not*** consistent with the <u>moderate</u> decline that had occurred in the secondary market for mortgage loans at that time.

83.     The two units shuttered – wholesale and conduit (whole loan) purchasing operations – amounted to almost 70% of Opteum's 2006 production.  In connection with this exit, Defendants also announced that they would incur at least $4.53 million in exit and disposal costs.  These costs were in addition to the $22 million pretax quarterly loss related to Defendants Alt-A loan "remarketing."

84.     Nevertheless, these April and May announcements again allowed Defendants to condition the market for Opteum's future success despite its obvious financial turmoil.  Now that it was becoming apparent to investors that Opteum engaged in high-risk liar loans, the Company announced it was selling its higher-risk businesses while "continu[ing] to originate high-quality loans," which would purportedly allow the Company to "stem[] OFS's losses associated with mortgage originations."  These statements, in addition to the influx of cash (and apparent support) from Citigroup in December and the Company's positive statements in its defensive

response to the FBR report in March, gave a false impression to the public that Opteum was on stable ground.

85.    Despite the downward momentum in Opteum's business, Defendants never conceded the true condition of the Company and instead garnered significant bonuses and millions of dollars in stock awards from the Company.  The chart below evidences these bonuses paid throughout the Class Period – much of which was based upon the merger with OFS or contingent upon earnings and upon the successful integration of OFS, as follows:

### Summary Compensation Table

| | | | | | | | | Payouts | |
| Name and Position | Year | Salary | Bonus | Other | Restricted / Stock Awards | Securities Underlying Options/ SARs | Payouts LTIP | All Other Compensation | |
| | | | Annual Compensation | | | Long-Term Compensation | | | |
| | | | | | Awards | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Jeffrey J. Zimmer, President and Chief Executive Officer | 2005 | $ 400,000 | $ 684,177 | — | $ 1,008,700(1) | — | — | $ | 22,204 |
| | 2006 | 500,000 | 500,000 | — | 1,614,529 | — | — | | 196,119 |
| Peter R. Norden, President and Chief Executive Officer (OFS); Senior Executive Vice President | 2005 | $ 118,791 | — | — | — | — | — | $ | 11,723 |
| | 2006 | 750,000 | $ 750,000(3) | — | — | — | — | | 58,067 |

(1)    This represents a grant of 110,000 shares with dividend equivalent rights awarded in 2006 as 2005 compensation, none of which vested in 2005.

(2)    This represents a grant of 73,333 shares with dividend equivalent rights awarded in 2006 as 2005 compensation, none of which vested in 2005.

(3)    Non-discretionary cash bonus.

86.     Furthermore, the 2005 Form 10-K reiterated the Company's purported Investment Strategy, Asset Acquisition Strategy, Leverage Strategy, and Risk Management Approach, which were each supposed to insulate investors from massive, catastrophic losses and to moderate the risk taken by Defendants.  As evidence of this, the 2005 Form 10-K stated that "**Opteum seeks to differentiate itself from other mortgage portfolio managers through its approach to risk management,**" and also stated, in part, the following:

> It invests in a limited universe of mortgage related securities, primarily, but not limited to, those issued by Fannie Mae, Freddie Mac and Ginnie Mae.  Payment of principal and interest underlying securities issued by Ginnie Mae is guaranteed by the U.S. Government.  Fannie Mae and Freddie Mac mortgage related securities **are guaranteed as to payment of principal and interest by the respective agency issuing the security**.  Opteum seeks to manage the risk of prepayments of the underlying mortgages by creating a diversified portfolio with a variety of prepayment characteristics.  Finally, Opteum seeks to address interest rate risks by managing the interest rate indices and borrowing periods of its debt, as well as through hedging against interest rate changes.  [Emphasis added.]

87.     The statements "Opteum seeks to differentiate itself from other mortgage portfolio managers through its approach to risk management" and "invests in a limited universe of mortgage related securities, primarily, but not limited to, those issued by Fannie Mae, Freddie Mac and Ginnie Mae" were materially false and misleading because the Company's previous risk management controls and procedures were incompatible with OFS' business, OFS continued to lack adequate controls and/or ignored its stated underwriting criteria, and OFS had created loans that were designed to produce short-term results at the expense of subjecting Opteum to the unreasonable risk of hundreds of millions of dollars in loss.

88.     Defendants undertook very little to no pre-acquisition due diligence, which, if fully and completely undertaken, would have meant a more probing review of interoperable systems and controls.  A fuller due diligence was even more important because of the highly-different products and loans offered between the two merging entities.

31

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION
## OF OPTEUM IS BELATEDLY DISCLOSED

89.    It was only days later, on May 10, 2007, that Defendants first shocked and alarmed investors after they published a release that partially revealed that as a result of the complete failure of the OFS merger, the Company would be forced to take almost **$9.0 million** in asset write-downs and another **$50 million** in negative value adjustments – almost all of which were related to OFS, and that it would report a net loss of over **$78.0 million** for the first quarter 2007.  At that time, Defendants published a release that stated, in part, the following:

Opteum Inc. Reports First Quarter 2007 Results;

76.5% of First Quarter Net Loss Attributable To:

$37.4 Million Valuation Allowance on OFS's Deferred Tax Assets;

$12.2 Million Negative Fair Value Adjustment to OFS's Mortgage Servicing Rights;

$1.3 Million Negative Fair Value Adjustment to OFS's Residuals;

$8.8 Million in Asset Write Downs at OFS

Opteum Inc. (NYSE:OPX) [], a real estate investment trust [], today reported a consolidated net loss of $78.1 million, or $(3.14) per Class A Common Share for the three month period ended March 31, 2007, compared to a consolidated net loss of $8.0 million, or $(0.34) per Class A Common Share, for the prior year period. ***The Company's first quarter results were significantly impacted by operations at the Company's majority-owned subsidiary, Opteum Financial Services, LLC ("OFS").***

***Nearly 50% of the Company's first quarter net loss, or $37.4 million, was attributable to a valuation allowance on OFS's deferred tax assets. Nearly 17.5% of the first quarter net loss was attributable to negative fair value adjustments to OFS's mortgage servicing rights and retained interests in securitizations. Slightly more than 10% of the first quarter net loss was attributable to asset write downs at OFS*** due in part to the Company's decision to exit the mortgage origination business.  [Emphasis added.]

90.    The May 10, 2007 revelations caused shares of Opteum stock to fall precipitously.

As evidence of this, the following day, after publication of Defendants' release, shares of the

Company dropped by over 25% in a single trading day – falling to approximately $4.08 per share from $5.49 per share the prior day, on volume of over 1.79 million shares traded – many times the Company's daily average trading volume.  However, the full truth regarding the full extent of the complete failure of the OFS acquisition – and the impact on the Company's bottom line continued to be concealed.

91.     Thereafter, on July 2, 2007 – as evidence of the total failure of the OFS acquisition – Defendants announced that the Company had completed the sale of the money-losing retail mortgage loan origination business.  At that time, Defendants also revealed that in exchange for substantially all of the assets related to OFS' retail mortgage loan origination business, and certain other assets associated with OFS' corporate staff functions, the Company received $1.5 million cash plus the assumption of approximately $4 million in lease obligations and other liabilities related to the business.  Investors also learned that, in conjunction with the sale of this business, Defendant Norden resigned his position as Senior Executive Vice President, effective June 29, 2007, and also resigned his position as President, Chief Executive Officer, and Co-Head of Capital Markets of OFS.  Investors saw this as a step in turning the Company around, having decided to divest itself of OFS mortgage business and two OFS co-founders.

92.     On August 10, 2007, the full truth was finally revealed when investors learned for the first time that results for Q2:07 would be even worse than previously stated – *with a massive net loss of approximately $162.5 million or over $6.50 per share, and with a write down in the Company's book-value to approximately $1.17 per share at June 30, 2007*, compared with the $4.80 book-value reported on March 31, 2007.  This massive charge also included *a loss from continuing operations of at least $82 million, and losses from discontinued operations, net of tax, of $80.5 million*.  On this news, the value of Opteum's stock fell from a closing price of

$1.65 on August 9, 2007 to close at $1.05 per share the following day -- a loss of over one third of the shares' value on unusually high trading volume.

<u>**CAUSATION AND ECONOMIC LOSS**</u>

93.     Between January 9, 2007 (when the Company announced the unscheduled departure of OFS co-founder Levine) and August 10, 2007 (when the truth was finally revealed), Opteum shares fell from $7.17 to $1.05 – a loss of over 85% of their value.  During this period, Defendants made multiple partial disclosures regarding the Company's need to delay filings, its improper accounting and need to restate financials, rapidly plummeting financial results, and Opteum's eventual need to drop the vast majority of OFS' business.   Defendants continually prevented the market from being impacted by these statements and continued to conceal the true financial condition of the Company by tempering these disclosures with ongoing false and misleading statements.  Even in those partial disclosures, Defendants touted OFS' potential and Citigroup's interest in the Company and defended the Company's stability in the face of the FBR report questioning whether Opteum was a going concern.  On August 10, 2007, the Company was finally forced to announce a net loss of $162.5 million.

94.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Opteum's stock price and operated as a fraud or deceit on Class Period purchasers of Opteum's stock by misrepresenting the Company's financial results and the purpose and effect of the acquisition of OFS in early-November 2005.  Over a period of approximately 23 months, Defendants improperly published a series of materially false and misleading statements about Opteum and inflated the Company's financial results by failing to take adequate reserves or properly hedge or value assets and collateral.

95.     Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors – including the ruinous consequences of Defendants' total failure to integrate OFS into the Company – shares of Opteum declined precipitously – evidence that the prior artificial inflation in the price of Opteum's shares was eradicated.  As a result of their purchases of Opteum stock during the Class Period, Plaintiffs and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

96.     By improperly characterizing the Company's financial results and misrepresenting its prospects, Defendants presented a misleading image of Opteum's business and future growth prospects.  During the Class Period, Defendants repeatedly emphasized the ability of the Company to integrate OFS and to monitor and control costs and expenses and monitor collateral value and risk, and consistently reported expenses and expense ratios within expectations and within the range for which the Company was adequately reserved.  These claims caused and maintained the artificial inflation in Opteum's stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

97.     The decline in Opteum's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market.  The timing and magnitude of Opteum's stock price decline negates any inference that the losses suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

98.     Defendants' false and materially misleading statements had the intended effect of causing Opteum's shares to trade at artificially inflated levels throughout the Class Period –

reaching a Class Period high of over $10.00 per share in early 2006. However, as a direct result of investors learning the truth about the Company beginning on May 10, 2007, Opteum's stock price collapsed, falling 25% in a single trading day to $4.08 per share from $5.49 per share the prior day. On the news revealed on the last day of the Class Period, the value of Opteum's stock fell from a closing price of $1.65 on August 9, 2007 to close at $1.05 per share the following day -- a loss of over one third of the shares' value on unusually high trading volume. This dramatic share price decline eradicated much of the artificial inflation from Opteum's share price, causing real economic loss to investors who purchased this stock during the Class Period.

99. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Opteum's stock and the subsequent significant decline in the value of the Company's shares when Defendants' prior misstatements and other fraudulent conduct was revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

100. At all relevant times, the market for Opteum's common stock was an efficient market for the following reasons, among others:

(a) Opteum's stock met the requirements for listing, and was listed and actively traded on the NYSE national market exchange, a highly efficient and automated market;

(b) As a regulated issuer, Opteum filed periodic public reports with the SEC and the NYSE;

(c) Opteum regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and,

        (d)    Opteum was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

    **101.**    As a result of the foregoing, the market for Opteum securities promptly digested current information regarding Opteum from all publicly available sources and reflected such information in Opteum stock price.  Under these circumstances, all purchasers of Opteum common stock during the Class Period suffered similar injury through their purchase of Opteum common stock at artificially inflated prices and a presumption of reliance applies.

## COUNT I

**By the Plaintiffs Against Defendants Opteum, Norden, and Zimmer**

**For Violation Of Section 10(b) Of The Exchange Act
And Rule 10b-5 Promulgated Thereunder**

    **102.**    The Plaintiffs incorporate by reference each and every allegation contained above as if set forth herein.

    **103.**    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public regarding Opteum's business, operations, management and the intrinsic value of Opteum common stock; (b) enable Defendants to artificially inflate the price of Opteum shares; (c) allow Defendants to raise as much as $8.2 million in cash through the sale of equity to investment bank Citigroup Realty; (d) allow Defendants to obtain millions of dollars in salary increases, bonuses and stock awards that were tied to the acquisition and false financial reporting by Defendants

within the Class Period; and (e) cause the Plaintiffs and other members of the Class to purchase Opteum common stock at artificially inflated prices.

104.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

105.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and, (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Opteum's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

106.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Opteum as specified herein.

107.    These Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Opteum's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Opteum and its business operations and future prospects in the light of the circumstances under which they were made not

38

misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Opteum common stock during the Class Period.

108.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and, (d) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or severely recklessly disregarded was materially false and misleading.

109.   The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severe reckless disregard for the truth in that they failed to ascertain and to disclose such facts.   Such Defendants' material misrepresentations and/or omissions were done knowingly or with severe recklessness for the purpose and effect of concealing Opteum's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.   As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the

39

misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by severely recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

110.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Opteum common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Opteum's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or severely recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Opteum common stock during the Class Period at artificially high prices and were damaged thereby.

111.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Opteum was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Opteum common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

112.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

113.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## CLASS ACTION ALLEGATIONS

114.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased shares of the Company in the open market between November 3, 2005 and August 10, 2007, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

115.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Opteum common shares were actively traded on the NYSE.  As of December 18, 2006, the Company had over 24.513 million shares of common stock issued and outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Opteum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

116.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

117.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

118.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted to state material facts about the business, operations, and management of Opteum;

(c)     whether Defendants acted with scienter with regard to the materially false and misleading statements or omissions;

(d)     whether Defendants' materially false and misleading statements or omissions caused the Plaintiffs' and Class members' losses; and,

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

119.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## NO SAFE HARBOR

120.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Opteum who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

121.    The allegations are based upon the investigation of Plaintiffs' counsel, which included a review of SEC filings by Opteum as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, internet searches, and interviews of former employees and other persons with knowledge.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

43

## ADDITIONAL SCIENTER ALLEGATIONS

**122.**     As alleged herein, Defendants acted with scienter in that each Defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Opteum, their control over and/or receipt and/or modification of Opteum's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Opteum, participated in the fraudulent scheme alleged herein.

**123.**     Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because the scheme**:** (a) deceived the investing public regarding Opteum's business, operations, management and the intrinsic value of Opteum common stock; (b) enabled Defendants to artificially inflate the price of Opteum shares; (c) allowed Defendants to raise as much as $8.2 million in cash through the sale of equity to investment bank Citigroup Realty; (d) allowed Defendants to obtain millions of dollars in salary increases, bonuses and stock awards that were tied to the acquisition and false financial reporting by Defendants within the Class Period; and (e) caused Plaintiffs and other members of the Class to purchase Opteum common stock at artificially inflated prices.

**124.**     In addition to the foregoing, because of the Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about the Company's

business, operations, products, operational trends, financial statements, markets, and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets, and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith.

125.   It is appropriate to treat the Individuals named as Defendants herein as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing, and/or disseminating the false, misleading, and incomplete statements and information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

126.   As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements,

business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

127.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## COUNT II

### By the Plaintiffs Against Individual Defendants
### Zimmer and Norden

### For Violation Of Section 20(a) Of The Exchange Act

128.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

129.    The Individual Defendants acted as controlling persons of Opteum within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had

the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

130.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

131.    As set forth above, Opteum and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, and certifying Plaintiffs as class representatives of the Class, respectively, under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Classes their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Classes have an effective remedy; and,

E.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED: APPLICABLE TO ALL CLAIMS

Plaintiffs hereby demand a trial by jury.


Dated: October 12, 2009                    _____/s/ Joseph E. White, III_____

                                           Joseph E. White, III
                                           SAXENA WHITE, PA
                                           2424 North Federal Highway, Suite 2150
                                           Boca Raton, Florida  33431
                                           Telephone: (561) 394-3399
                                           Facsimile: (561) 394-3382
                                           *Additional Counsel for the Class*

                                           Kim E. Miller (admitted *pro hac vice*)
                                           KAHN SWICK & FOTI, LLC
                                           12 E 41st Street, 12th Floor
                                           New York, NY 10017
                                           Telephone: (212) 696-3730


                                           Lewis Kahn  (admitted *pro hac vice*)
                                           KAHN SWICK & FOTI, LLC
                                           650 Poydras Street - Suite 2150
                                           New Orleans, LA 70130
                                           Telephone: (504) 455-1400
                                           Facsimile: (504) 455-1498

David A.P. Brower
BROWER PIVEN, A Professional Corporation
488 Madison Avenue, 8th Floor
New York, New York  10022
Telephone: (212) 501-9000
Facsimile: (212) 501-0300

*Lead Counsel for Lead Plaintiff and the Class*

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION**

| | |
|---|---|
| ) | |
| ) | |
| **IN RE OPTEUM, INC. SECURITIES** ) | CIVIL ACTION NO. 07-14278-CIV- |
| **LITIGATION** ) | GRAHAM |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

## Certificate of Service

I hereby certify that on October 12, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Court's Docket and the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


_____/s/ Joseph E. White, III_____


***Electronic Filing***
Mara Aronson Geronemus
Sonya Ann Strnad
Tracy Ann Nichols
HOLLAND & KNIGHT
701 Brickell Avenue, Suite 3000
Miami , FL 33131
305-374-8500

Richard James Mockler, III
GREENBERG TRAURIG, PA
Courthouse Plaza
625 East Twiggs Street, Suite 100
Tampa , FL 33602
813-318-5700